364 May 5, 2016 No. 29

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent,*

*v.*

JOSHUA ABRAHAM TURNIDGE,
*Appellant.*

(CC 08C51758; SC S059155)

On automatic and direct review of the judgment of conviction and sentences of death imposed by the Marion County Circuit Court.

Thomas. M. Hart, Judge.

Argued and submitted June 17, 2015.

Joshua B. Crowther, Chief Deputy Defender, Salem, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Susan G. Howe, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, David B. Thompson, and Timothy A. Sylwester, Assistant Attorneys General.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Brewer, and Baldwin, Justices, and Linder, Senior Justice pro tempore.*

LINDER, S. J.

The judgment of conviction and sentences of death are affirmed.

_____

* Nakamoto, J., did not participate in the consideration or decision of this case.

**LINDER, S. J.**

Defendant and his father were jointly charged and tried on 10 counts of aggravated murder and other felonies arising from their involvement in a bombing at a bank that killed two law enforcement officers and injured another law enforcement officer and a bank employee. A jury found them each guilty on all counts and determined that sentences of death should be imposed. The trial court thereafter entered separate judgments of conviction for defendant and his father, each of which included two sentences of death, one for each murder victim. On direct review under ORS 138.012, defendant raises 151 assignments of error, supplemented by additional *pro se* assignments, relating to the pretrial and guilt phases of his trial. He requests reversal of the judgment of conviction and remand for entry of a judgment of acquittal; he also, implicitly in the alternative, requests an order for a new trial. We affirm the judgment of conviction and sentences of death.[1]

## I.　FACTS AND PROCECURAL BACKGROUND

In setting out the facts, we begin with those relating to the bombing itself, followed by information learned from the ensuing investigation. We then describe the resulting charges and the trial. Because a key issue relating to the evidence as a whole involves the trial court's denial of a motion for judgment of acquittal, we set out the facts in the light most favorable to the state, including all reasonable inferences that a jury could draw from those facts. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995); *see also State v. Brown*, 310 Or 347, 350, 800 P2d 259 (1990) (because jury found defendant guilty, in assessing sufficiency of evidence relating to motion for judgment of acquittal, court viewed evidence in light most favorable to state). We describe additional facts later in this opinion as they relate to particular assignments of error.

---

[1] In a separate opinion issued today, we also affirm the judgment of conviction and sentences of death imposed against defendant's father. *State v. Turnidge (S059156)*, 359 Or 507, ___ P3d ___ (2016).

A.   *The Bombing*

Shortly before 10:30 a.m. on Friday, December 12, 2008, a man called a Wells Fargo Bank in Woodburn and told the teller who answered, "If you value your life and the life of your employees, you need to * * * get out because I'm going to kill you, you * * * are all going to die." The caller told the teller to have all employees leave the bank and check the outside garbage area, where they would find a plastic bag containing a cell phone; he explained that he would then call that phone to tell them what to do next. He also stated either that he had called or was going to call a neighboring bank, West Coast Bank, with similar instructions.[2] The caller spoke calmly, had no accent, and—in the teller's estimation—was likely in his thirties or forties.

The teller called 9-1-1, and detectives from the Woodburn Police Department responded. The detectives checked the outside garbage area and found several large black plastic trash bags and a zipper-style bag containing a cell phone. Concerned that the phone might be an explosive device, they called for bomb technicians. Trooper William Hakim from the Oregon State Police and an FBI special agent responded; they examined and x-rayed the phone and confirmed that it was not an explosive device. Another law enforcement officer then took the phone to the Woodburn Police Department, and Trooper Hakim and the FBI special agent left the scene.

Because the caller had mentioned the neighboring West Coast Bank, a detective called dispatch and confirmed that that bank had reported no threatening phone call. Other detectives on the scene spoke with West Coast Bank employees and checked that bank for suspicious packages. In walking the exterior of West Coast Bank, one detective noticed a large metal box among some bushes, within one to a few feet of an exterior bank window, on a side of the bank that faced a sidewalk and a residential street. The box was painted green and looked like a landscaping utility box or part of a sprinkler system. It was almost square or

_____

[2] West Coast Bank was located directly to the east of Wells Fargo Bank. Both banks faced Highway 214 in Woodburn, near an Interstate 5 interchange.

cube-like in shape, measuring about 11 and 1/2 inches deep by 11 inches wide, and 15 inches high, with a nonopening "lid" that created an appearance of a box top. The detective rotated the box 180 degrees, thinking that, if it were a utility box, it would not rotate. As the box rotated, an attached wire popped out from underneath it. The wire was painted the same green color and appeared to have been buried in bark dust. In addition to rotating the box, the detective held it by its lidded top and shifted the box slightly.

In response to police questions about whether the box was recently placed or already had been in that location, a bank employee, Perkett, and the bank branch manager, Taylor, each looked at the box. Perkett lifted it slightly, and Taylor tipped it to a 45-degree angle. A welded, uneven grid with openings to the inside, fashioned from flat stock metal, crossed the underside. Viewed from underneath, looking through that grid, the box appeared mostly hollow. With the box tipped, Taylor could see wires inside the hollow area, as well as what looked like a secured motorcycle battery. He also saw a toggle switch on the outside of the box. Taylor and Perkett told the detective that they had not seen the box before, and Perkett then tried to reach the bank's landscaper who had worked at the bank the previous Sunday. After several hours, the landscaper arrived and said that the box was not his and had not been there before, which prompted law enforcement to treat the box as a suspicious device. They photographed it, recalled the bomb squad, and Trooper Hakim again responded. While Trooper Hakim was assessing the device, Chief Scott Russell and Captain Thomas Tennant from the Woodburn Police Department—who had been monitoring the situation throughout the day—arrived to assist as needed.

Trooper Hakim inspected the device, including turning it upside down and x-raying it, but the x-ray was not conclusive. He ultimately concluded that the device—which, as noted, appeared to be hollow except for the secured motorcycle battery inside—was a "very good hoax device."[3] So that

_____

[3] Several witnesses testified that the vast majority of suspicious devices placed at banks nationwide prove to be hoax devices. A hoax device resembles a real bomb, but does not contain any explosive filler.

it could be taken into evidence for investigatory purposes, Trooper Hakim decided to dismantle the device to ensure that it was safe.

By then, it was around 5:00 p.m. and was growing dark, and the weather was cold and rainy. To get out of the weather and darkness, Trooper Hakim moved the device inside West Coast Bank, which by then had closed to customers. All employees, except Taylor and Perkett, left the bank; meanwhile, various law enforcement officers moved in and out of the bank. Eventually, only Perkett, Taylor, Trooper Hakim, Chief Russell, and Captain Tennant remained inside the bank, with Captain Tennant assisting Trooper Hakim with the device, which had been placed on the floor with the grid side face-up, and Chief Russell observing from nearby. Taylor went into a conference room to take an incoming phone call, and Perkett, who was standing in the same open area as the others, prepared to leave.

Trooper Hakim and Captain Tennant tried without success to remove bolts that appeared to hold the lid on the device, and then Trooper Hakim used a crowbar to pry on the lid. Hitting either the device or the crowbar with a hammer, he succeeded in slightly moving the lid. He stated, "There, I got it." A second or so later, the device exploded, causing extensive damage to the immediate area inside the bank and violently projecting shrapnel through the windows, walls, and roof, and outside onto the road and into a nearby parked car and a residence.

Other law enforcement officers working outside the bank rushed inside. Trooper Hakim and Captain Tennant had suffered horrific injuries, and were dead. Chief Russell was alive, but his legs were nearly severed, and he was bleeding profusely from those and other injuries. Perkett suffered a wound to her leg, but was able to walk out of the bank. Taylor, who had been in the conference room, was not injured. Responding law enforcement officers called for emergency medical help for Chief Russell, who was immediately transported to the hospital. He underwent emergency surgery, which resulted in amputation of his right leg. He remained in critical condition for several days due to his multiple injuries, but survived.

B.  *The Investigation*

Immediately after the bombing, state and federal law enforcement focused the investigation on the cell phone discovered outside Wells Fargo Bank, the preblast photographs of the device—by then, known to be a bomb—and postblast evidence gathered from West Coast Bank. On the night of the bombing, investigators determined that the cell phone was a prepaid "TracFone" and had been used to call to another TracFone. Various records reviewed that same night revealed that both phones had been purchased at a Walmart and had been activated via the internet early that same morning, at 4:22 a.m. and 4:30 a.m., from a Best Western hotel in north Salem. Records also revealed that the second TracFone (which was never recovered) had been used to place the call to Wells Fargo Bank and to attempt to also place a call around the same timeframe to West Coast Bank. The next day, Saturday, investigators determined that the phones had been purchased at a Walmart in Bend on November 26, 2008, and that airtime cards for them had been purchased at a particular Walmart in Salem shortly after 9:00 a.m. on December 11. Investigators viewed video surveillance from the Salem Walmart showing a Caucasian male purchasing the airtime cards and then leaving the parking lot in an older, light-blue small Chevrolet pickup truck, possibly a LUV model. They were able to make out some, but not all, of the truck's license plate numbers.

Also on Saturday, the day after the explosion, and continuing into Sunday, investigators searched various databases to develop a list of registered small Chevrolet pickups of similar age, with similar plate numbers. The search returned a Chevrolet pickup registered to defendant's parents. After retrieving a Department of Motor Vehicles (DMV) photograph of defendant's father, Bruce Turnidge, investigators determined that he was not the person in the surveillance footage. They then searched the database for individuals associated with Bruce. That led them to defendant. Based on his DMV photograph and identifying information, defendant (unlike Bruce) matched the appearance, height, weight, and apparent age of the person in the video footage. Investigators also obtained video surveillance images from

the Bend Walmart and confirmed that the person who pur-
chased the TracFones on November 26 resembled the same
person in the Salem Walmart footage, who in turn resem-
bled defendant. Investigators obtained a series of addresses
from their searches, including a home in north Salem on
Nolan Lane.

On Sunday, sometime after 3:30 p.m., state and fed-
eral law enforcement officers drove by the Nolan Lane prop-
erty and set up a distant perimeter. An older blue Chevrolet
LUV pickup truck, which matched the truck from the Salem
Walmart surveillance footage, was parked in the driveway.
A detective from the Keizer Police Department and a lieu-
tenant from the Oregon State Police approached the home
and knocked on the door; defendant answered and spoke
with them. Among other things, defendant stated that he
had learned about the bombing from the news and had not
been involved. Following a consent search of the pickup
and further conversation—during which defendant stated
that he had been in Bend and Medford on December 12,
spoke about a biodiesel business that he had with his
father, Bruce, and denied any involvement in the bombing—
defendant was placed under arrest and transported to the
Marion County Sheriff's Office.

Meanwhile, investigators learned of another address
of interest, on Potts Road in rural Jefferson, where Bruce
rented a home and out-buildings that included a garage, an
open-bay pole barn, and a closed-bay shop. Within two hours
of defendant's arrest, several law enforcement officers went
to that address. Bruce's wife (defendant's mother) consented
to a search of the house. Officers located Bruce in a room
above the garage accessible from an outside entrance. They
and Bruce moved to the house, where Bruce spoke at length
with an FBI special agent about his political views. Bruce
and his wife eventually were asked to leave the property for
the night, and a search warrant was obtained.

The next day and continuing for several days, law
enforcement executed the search warrant at the Potts Road
property. Among other things, investigators particularly
looked for items consistent with components of the bomb that
were visible in the preblast photographs or that had been

otherwise discovered during the postblast investigation, as well as any items relating to the TracFones. Inside the house, investigators discovered and seized a desktop computer and a laptop computer, and, from different trash cans, a TracFone brochure and other papers. Inside the pole barn, which defendant and Bruce used as a shop for their biodiesel business, investigators found tools and other items consistent with welding and metal fabrication work that could have been used to construct the bomb, and electrical connectors consistent with connectors visible in the preblast bomb photographs. They also found two "servo" motors, and remnants of a third, which is a type of motor used in remote-control toys; investigators had determined by that point that the bomb had contained such a motor. The floor in the metalworking area of the pole barn displayed cut marks consistent with the dimensions of the bomb from the preblast photographs. The pole barn appeared to have been thoroughly cleaned.

Outside the pole barn, investigators discovered a burn pile containing wires, nuts, and L-shaped metal pieces that all resembled components of the bomb, as well as a vehicle charger used to charge electronic devices, a cell phone battery, computer parts, other metallic objects, and cans of spray paint. Farther away, at an outside picnic area and along a riverbank, investigators found an empty plastic container for Tovex, which is a slurry-type, powerful "high-explosive."[4] They also found sheets of metal and plywood; flat stock metal; a spool of wire; wire crimps; a like-new soldering kit; and an electrical connector box containing wire strippers. The plywood sheet bore grinding marks and welding splatters, and had an outline of green paint that was similar in size and color to the bomb pictured in the preblast photographs. Investigators also found angle iron, expanded metal, and wire all similar to components of the bomb. In a shallow area of the river nearby, a dive team found similar metal pieces; another Tovex container; a slurry-like substance adhered to a rock that was consistent with Tovex; fuse-type blasting caps; a partially burned

_____

[4] A "high explosive" is a higher-velocity explosive (in contrast to slower-velocity explosives such as gun powder and other powders) that requires a detonator to initiate. Tovex is typically used for moving earth, such as for quarrying and blasting.

cardboard blasting cap box; computer and electronic components; an antenna resembling a radio antenna; and a sheet of metal that had a squared-off section cut out of it, similar in dimensions to the paint outline on the plywood and to the bomb pictured in the preblast photographs. From the appearance and condition of some of the items—for example, the blasting cap box—they did not appear to have been exposed to the weather or river water for a significantly long period of time. Subsequent paint and metallurgy analysis showed that some of the materials recovered from the Potts Road property—including various wires and the plywood and various pieces of metal (painted and otherwise)—were consistent in color, pigment, and chemical composition with the components of the bomb recovered from the blast scene; some of the seized and recovered metal also was determined to have been made with the same manufacturing tooling. Based on evidence seized from the Potts Road property, Bruce was arrested on Tuesday, December 16.

In addition to the Potts Road search, investigators searched defendant's home at Nolan Lane, where they seized a receipt for two laptop computers that were different from the two computers seized from the Potts Road property. The make and model of the listed laptops later were determined to contain the same component parts as the computer parts found in the river and in the burn pile.

From evidence seized during the searches and recovered from West Coast Bank, together with fragments of bomb components recovered during the autopsies of Captain Tennant and Trooper Hakim, law enforcement investigators learned more about the bomb components and searched for related purchases. They learned that, on November 26, about six minutes after defendant had been recorded on a surveillance video from the Bend Walmart purchasing the TracFones, as well as canned spray paint, a man about the same age as defendant purchased two toggle switches—of the same type visible on the outside of the bomb—from a neighboring auto parts store. Also on that same day, a little more than an hour before those purchases, someone purchased a servo motor—of the same type from which fragments had been discovered at the

postblast scene—at a hobby shop in Bend. Investigators further learned from phone records that defendant had been in Bend that day and had called Bruce several times, including within eight minutes of the purchase of the servo motor. And, on December 1, Bruce purchased a soldering kit—like the one found near the river—from a store in Brooks, and someone named Bruce purchased a battery—matching the type and brand of the battery visible in the bomb—from a store in Albany.

Using the preblast photographs and analyzing the various components recovered from the blast scene and from the autopsies of Captain Tennant and Trooper Hakim, investigators reconstructed the bomb to determine the nature of its design. From the reconstructed bomb, they determined that the real bomb had been a complex one, constructed with scrap-type metal pieces that had been welded, bolted, and otherwise fastened together. As part of its design, the bomb had been mostly hollow, with solid metal sides and what appeared to be a metal lidded top, and then with the flat stock grid crossing the underside. When the bomb was tipped "upside down," with the flat stock grid facing upwards, a 12-volt battery had been visible in the hollow area, secured to the grid. Also when the bomb was in that position, farther behind the battery at the bottom of the hollow area, a thick piece of metal was visible, running the same width and depth dimensions as the bomb's metal top. Investigators described that thick metal piece as a "shelf" inside the bomb's structure.[5] Two electrical connectors had been attached to a corner of that metal piece, and wire had run from the battery to those connectors. Investigators determined that, behind that thick metal interior "shelf," several key components had been concealed: a servo motor; two AA batteries; a second internal toggle switch connected to the servo; three to five pounds of the explosive Tovex; and a thick piece of steel that may have encased the explosive. They also surmised

---

[5] When the device was tipped "upside down," with the flat stock grid facing upwards, and one looked into the hollow area of the device through the grid, the thick piece of metal appeared to be the device's interior bottom or "floor." When the device was turned right-side-up, with the grid facing down, the thick piece of metal would have been near or part of the lidded top.

that the "shelf" had concealed both a receiver for the servo and a detonator for the explosive, such as a nonelectric, fuse-type blasting cap.

From the various internal components—particularly, the servo motor, which would have operated to accept a remote command—investigators determined that the bomb was designed to detonate remotely, from a distance of several hundred feet to possibly a few miles. Investigators further determined that the bomb ran on two circuits that required both toggle switches to be in the "on" position for detonation to occur. The internal toggle switch, if flipped to the "on" position, initiated a detonator. The external switch, however, operated as a safe-arm switch so that the bomb could be safely handled. Specifically, the two switches worked together in this way: The servo motor, when it received a remote signal, would flip the internal toggle switch, which in turn would initiate the detonator, which in turn would detonate the explosive, depending on the position of the safe-arm switch. If the safe-arm switch were "off," then flipping the internal switch would have no effect. If, however, the safe-arm switch were "on," then the detonator would be triggered, and the bomb would explode.

Investigators theorized that, when the bomb was planted outside the bank, the safe-arm switch was placed in the "on" position. Then, while Trooper Hakim and Captain Tennant worked to dismantle the bomb, a stray radio signal operating on the same radio frequency range as a receiver inside the bomb—such as a signal sent from a nearby CB radio or garage door opener—may have signaled the receiver and servo motor to flip the internal switch to "on," which initiated the detonator and triggered the explosion. Evidence at trial also suggested alternative scenarios: (1) in handling the bomb before the explosion, someone on the scene inadvertently could have flipped the external safe-arm switch to the "on" position, which either would have set the groundwork for the explosion once the internal switch was flipped, or, if that internal switch already had been flipped somehow, immediately would have caused the bomb to detonate; or (2) an interior component itself—such as the servo motor, the internal switch, or a detonator—might have been

triggered during efforts to dismantle the bomb.[6] Regardless of the means of detonation, the explosive inside the bomb was capable of causing death and destruction. As originally placed at West Coast Bank, the metal grid was at the base of the bomb, on the ground, while the area concealed by the "shelf," where the explosive was contained, was elevated off the ground. That elevated positioning of the explosive rendered the bomb more dangerous, because explosives typically cause greater damage when they explode above rather than on the ground. Also, had the bomb exploded where it was originally planted outside the bank, the damage and destruction likely would have been even more extensive, because the blast would not have been contained by any structure.

In seeking to determine defendant's and Bruce's whereabouts on December 12, investigators focused on telephone carrier and cell tower records for their personal cell phones, together with records showing the TracFone activations at the Best Western in north Salem, which offered unsecured wireless service accessible from an exterior parking lot. The carrier and cell tower records revealed a call and travel pattern establishing that, sometime after 1:40 a.m. on December 12, defendant left north Salem and traveled south to Jefferson, and then, by 3:56 a.m., both defendant and Bruce travelled away from Jefferson, separately but in the same direction, back north toward Salem, arriving by 4:01 a.m. in the general vicinity of the Best Western. The TracFones then were activated at the Best Western at 4:22 a.m. and 4:30 a.m.

After the TracFones were activated, there was about a three-hour time break in the phone records—during which investigators theorized that defendant and Bruce traveled together, north to Woodburn, and planted the bomb

_____

[6] In its case-in-chief, the state relied principally on the stray-signal theory. After defendant and Bruce presented evidence contradicting that theory in their defense case, the prosecutor did not rely on that theory in his closing argument to the jury. Instead, the prosecutor focused on the evidence connecting defendant and Bruce to the construction, design, and placement of the bomb, emphasizing the state's theory that the bomb was designed and intended to be lethal, and was planted at the bank for the purpose of killing and injuring others, regardless of the specific force that caused it to detonate.

at West Coast Bank. Beginning at 7:19 a.m., both defendant and Bruce either placed or received calls from around an Interstate 5 rest stop near Wilsonville, north of Woodburn. Then they traveled south, where an 8:40 a.m. call placed them near Woodburn. The call to Wells Fargo Bank on one of the TracFones occurred at 10:19 a.m., from the Woodburn area; within about an hour of that call, defendant and Bruce—still together—made calls to others on their cell phones from Brooks, just south of Woodburn. After leaving Brooks, they apparently each drove separately to Jefferson, arriving at the pole barn on Potts Road after 11:00 a.m., where they spoke to others working there. They then visited a mutual acquaintance in Salem at about noon. Eventually, each returned home, with defendant's last recorded call to Bruce before the bombing occurring at 2:33 p.m. The next recorded call between the two occurred about an hour after the bombing, at 6:17 p.m., at which time each appeared to be at his home. Investigators also determined that Bruce's large white pickup truck had been parked at West Coast Bank within one to two weeks before the bombing and that that truck had been seen travelling to the pole barn on the Potts Road property around 2:00 a.m., on the morning of the bombing. Finally, investigators determined that someone driving a blue Chevrolet LUV pickup truck had purchased gas in Woodburn in the early mid-morning hours on that same day and then had remained parked at the gas station for more than five minutes, with the driver looking in the general direction of West Coast Bank.

As to defendant's and Bruce's respective reactions and demeanors on the evening of and during the days after the bombing, investigators learned from various witnesses that neither acted unusually. Each continued with his ordinary activities and did not display any noticeable change in behavior or affect.

As part of the investigation, law enforcement attempted to determine a possible motive for defendant and Bruce to have built and planted the bomb. That led them to evidence that defendant and Bruce had planned to rob a bank. Specifically, the FBI analyzed a handwritten paper retrieved from a trash can at the Potts Road property—which, based

on handwriting analysis, likely had been written by defendant. They determined that that paper contained a series of numbers that ultimately calculated the weight and monetary total of particular physical counts of bills—for example, the weight of $500,000 worth of $20 or $50 bills—and how much various amounts would weigh for the purpose of transporting the bills in 100-pound bags. On the computers seized from the Potts Road property, investigators also found evidence of fairly recent internet searches for "monetary conversion," offshore bank accounts, currency rates, and foreign currency exchange rates. And investigators learned from friends and associates that defendant and Bruce in the past had spoken hypothetically about bank robbery, with Bruce in particular frequently describing different bank robbery scenarios, including the use of explosives or fire as diversions or otherwise, and the use of remote controlled cars to deliver explosives. Bruce, but not defendant, also had spoken hypothetically many years before about killing police by various means, including detonating a bomb during a police memorial. A friend of defendant's also relayed that, many years earlier, defendant had told him that defendant had called in a bomb threat to a Woodburn bank located in the same area as the banks involved in this case. Finally, at the time of the bombing, both defendant and Bruce were having personal financial troubles, and their biodiesel business was not generating any profit.

Investigators also learned from various of defendant's and Bruce's family members, friends, and acquaintances that they viewed the government—including law enforcement—as over-reaching, requiring ordinary citizens to respond in possibly violent ways. As an example, defendant's former fiancée had observed defendant and Bruce react "jubilant[ly]" to news of the 1995 Oklahoma City bombing, which they thought was an appropriate citizen response given earlier events at Ruby Ridge, Idaho, and Waco, Texas. Relatedly, during a hunting trip in early November 2008, defendant and Bruce had agreed that the upcoming presidential transition likely would infringe on their right to bear arms. More generally, for his part, defendant over the years had expressed in intense terms to friends and acquaintances his dislike of police and his distrust of banks.

Investigators learned other relevant details about both defendant and Bruce. For example, both were skilled welders and had experience working with electronics, with defendant having more electronics experience than Bruce. Both had experience using remote control devices, including experience on defendant's part in connecting servo motors to different control surfaces to make them function. And both had experience using explosives; Bruce in particular was experienced in using explosives effectively for different objectives. Investigators also learned that, at some point within three to four months before the bombing, two individuals resembling defendant and Bruce had spoken with a store employee in Jefferson about blowing up stumps from a remote location; the three had discussed that, with remote detonations, care should be taken to avoid crossing remote signals with CB radio signals. Finally, investigators learned that defendant—but not Bruce—was experienced in using a computer and owned a laptop (of the same type found at the river at Potts Road) that automatically connected to unsecured wireless internet networks.

As noted, defendant told investigators, as well as others, that he had driven to Bend and other Oregon cities on December 12; he also discussed with friends, acquaintances, and others—after his arrest—alternative theories for the bombing and that police had wrongly arrested him. He later testified at trial, however, that he had been driving with Bruce in the Willamette Valley area from the early morning hours on December 12 until midday, although he offered personally exculpatory explanations for each of the critical time periods—such as activation of the TracFones, placement of the bomb, and calling Wells Fargo Bank. Overall, his testimony was to the effect that he had no knowledge of any planning, bomb construction or placement, or attempted robbery. Rather, according to defendant's testimony, Bruce alone had planned, built, and planted the bomb; activated the TracFones; and called Wells Fargo Bank. As for the purchases of the TracFones and spray paint, the airtime cards, and the toggle switches, defendant maintained that he had purchased those items at Bruce's request, with no knowledge of how Bruce intended to use them. Defendant denied purchasing the servo motor.

C.   *The Charges and Trial*

In separate, identical indictments, the state jointly charged defendant and Bruce with aggravated murder (10 counts each, including four counts of aggravated felony murder),[7] attempted aggravated murder (three counts), conspiracy to commit aggravated murder, first-degree assault, second-degree assault, unlawful manufacture of a destructive device, and unlawful possession of a destructive device. The trial court conducted a joint guilt-phase trial, at which the state presented the evidence generally summarized above. Defendant took the stand in his defense and testified to the effect, also as noted above, that Bruce alone had planned a bank robbery, built and planted the bomb at West Coast Bank, and placed the life-threatening call to Wells Fargo Bank. Unlike defendant, Bruce did not testify at trial. Defendant, together with Bruce, also introduced evidence attempting to show that—in assessing the nature of the bomb and its destructive potential—law enforcement officers had acted negligently or otherwise had deviated from standard operating procedures. Defendant and Bruce relatedly attempted to show that the bomb had exploded as a result of law enforcement manipulation.[8]

At the conclusion of the joint guilt-phase trial, a jury found both defendant and Bruce guilty on all counts. After separate penalty-phase proceedings under ORS 163.150(1)(a), the jury unanimously answered "Yes" to the four questions set out in ORS 163.150(1)(b), as to both defendant and to

---

[7] The state alleged the same five theories of aggravated murder as to each defendant—with duplicate counts for each murder victim, resulting in 10 counts total—based on different statutory aggravating circumstances, as follows:

- Two or more deaths in the same criminal episode, ORS 163.095(1)(d);
- Death of a police officer, ORS 163.095(2)(a)(A);
- Death by explosive device, ORS 163.095(2)(c);
- Felony murder, criminal mischief (explosive device), ORS 163.095(2)(d), ORS 163.115(1)(b)(B); and
- Felony murder, robbery, ORS 163.095(2)(d), ORS 163.115(1)(b)(G).

[8] At trial, both defendants made extensive efforts to persuade the jury that law enforcement officers had mishandled the bomb in several respects. We do not describe that evidence in detail, because the jury rejected it, and our standard of review views the evidence in the light most favorable to the jury's verdict.

Bruce.[9] For both defendant and Bruce, the trial court merged their individual aggravated murder convictions relating to each murder victim and then entered identical judgments, one against defendant and one against Bruce, setting out two convictions for aggravated murder (one for Captain Tennant and one for Trooper Hakim), and two sentences of death.

As noted, defendant raises 151 assignments of error that relate to both the pretrial and guilt phases (but not the penalty phase) of his trial. In a supplemental *pro se* brief, defendant raises four additional assignments of error. Below, we address the assignments that merit discussion.

## II.   PRETRIAL PHASE

A.   *Motion to Sever Trials (Assignment Nos. 1-5)*

As just described, defendant and Bruce were charged jointly, in identical indictments, with identical offenses. Before trial, defendant moved to sever his trial from Bruce's trial. The state objected, and the trial court denied the motion. During trial, in response to certain evidentiary rulings that defendant viewed as unfavorable to his defense, defendant responded by, among making other motions, renewing his motion to sever, each time summarily and each time unsuccessfully. On review, defendant argues that the trial court's rulings were error under ORS 136.060 and the Sixth and Fourteenth Amendments to the United States Constitution.[10] As we explain below, we conclude that

---

[9]   ORS 163.150(1)(b) provides:

"Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

[10]   Defendant also argues that the trial court's rulings violated his right to an impartial jury, as guaranteed by Article I, section 11, of the Oregon Constitution.

the trial court did not err in denying defendant's motions to sever.

Severance of trials for jointly charged defendants is governed by ORS 136.060, which provides:

> "(1)   Jointly charged defendants shall be tried jointly unless the court concludes before trial that it is *clearly inappropriate* to do so and orders that a defendant be tried separately. In reaching its conclusion the court shall strongly consider the victim's interest in a joint trial.
>
> "(2)   In ruling on a motion by a defendant for severance, the court may order the prosecution to deliver to the court for inspection in camera any statements or confessions made by any defendant that the prosecution intends to introduce in evidence at the trial."

(Emphasis added.) Central to the parties' arguments on this issue are their different positions on what circumstances render a joint trial "clearly inappropriate" under that statute. According to defendant, the standard is not a particularly demanding one. The statute does not, for example, expressly require a showing that a joint trial would create a risk of "substantial prejudice" or would give rise to evidentiary or other issues at trial that would violate a statutory or constitutional provision. Under that less-demanding standard, defendant argues that a joint trial was "clearly inappropriate" here because he and Bruce advanced "inconsistent defenses," the state relied on evidence that was not "mutually admissible" against both of them, and some evidence admitted against Bruce could easily have tainted the jury's view of him as well.

The state, relying on *State v. Turner*, 153 Or App 66, 956 P2d 215, *rev den*, 327 Or 317 (1998), and other Court of Appeals cases interpreting ORS 136.060(1), responds that "clearly inappropriate" is a heightened standard that is satisfied only if a joint trial would violate a statutory or

Defendant made no specific argument about Article I, section 11, to the trial court, however, and, on review, defendant neither cites any authority nor makes any developed argument for the proposition that Article I, section 11, requires jointly charged defendants to be tried separately. For those reasons, we do not address defendant's Article I, section 11, argument.

constitutional provision, and not if there is merely a potential for prejudice to one or more defendants. Consequently, according to the state, that standard is not satisfied by the kinds of problems that defendant identifies, such as inconsistent defenses or the state's use of evidence that is not mutually admissible against both defendants.[11]

We begin by construing the "clearly inappropriate" standard that ORS 136.060(1) establishes. We then examine whether, on this record, the trial court erred by concluding that the problems that defendant identified did not, pursuant to that standard, require severance.

In construing a statute, we examine the text of that statute in context and, where appropriate, consider legislative history and pertinent canons of statutory construction. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). The term "clearly inappropriate" is not statutorily defined. Neither is it a legal term of art. We therefore look to its everyday meaning. *See Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 295-96, 337 P3d 768 (2014) (contrasting approach for interpreting plain meaning of legal terms versus lay terms). The words "clearly" and "inappropriate" do have fairly "plain, natural, and ordinary" meanings. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) (describing meaning to be given to words of ordinary usage). "Clearly" means "without doubt or question." *Webster's Third New Int'l Dictionary* 420 (unabridged ed 2002). "Inappropriate" means, of course, "not appropriate," *id.* at 1140, which is the opposite of "appropriate," which means "specially suitable" or "proper." *Id.* at 106. As a matter of plain text, then, the "clearly inappropriate" standard requires a determination that, without doubt or question, a joint trial would *not* be suitable or proper in a particular instance.

---

[11] The state also argues that defendant failed to preserve his current arguments because he did not argue in the trial court that the Court of Appeals cases interpreting ORS 136.060 were decided incorrectly. Both parties, however, relied on Court of Appeals case law to support their respective positions as to whether, given the circumstances of this case, a joint trial was "clearly inappropriate" under ORS 136.060. Although defendant's argument below may not have been as well-developed as the argument that he now makes on direct review, we conclude that he sufficiently preserved the issue.

Two aspects of the text of ORS 136.060(1) provide useful insight. First, by providing that jointly charged defendants "shall be tried jointly unless the court concludes" that a joint trial would be "clearly inappropriate," the statute expresses a preference for joint trials. A joint trial is mandatory in all cases, unless the statutory standard of "clearly inappropriate" is met. In effect, then, the default approach under the statute is for jointly charged defendants to be jointly tried. Second, to overcome that default approach, it is not enough that a joint trial be inappropriate; it must be "clearly" so. There must be no doubt or question that a joint trial is inappropriate; a risk or possibility that the joint trial will prove inappropriate is not enough.

The second subsection of the statute provides context that bolsters that understanding. ORS 136.060(2) gives the trial court, in ruling on a motion to sever, the authority to order the prosecution to deliver to the court, for *in camera* inspection, "statements or confessions made by any defendant that the prosecution intends to introduce into evidence at the trial." Through that procedural authority, a trial court can anticipate a so-called *Bruton* problem, which refers to constitutional issues that potentially arise in joint trials of codefendants when statements or confessions of one defendant are admissible against the defendant who made them, but inadmissible against another defendant. In certain circumstances, the prejudice to the jointly tried defendants may be sufficiently great that, despite a trial court's instructions limiting the jury's consideration of the statements, reversal and a remand for separate trials is constitutionally required. *See, e.g.*, *Bruton v. United States*, 391 US 123, 88 S Ct 1620, 20 L Ed 2d 476 (1968) (admission of codefendant's confession implicating both codefendant and defendant violated defendant's federal constitutional rights to confrontation and cross-examination, despite jury instruction to consider confession only as to codefendant).[12]

---

[12] *Bruton* did not involve a motion for severance. Rather, the issue involved the admissibility of a codefendant's confession that implicated the defendant. Because severance can address the prejudice caused by such a confession, the United States Supreme Court in *Bruton* noted the existence of a provision of Rule 14 of the Federal Rules of Criminal Procedure (FRCrP) that, "[i]n ruling on a motion by a defendant for severance[,] the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or

In combination, then, the text and context of ORS 136.060(1) suggest that "clearly inappropriate" was designed to be a difficult standard to meet. The statute expresses a preference for joint trials of jointly charged defendants, sets a standard that requires no doubt or question that a joint trial will be "inappropriate," and then provides the trial court with explicit authority to make a record on which the court can assess whether any statement or confession that the state intends to put into evidence at trial would violate constitutional protections if the jointly charged defendants are jointly tried.

Defendant, however, points to another statute, ORS 132.560, as relevant context to support his position that the standard in ORS 136.060(1) is less demanding. ORS 132.560 governs requirements for charging instruments and controls the joinder of *offenses* against a single defendant. Subsection (3) provides that, if it appears that the state or the defendant is "substantially prejudiced" by the joinder of the multiple charged offenses, then either party may move, and the court may order, separate trials on separate offenses or other relief that justice requires. Comparing that statute to the severance statute at issue here, ORS 136.060(1), defendant asserts that the "clearly inappropriate" standard in the severance statute must mean something less than what would be considered "prejudicial," or "substantially prejudic[ial]," under the joinder statute.

That comparison does not aid defendant, for two reasons. First, as we will describe, the "clearly inappropriate" standard was added to ORS 136.060(1) in 1986, but the legislature did not add the "substantially prejudiced" standard to ORS 132.560(3) until years later. *See* Or Laws 1989, ch 842, § 1 (enacting "prejudiced" wording in ORS 132.560(3)); Or Laws 1999, ch 1040, § 17 (adding "substantially"). Because those amendments occurred at different points in time, and in different and, at most, tangentially related statutes, it is difficult to see how the legislature's

---

confessions made by the defendants which the government intends to introduce in evidence at the trial." 391 US at 131-32. The similarities in that wording to ORS 136.060(2) are notable. FRCrP 14 does not, however, contain any wording similar to the wording of ORS 136.060(1) and thus contains no explicit presumption in favor of joint trials.

later use of the "substantially prejudiced" standard in the offense-joinder statute helps to inform our understanding of the earlier use of the "clearly inappropriate" standard in the trial severance statute. *See Gaines*, 346 Or at 177 n 16 ("Ordinarily, only statutes enacted simultaneously with or before a statute at issue are pertinent context for interpreting that statute."). Second, and in all events, we disagree that, textually, "clearly inappropriate" communicates a less demanding standard than "substantially prejudiced." To the contrary, when considered in context, as we have already considered it, "clearly inappropriate" suggests a stringent standard, for the reasons that we have already discussed.

Still, for added guidance, we turn to the enactment history of ORS 136.060. *See State v. Dickerson*, 356 Or 822, 830, 345 P3d 447 (2015) (court examines prior versions of statute as part of statutory context). Before 1983, ORS 136.060 provided that, "[w]hen two or more defendants are jointly indicted for a felony, any defendant requiring it shall be tried separately." ORS 136.060 (1981), *amended by* Or Laws 1983, ch 705, § 1. Thus, under the earlier version of that statute, defendants who were jointly charged with felonies were entitled to separate trials if they moved for severance and "if required." This court did not have occasion to consider the words "if required" in that version of the statute, except to briefly note in one case that a trial court's grant of a motion to sever trials for a defendant and a codefendant jointly charged with negligent vehicular homicide had been "obedient to the demands of" that version of the statute. *State of Oregon v. Berry and Walker*, 204 Or 69, 78, 282 P2d 344 (1955). In 1983, the legislature amended ORS 136.060, adding what is now subsection (1), to provide, in part, that, "[w]hen two or more defendants are jointly charged with commission of the same crime or crimes, whether felony or misdemeanor, *** all of which occurred as part of the same act or transaction, they may be tried separately or jointly in the discretion of the court." Or Laws 1983, ch 705, § 1. Thus, during the early 1980s, the statute changed from one that entitled jointly charged defendants, on a proper motion, to separate trials "if required," to one that allowed severance at the court's unbounded discretion.

In 1986, the voters passed a "Crime Victims' Bill of Rights" that amended several statutes, including ORS 136.060. Or Laws 1987, ch 2. As a result of that amendment, ORS 136.060(1) took its current form, mandating a joint trial for jointly charged defendants "unless the court concludes before trial that it is clearly inappropriate to do so and orders that a defendant be tried separately," and further requiring the court to "strongly consider the victim's interest in a joint trial." Or Laws 1987, ch 2, § 6.[13]

Defendant asserts that, in amending ORS 136.060 as part of the 1986 crime victims' rights initiative, the voters intended to increase victims' rights, but not remove rights from criminal defendants. The wording of the initiative contradicts that assertion, however. Textually, the voters expressed a preference for joint trials that did not exist in the 1983 version of the statute, and they significantly constrained a trial court's authority to grant a defendant's motion for severance, limiting that authority to circumstances in which it was "clearly inappropriate" to go forward with joint trials. The fact that the voters may have done so to further a victim's interest in having joint trials, rather than with the independent goal of narrowing when a defendant could obtain severance, does not change the fact that the voters achieved their objective by making it harder for a jointly charged defendant to obtain a severance.[14] *See generally Bruton,* 391 US at 134 ("Joint trials do conserve

---

[13] As part of the 1986 initiative, the voters also removed the earlier references to felonies or misdemeanors. ORS 136.060(1) now refers more generally to "[j]ointly charged defendants."

[14] When interpreting a statute adopted via initiative, this court may consider the history of the measure, including "the ballot title and arguments for and against the measure included in the voters' pamphlet, and contemporaneous news reports and editorial comment on the measure." *Ecumenical Ministries v. Oregon State Lottery Comm*., 318 Or 551, 560 n 8, 871 P2d 106 (1994); *see also State v. Algeo*, 354 Or 236, 246, 311 P3d 865 (2013) (court may consider history of voter-adopted measure, if useful to court's analysis, in addition to considering text and context). *But see State v. Sagdal*, 356 Or 639, 643, 343 P3d 226 (2015) (court exercises caution in relying on statements of advocates, such as those contained in voters' pamphlet, due to partisan character). The only part of the voters' pamphlet pertinent to ORS 136.060 was the statement that the measure would "[i]ncrease[] preference that jointly charged defendants be tried together. Court shall strongly consider victim's interest in joint trial when deciding defense request for separate trials." Official Voters' Pamphlet, General Election, Nov 4, 1986, 52.

state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.").

We therefore construe ORS 136.060(1) as follows. In granting a pretrial motion to sever, a trial court must conclude that a joint trial is "clearly inappropriate," which means that the record must establish, beyond doubt or question, that a joint trial of jointly charged defendants would be inappropriate. "Inappropriate," in that context and given the preference for joint trials, necessarily means legally inappropriate, such that going forward with a joint trial would be legal error. That is, the standard is triggered by the kind of circumstances that—in advance of trial—a court can foresee likely could result in a legal error of sufficient gravity to give rise to either a mistrial or a reversal, followed by separate retrials. An example of the kind of circumstance that the legislature had in mind is reflected in subsection (2) of the statute, which ensures the trial court's authority to order the prosecution to turn over statements and admissions of a jointly charged defendant that the prosecution anticipates introducing at trial. That subsection plainly anticipates the kind of circumstance that arose in *Bruton*, where the defendant could not be tried jointly with his codefendant—given the admissions and statements on which the prosecution had relied to prove the codefendant's guilt—without violating the defendant's federal confrontation and cross-examination rights. *See* 391 US at 135-36 (reversing on that ground). That is not to say that a *Bruton* problem is the exclusive ground on which a trial court may allow a motion to sever, but it demonstrates the nature of the standard involved: A trial court may conclude that it would be "clearly inappropriate" for jointly charged defendants to be jointly tried when the information available to the trial court in advance of trial permits the court to reasonably predict that a joint trial could likely inject error into the trial that would result either in a mistrial in the course of the trial or a later reversal by an appellate court.

In articulating that standard, one aspect of the statutory procedure and standard bears special emphasis. By its express terms, ORS 136.060(1) requires the "clearly inappropriate" determination to be made in advance of trial

and on the basis of the record made at that time. In particular, that statute expressly declares that jointly charged defendants "shall be tried jointly" unless the court concludes "before trial" that it is clearly inappropriate to do so and "orders" separate trials. The record on which the trial court is to resolve the motion is thus necessarily the record made at the time of the motion. We therefore agree with the Court of Appeals, which for many years has held:

> "When we review a trial court's ruling on a motion to sever, *** we examine the decision in light of the arguments asserted and circumstances pertaining at the time the pretrial motion was made. *** Errors that occur during trial may provide grounds for a mistrial motion or for other relief, but they cannot provide the basis for a motion to sever."

*Turner*, 153 Or App at 74. As a simple matter of practicality, it is difficult to see how a joint trial can be severed into separate trials once the trial has begun. Even if it could be, however, the statute does not authorize midtrial severance. Therefore, although defendant in this case renewed his severance motion during the trial at several points, the only severance motion and arguments in support that we consider are those that he made pretrial, pursuant to ORS 136.060.[15]

We turn to the merits of defendant's motion. In particular, we consider whether—when defendant made his pretrial motion to sever—the trial court could determine on the record before it that a joint trial was "clearly inappropriate." In support of his motion, defendant relied, in part, on his claim that the state intended to offer certain statements or confessions made by Bruce that violated defendant's confrontation and cross-examination rights under *Bruton*, 391 US 123. As we have discussed, if defendant were correct in

---

[15] Although we do not consider defendant's midtrial motions for severance as such, defendant coupled those midtrial motions with other objections and grounds for relief—such as moving to admit or exclude certain evidence or for a mistrial. To the extent that defendant has raised claims of errors based on the appropriate related objections and motions that he made midtrial, we have considered them either expressly in resolving those other claims of error, or we have considered them and declined to address them because they lack merit or—if any error occurred—such error was harmless.

that regard, a joint trial would be "clearly inappropriate" under ORS 136.060(1), and it would have been error for the trial court to decline to order separate trials. But, as we will explain, none of Bruce's statements were objectionable on that basis.

In *Bruton*, the United States Supreme Court held that a defendant is denied his or her rights under the Confrontation Clause of the Sixth Amendment when, in a joint trial with a codefendant, the codefendant does not testify, but the codefendant's statement implicating the defendant as a participant in a crime is admitted in evidence. 391 US at 126. In so holding, the Supreme Court overruled prior case law holding that jury instructions limiting the use of such evidence were sufficient to cure the prejudice. *Id.* While acknowledging that juries generally can be expected to follow limiting instructions of that kind, *id.* at 135, the danger of the jury not doing so in this context was too great:

> "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination."

*Id.* at 135-36 (citations and footnote omitted).

As that passage reveals, the danger that the Court identified was specific to statements made by one defendant that directly incriminated the other defendant, that were not subject to cross-examination, and that could not be cured by a jury instruction. For the *Bruton* rule to apply, the nontestifying codefendant's out-of-court statement must "on its face" incriminate the other defendant. *Richardson v.*

*Marsh*, 481 US 200, 208-09, 107 S Ct 1702, 95 L Ed 2d 176 (1987). Where the statement does not expressly incriminate the other defendant, and instead becomes incriminating "only when linked with evidence introduced later at trial," no *Bruton* problem arises. *Richardson*, 481 US at 208.

In this case, defendant's *Bruton* argument ran to various out-of-court statements that Bruce had made, which ultimately were admitted into evidence and which we have earlier generally described. *See* 359 Or at 378 (generally describing statements); *see also State v. Turnidge (S059156)*, 359 Or 507, 511, ___ P3d ___ (2016) (summarizing some statements at issue in more detail). In none of those statements, however, did Bruce confess to or make admissions about the charged crimes. Neither did any of Bruce's statements directly implicate defendant in the charged crimes or shift blame for the crimes to defendant. Indeed, the challenged statements did not relate directly to the crimes at all. They revealed, instead, Bruce's unfavorable views toward government and law enforcement, which the state offered to demonstrate his motives in committing the crimes. Bruce's out-of-court statements did not, as *Bruton* requires, "on their face" incriminate defendant and did not present a risk of prejudice that was the same as or analogous to the risk that animated the holding in *Bruton*. The fact that the state intended to introduce Bruce's statements at the joint trial therefore did not render the joint trial "clearly inappropriate" under ORS 136.060(1) and require the trial court to order separate trials.[16]

In addition to his *Bruton*-based claim, defendant also argued below that the trial court should order separate trials because the state's use of Bruce's out-of-court statements in a joint trial would, in effect, "taint" him "by association," notwithstanding any limiting jury instruction to the

---

[16] Defendant separately assigns error to his motion, under *Bruton* and on Sixth Amendment grounds, to exclude Bruce's out-of-court statements. Our analysis above effectively resolves that assignment of error as well.

Because the statements do not fall within the *Bruton* rule, we also need not decide whether, as the state argues, that rule is now limited by *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004). *See, e.g.*, *U.S. v. Smalls*, 605 F3d 765, 768 n 2 (10th Cir 2010) ("the *Bruton* rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements"; citing representative federal cases).

contrary. Specifically, defendant argued that, given his close relationship with Bruce—that is, because he was Bruce's son and coworker—the jury might conclude that defendant took seriously, or even endorsed, Bruce's beliefs. Defendant's argument was, in essence, that Bruce's out-of-court expressions of his anti-government sentiments likely would not be relevant and admissible against defendant if he were separately tried and admitting them in a joint trial would be so highly prejudicial that the jury could not be expected to follow the court's instructions to consider that evidence against only Bruce.

We do not agree that the earlier statements that Bruce had made were irrelevant to defendant's guilt. Here, the state had ample evidence that Bruce and defendant had committed the crimes together. If, then, the state could prove that Bruce had a motive to commit the crimes (*i.e.*, his anti-government, anti-law enforcement, and anti-establishment sentiments), that would be relevant to show *why* the crimes were committed, even if the motivation were Bruce's, and defendant's role were that of a follower or an aide who did not share those views. If that evidence "tainted" defendant in some way, as he argued in support of severance, the taint was not an impermissible one. *See generally Zafiro v. United States*, 506 US 534, 540, 113 S Ct 933, 122 L Ed 2d 317 (1993) (right to fair trial does not include right to exclude codefendant's testimony if relevant). And even if the taint were in some way impermissible, it is the kind of concern that we have long trusted limiting jury instructions to overcome. *See generally State v. Reyes*, 209 Or 595, 630-31, 308 P2d 182 (1957) (when evidence is admissible for limited purpose, such as to show motive, court should give instruction on request to minimize possible use of evidence by jury for inadmissible purpose).

But more to the point, defendant's claim in that regard does not meet the "clearly inappropriate" standard for severance under ORS 136.060(1). As we have discussed, that standard is not implicated by every evidentiary dispute over relevancy and potential prejudice that inevitably may arise at trial. Rather, the standard is triggered by the kind of circumstances that, in advance of trial, a court can foresee will lead to a legal error of sufficient gravity that it

could likely result in either a mistrial or a reversal, followed by separate retrials. Evidence that Bruce held fervent anti-government sentiments, and harbored a motive to commit the crimes as a result, does not satisfy that standard.

The same is true of the final argument that defendant made in support of his motion for severance and that he renews on review. He argued that his and Bruce's "respective positions at trial may conflict and may require mutually exclusive defenses, of such a nature that, in viewing the totality of the evidence in the case, the defendant will be denied a fair trial[.]" *See generally Rhone v. United States*, 365 F2d 980, 981 (DC Cir 1966) (generally noting scenario in which defenses are irreconcilable, presenting danger that jury will unjustifiably infer that conflicting defenses demonstrates guilt of both defendants). By way of example, defendant cites aspects of his and Bruce's opening statements, in which his counsel asserted his innocence and pointed to Bruce as the lone perpetrator, while Bruce's counsel asserted that defendant was not truthful. Those aspects of the trial record, according to defendant, show that he and Bruce took "inconsistent and hostile positions at trial," and each was attempting to use the state's evidence "to exculpate himself and inculpate the other."[17]

In essence, however, the only inconsistency in their defenses was that defendant's theory of the case was that Bruce had committed the crimes without defendant's assistance, while Bruce, through his not-guilty plea, effectively claimed that he was not involved in the crimes at all. If that kind of inconsistency in the defenses of jointly charged defendants were to render joint trials "clearly inappropriate," then few, if any, joint trials could ever go forward under ORS 136.060(1). It would be the rare case in which jointly tried defendants would not have different theories as to their respective roles in and culpability for the crime. Thus, it would be the usual case, not the exceptional one, in which jointly charged defendants could point to the tension

---

[17] In making this argument, defendant relies on aspects of the record from trial, rather than the motion for severance, which, as discussed, is not part of a trial court's consideration when ruling on a motion for severance. In any event, we reject defendant's argument for the reasons explained in the text below.

that might arise from their inconsistent theories and the evidence that they may present. If we were to deem joint trials to be "clearly inappropriate" in every such case, the statute would establish a presumption in favor of joint trials but then except the usual case to which the presumption would otherwise apply. In effect, the exception would be so broad as to swallow the presumptive rule—a result that we do not think the voters intended when they enacted the current version of ORS 136.060(1). The statute requires more, and the kind of "inconsistency" in the defenses advanced by jointly charged defendants on which defendant relies in this case does not satisfy it.

For those reasons, we conclude, as did the trial court, that a joint trial of defendant and Bruce was not "clearly inappropriate" in these circumstances, ORS 136.060(1). Consequently, the trial court did not err in denying defendant's motion to sever.[18]

B. *Motion to Suppress Statements Made to Law Enforcement (Assignment No. 6)*

Before trial, defendant moved to suppress the statements that he made to law enforcement when he was questioned at his home, arguing, among other things, that those statements were obtained in violation of his right to counsel under Article I, section 12, of the Oregon Constitution.[19] In particular, defendant argued that he was in custody or circumstances sufficiently compelling to be the equivalent of custody, and, while being questioned in that setting, he invoked his derivative right to counsel, which required law enforcement to immediately cease questioning. The trial court denied that motion, reasoning that the surrounding

---

[18] Defendant also argues that the trial court's failure to sever his trial from Bruce's trial violated his fair trial rights under the Sixth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment, *Pointer v. Texas*, 380 US 400, 85 S Ct 1065, 13 L Ed 2d 923 (1965). Our analysis of defendant's so-called *Bruton* claim under the "clearly inappropriate" standard of ORS 136.060(1) necessarily resolves defendant's Sixth Amendment argument as well.

[19] Article I, section 12, of the Oregon Constitution provides that "[n]o person shall be put in jeopardy twice for the same offence [*sic*], nor be compelled in any criminal prosecution to testify against himself." The right to counsel that Article I, section 12, provides is derivative of the protection against compelled self-incrimination. *State v. Joslin*, 332 Or 373, 380, 29 P3d 1112 (2001).

circumstances had not been compelling and that, in all events, defendant knowingly and voluntarily waived his rights and chose to speak with law enforcement.

On review, defendant renews his argument, but only in part. As he did below, he argues that the circumstances were sufficiently compelling to trigger his derivative right to have counsel present, if he invoked that right, before law enforcement could continue questioning him. Beyond that, however, he does not focus on whether he adequately waived his rights and responded to questions. Rather, his principal argument on review is that he equivocally—rather than unequivocally—invoked his right to counsel, which required law enforcement to clarify whether he wanted to continue speaking without counsel present before asking him further investigatory questions. As we explain below, we agree with the trial court that the circumstances were not compelling within the meaning of Article I, section 12, and defendant's derivative right to counsel therefore was not triggered. As a result, law enforcement was not required to cease or narrow the questioning, contrary to defendant's position. The trial court therefore correctly denied defendant's motion.

1. *Additional facts*

We state the facts consistently with the trial court's factual findings and its denial of defendant's motion to suppress. *State v. Shaff*, 343 Or 639, 641, 175 P3d 454 (2007). To the extent that the court did not make express findings, we presume that the court decided the facts in the light most favorable to the state. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

As we described earlier, by December 14, the second day after the bombing, investigators had identified defendant as a possible suspect, based on both their review of the Salem Walmart video surveillance footage and defendant's association with Bruce, who in turn owned a Chevrolet LUV pickup truck that matched the truck in the footage. Detective Troncosco from the Keizer Police Department and Lieutenant Duvall from the Oregon State Police drove by defendant's home on Nolan Lane around 4:00 p.m., and saw a Chevrolet LUV pickup truck, which matched the one in the

Walmart footage, parked in the driveway. They called for back-up; other officers arrived; and, with the permission of adjacent and nearby neighbors, two officers secured vantage points to observe the home, and others established a distant perimeter. At 4:23 p.m., Troncosco and Duvall parked Duvall's unmarked car in front of defendant's home and approached the door. One officer observing the home from a distant vantage point briefly drew his weapon to "cover" them, but neither he nor his weapon were visible from defendant's home. At that point, none of the other officers could be seen from defendant's home.

Troncosco and Duvall, both wearing plain clothes, knocked on the door. Defendant answered. Troncosco and Duvall explained that they were investigating the Woodburn bank bombing and were talking to individuals who owned pickup trucks. They asked defendant if they could speak with him privately. Defendant agreed to talk, stated that they could talk on the porch, and he stepped outside and closed the door. By then, it was getting dark and snowing, and it was very cold. Troncosco asked defendant if he would be willing to speak in Duvall's unmarked car to get out of the weather. Troncosco was also concerned that, with the door shut, he and Duvall could not see whether anyone was inside the house near the door, which presented a safety concern. Defendant agreed to speak in Duvall's car, went back inside his house for a few moments, and returned wearing a jacket.

Before the three walked to Duvall's car, Troncosco told defendant that he was not under arrest and asked if he had any weapons. Defendant responded that he was unarmed, and he consented to be searched for weapons. Duvall quickly patted down the outside of defendant's clothing and confirmed that he was unarmed. Duvall then entered the car on the driver's side, defendant sat in the front passenger's seat, and Troncosco sat in the back seat. Once inside, defendant asked Troncosco if "he had to talk." Troncosco again told defendant that he was not under arrest, that he did not have to speak with them, and that he was free to leave. Troncosco also told defendant that, although he was not under arrest, Troncosco would advise him of his rights,

and he then read defendant his *Miranda* rights. Defendant acknowledged that he understood those rights and stated that he had no questions.

Troncosco began by verifying defendant's identity, confirming his name and asking other identifying information. About then, one or two law enforcement officers walked in from the more distant areas, but without weapons drawn. Also by then, defendant's fiancée, who had been in the home, had opened the door to watch as defendant was interviewed. One or both of the officers who had emerged from the more distant areas approached defendant's front porch, and stood by, casually speaking with defendant's fiancée. Defendant's fiancée did not see any officer's weapon drawn.

At that point, Troncosco asked defendant if he would be willing to speak at the office because they were not in a good setting to conduct the interview. Defendant replied, "This sounds serious. Do I need an attorney?" Troncosco told defendant that he could not offer legal advice and that defendant would need to make that decision himself. Troncosco again explained that law enforcement was contacting several owners of similar trucks and that he was not the only person being contacted. Defendant asked Troncosco a second time whether he should have an attorney, adding that he had nothing to do with the bombing. Troncosco again told defendant that defendant had to decide for himself whether he wanted an attorney present. Troncosco added that the police had spoken with other people who had not thought it necessary to have an attorney, but emphasized that defendant needed to answer that question for himself.

Defendant then proceeded to talk to Troncosco and Duvall in Duvall's car. In response to questions, defendant explained, among other things, that he had been driving the blue Chevrolet LUV pickup truck, but Bruce owned it; that defendant had a biodiesel business with Bruce that involved, for defendant, welding and painting metal; and that defendant was trying to get a second job because he and Bruce needed money to expand. Defendant also stated that he had been in Bend, Medford, and Eugene on the day of the bombing, driving Bruce's larger white pickup truck, and had

learned of the bombing through news coverage. Finally, in response to questions about whether he owned a computer, defendant told Troncosco and Duvall that he had owned a laptop, but it had been stolen and he had not reported the theft.[20]

After speaking with defendant for about 18 minutes, Duvall told defendant that he and Troncosco would like to look in his truck. Defendant agreed, saying, "I don't care; have at it" and "be my guest." Troncosco and Duvall gave defendant a consent-to-search card, which he read and signed, stating as he signed it, "I've got nothing to hide." The three left Duvall's car and walked to the truck. Defendant opened the truck, and Troncosco photographed it while defendant stood nearby in the driveway, smoking a cigarette. After photographing the truck, Troncosco and Duvall, out of defendant's earshot, agreed that the truck was the one in the surveillance footage.

Troncosco and Duvall then walked over to defendant, who was still standing in the driveway, smoking while it continued to snow. Troncosco told defendant that the driveway was not a good place to talk and asked if defendant would go to their office to continue their conversation. Defendant responded that he did not see any need to continue talking with them because he already had told them everything and had not been involved in the bombing. Troncosco replied that he had some photographs back at his office that defendant might be interested in seeing. Defendant then said, "[T]his sounds serious" and stated that he should have an attorney if he were going to do that. Troncosco asked defendant if he already had an attorney; defendant told Troncosco that he would get one and that they then could talk the next day. Troncosco confirmed that defendant did not want to speak any further without having an attorney and then advised defendant that he was being placed under arrest. Troncosco handcuffed defendant and had him sit in one of the patrol cars while police continued their on-site investigation.

---

[20] By the time that Troncosco and Duvall asked defendant about owning a computer, law enforcement knew that the TracFones had been remotely activated over the internet.

Before trial, defendant moved to suppress all statements that he made to Troncosco and Duvall, arguing (among other things) that, when he made those statements, he was in a police-dominated atmosphere that rendered the circumstances compelling, thus implicating his right to remain silent and his derivative right to counsel, under Article I, section 12. As earlier described, the trial court concluded that the circumstances were not compelling and that, even if they were, defendant waived his rights up until the point when, upon arrest, he unequivocally invoked his right to counsel under Article I, section 12.[21] We review the trial court's denial of defendant's motion to suppress for legal error. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

2. *Analysis*

Article I, section 12, provides, in part, that "[n]o person shall be *** compelled in any criminal prosecution to testify against himself." Although by its terms that provision is a guarantee against self-incrimination, encompassed within it is a derivative or adjunct right to have the advice of counsel in responding to police questioning. *See [State v. Meade](#)*, 327 Or 335, 339, 963 P2d 656 (1998) (right to assistance of counsel during custodial interrogation arises out of Article I, section 12, right against self-incrimination); *see generally [State v. Randant](#)*, 341 Or 64, 70, 136 P3d 1113 (2006), *cert den*, 549 US 1227 (2007)

---

[21] Defendant makes two additional arguments on direct review that we decline to consider. First, he argues that both his verbal expressions and other observable conduct while at the sheriff's office amounted to "statements" that followed impermissible questioning after he unequivocally invoked his derivative right to counsel. At trial, however, defendant did not mention in his motion to suppress any verbal expression or conduct after the conversations at his home generally, or at the sheriff's office in particular. Because his argument in that regard is unpreserved, we do not consider it.

Second, before the trial court and again on direct review, defendant argues that the statements at issue were obtained in violation of the Fifth Amendment to the United States Constitution, as well as Article I, section 12. On review, defendant only briefly cites the Fifth Amendment and does not offer any developed argument in support of his reliance on it. We therefore do not address it. *See [State v. Thompson](#)*, 328 Or 248, 254 n 3, 971 P2d 879, *cert den*, 527 US 1042 (1999) (court refused to address state or federal constitutional arguments in part, because, "on review, defendant has failed to present any thorough and focused constitutional analysis").

(discussing and comparing right to counsel as derived from both Article I, sections 11 and 12, of Oregon Constitution). The right to counsel that flows from Article I, section 12, applies only when a suspect is placed in "full custody" or when circumstances "create a setting which judges would and officers should recognize to be 'compelling,'" *i.e.*, the same "compelling circumstances" that give the right to *Miranda* protections more generally. *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990) (internal quotation marks omitted). To protect that derivative right to counsel, when a suspect in police custody or compelling circumstances asks to speak to a lawyer or have a lawyer's assistance, all police questioning must cease. *State v. Charboneau*, 323 Or 38, 54, 913 P2d 308 (1996), *cert den*, 520 US 1233 (1997); *State v. Montez*, 309 Or 564, 572, 789 P2d 1352 (1990). When, however, the request is "equivocal"—that is, when it is unclear or ambiguous if the suspect is unwilling to answer any questions without counsel present—police are limited to asking follow-up questions to clarify whether the suspect meant to invoke his or her right to counsel. *Charboneau*, 323 Or at 55-56; *Montez*, 309 Or at 572. In either case, nothing prevents the suspect from thereafter waiving the right to have counsel present during that or later interrogations. *Meade*, 327 Or at 339.

Here, defendant contends that, although he was not in full custody at the time, his encounter with Troncosco and Duvall effectively placed him in "compelling circumstances," thus triggering his rights under Article I, section 12, including a derivative right to counsel. In that regard, it is helpful to clarify the limited nature of the issue that defendant raises. The issue is not whether Troncosco and Duvall adequately advised defendant of his *Miranda* rights. They read defendant his *Miranda* rights, explaining that he was not under arrest and was free to leave; they thus appear to have opted to advise defendant of those rights regardless whether the warnings were constitutionally required. On review, defendant does not challenge the adequacy of those warnings or whether he voluntarily and knowingly waived them.

Whether the circumstances were compelling for purposes of Article I, section 12, nevertheless is in dispute

because, if they were, then defendant had a derivative right to counsel that attached when he was questioned. That would mean that, if defendant invoked his right to have counsel present while being questioned, Troncosco and Duvall were obligated either to cease asking questions entirely or to clarify whether defendant wanted an attorney present for questioning, depending on whether the invocation was equivocal or unequivocal. On the other hand, if the circumstances were not compelling, such that the derivative right to counsel under Article I, section 12, did not attach, Troncosco and Duvall were entitled to continue to ask defendant possibly incriminating questions, as long as they did not do so in a way that rendered his responses involuntary. *Cf. State v. McAnulty*, 356 Or 432, 459, 338 P3d 653 (2014), *cert den*, 577 US ___, 136 S Ct 34 (2015) (analyzing voluntariness of statements separately from whether suppression required based on *Miranda* violation). Thus, the predicate issue is whether defendant was questioned under circumstances that were, for constitutional purposes, compelling. Only if they were must we consider whether defendant invoked his right to have counsel present in a way that required Troncosco and Duvall either to cease or limit their questioning.[22]

---

[22] At trial, defendant argued that his request for counsel was unequivocal, obligating police to cease all questioning. He did not further argue that, if the trial court determined his invocation instead to be *equivocal*—in the sense that Troncosco and Duvall should have been unsure whether he was or was not invoking counsel—then Troncosco and Duvall exceeded the scope of permissible questioning by failing to first clarify whether defendant in fact was unequivocally invoking counsel. Although the trial court at one point characterized defendant as "equivocal[ly]" asking for counsel, the trial court did so in the context of finding that defendant had made a knowing and voluntary *Miranda* waiver. Defense counsel expressly disagreed with the trial court that defendant had, in that sense, "equivocal[ly]" invoked his right to counsel. The trial court also found that defendant had been being "coy" and playing a "coy game" with Troncosco and Duvall. In context, we understand the trial court to have found that defendant was deliberately expressing ambivalence about wanting an attorney in an effort to determine the degree to which he was a suspect. Indeed, defendant expressly argued as much in his written memorandum to the trial court in support of his motion to suppress. At no point, in either his written or oral submissions, did defendant argue that his questions about obtaining an attorney were equivocal invocations in the sense that law enforcement could, in response, seek only to clarify whether he was affirmatively invoking his right to counsel.

On review, defendant now argues both that he unequivocally invoked his derivative right to counsel (so that all questioning had to cease) or, alternatively, did so "equivocally"—that is, ambiguously—such that Troncosco and Duvall were required to clarify his intent. As we will explain, we conclude that the circumstances were not compelling. We therefore do not consider whether defendant's

To determine whether the circumstances were compelling for purposes of Article I, section 12, the overarching issue is whether the questioning occurred in a "police-dominated atmosphere." *State v. Roble-Baker*, 340 Or 631, 641, 136 P3d 22 (2006). The answer to that question turns on "how a reasonable person in the suspect's position would have understood his or her situation." *Shaff*, 343 Or at 645. Relevant factors in that regard are the location of the encounter, the length of the encounter, the amount of force exerted on the suspect, and the suspect's ability to terminate the encounter. *Roble-Baker*, 340 Or at 640-41. Those factors are not exhaustive or applied mechanically; ultimately, this court must consider the totality of the circumstances to determine whether "compelling circumstances" existed. *Id.* In arguing that the circumstances in this case were compelling, defendant principally relies on the location of his encounter, the number of officers on the scene, his inability to terminate the encounter, and what he characterizes as coercion.

We turn to an examination of the facts in light of the principles set out above, mindful that we are bound by the trial court's findings if there is evidence to support them. *Shaff*, 343 Or at 648. Troncosco and Duvall, wearing plain clothes, first spoke with defendant at his front door and on his front porch. A brief time passed, and the three then went to Duvall's unmarked patrol car. The car was parked directly in front of defendant's home, and defendant sat in the front, as opposed to the back, of the car. From there, the three moved to defendant's driveway, where Troncosco and Duvall photographed defendant's truck while defendant stood nearby in his driveway, smoking. He later was formally arrested in the driveway. Defendant's entire encounter with Troncosco and Duvall occurred within view of his fiancée and at or within close proximity to his home, a place familiar to him. That fact reduces significantly the likelihood that the circumstances were inherently compelling for purposes of the Article I, section 12, analysis. *See Shaff*, 343 Or at 646 (so explaining; citing representative cases); *see also State v. Carlson*, 311 Or

---

alternative argument about the ambiguous nature of his invocation is properly before us or—even assuming that it is—whether defendant's inquiries about whether he should get an attorney were sufficient to require Troncosco and Duvall to ask only clarifying questions of defendant.

201, 204-05, 808 P2d 1002 (1991) (questioning in familiar setting of parking lot of suspect's apartment not inherently compelling). Defendant counters that evidence by urging that Troncosco and Duvall "isolated" him from his home, which is characteristic of compelling circumstances. It was defendant, however, who declined Troncosco's and Duvall's request to speak in his home, and defendant who agreed to be interviewed in Duvall's car to get out of the cold. In other words, defendant made the choice to speak privately with Troncosco and Duvall somewhere other than in his home. That is not the kind of police-forced isolation that increases the potential for the circumstances to be compelling.

Equally important to the analysis is the nature of Troncosco's and Duvall's interactions with defendant. The trial court expressly found that Troncosco and Duvall were "relaxed" in their exchange with defendant, and it implicitly found that they were not overbearing. Consistently with those findings, defendant frequently set boundaries on his interaction with Troncosco and Duvall, and they readily accepted the boundaries that he set. *See State v. Johnson*, 340 Or 319, 332, 131 P3d 173, *cert den*, 549 US 1079 (2006) (setting not compelling, partly because defendant exercised control over interrogation). For example, in responding to Troncosco's and Duvall's request to enter his home to speak with him, defendant instead said he would speak to them on the porch, and Troncosco and Duvall agreed. Then, when Troncosco and Duvall suggested that they move to Duvall's unmarked patrol car to get out of the dark and snowy weather, defendant agreed to that suggestion, but he declined their request to go the state police office to talk, again drawing a boundary that Troncosco and Duvall respected. That give-and-take dynamic between defendant and Troncosco and Duvall continued up to the point when defendant told them that he would not speak with them further until he first consulted an attorney. In short, nothing about Troncosco's and Duvall's dialogue with or behavior towards defendant was overbearing and, in that sense, coercive.

Defendant argues, however, that the atmosphere was police-dominated because multiple officers had surrounded the perimeter area near defendant's home, and those officers were armed and had their weapons drawn while Troncosco

and Duvall talked with defendant. The trial court specifically found, however, that the officers who had secured the perimeter, and the one officer who had drawn his weapon to cover Troncosco and Duvall from a distant vantage point, had not been visible to defendant. The record provides ample support for that finding. Defendant's encounter with law enforcement was limited to his interactions with Troncosco and Duvall, with the possible exception of the one or two officers who might have become visible to defendant while he was in Duvall's car.[23] That fact alone does not compel a conclusion that the circumstances were compelling.

Defendant also urges that the circumstances were compelling because he was unable to terminate his encounter with Troncosco and Duvall. The record provides no support for that assertion, especially when viewed—as we are bound to view it—in the light most favorable to the trial court's ruling. The atmosphere was, as the trial court found, relaxed. And, as we have described, Troncosco and Duvall were not overbearing and, to the contrary, they respected defendant's preferences and the limitations that he set on their encounter. Beyond that, Troncosco and Duvall repeatedly told defendant that he did not have to talk with them. During their initial encounter with defendant at the front door, for example, Troncosco and Duvall set the tone by asking defendant if he would speak with them and then later asking defendant if he would do so in Duvall's car, with defendant agreeing to both requests. Then, before entering Duvall's car, Troncosco advised defendant that he was not under arrest. Again, once in the car, Troncosco reminded defendant that he did not have to speak with them and was free to leave, and he also gave defendant formal *Miranda* warnings, and did so while emphasizing to defendant that he was not, however, under arrest.[24] Defendant was thus

---

[23] The trial court expressly found that, other than the one officer who had drawn his weapon to cover Troncosco and Duvall, none of the officers on the scene had drawn their weapons at any time; it further found that defendant's fiancée did not see any police weapons during the encounter. The court did not make any finding, however, as to whether defendant saw either of the officers who walked in from the more distant areas.

[24] Likewise, although defendant does not expressly so argue, Troncosco's recitation of *Miranda* rights did not transform the nature of the encounter from one that was not compelling into one that was. The reading of *Miranda* rights is a

fully aware that he could have terminated the interview at any point, and Troncosco and Duvall did nothing to suggest that, had defendant attempted to stop answering questions, they would have ignored him or pressured him into continuing. Nothing in their actions or attitudes belied their words. The trial court, in making its factual findings, expressly characterized defendant as having been "coy," attempting to glean information about the investigation. The record as a whole, as well as in combination with the trial court's express and implicit findings, provides no basis to conclude that defendant was unable, due to law enforcement coercion or overbearance, to terminate the encounter if he so desired.

Finally, in arguing that the circumstances were compelling, defendant points to the fact that Duvall searched defendant for weapons. That argument again misses the mark. Duvall quickly patted down the outside of defendant's clothing with defendant's consent, which had been obtained after Troncosco had informed defendant that he was not under arrest and that the search would be limited to a weapons check. After that patdown, defendant sat, unrestrained, in the front seat of an unmarked patrol car parked in front of his home, speaking with Troncosco and Duvall, who were dressed in plain clothes. Viewed in context, Duvall's patdown search did not convert the otherwise noncompelling situation into a compelling one.

Based on the totality of the circumstances, we conclude that a reasonable person in defendant's position would not have perceived the circumstances of the encounter with Troncosco and Duvall to be compelling for purposes of Article I, section 12. The encounter occurred at a place familiar to defendant, in a relatively relaxed and noncoercive environment, with repeated expressions by Troncosco and Duvall that defendant had the ability to end the encounter whenever he wanted, and with repeated instances in which defendant exercised control over the terms of the encounter.

---

factor that weighs in favor of concluding that a defendant subject to police interrogation understands his or her ability to terminate questioning and to otherwise seek counsel rather than cooperate with law enforcement. *See, e.g.*, *State v. Jarnagin*, 351 Or 703, 722-24, 277 P3d 535 (2012) (advice of *Miranda* rights effective not only to ensure knowing and voluntary waiver of right to remain silent and to have assistance of counsel, but also to overcome taint of earlier interrogation made in compelling circumstances without *Miranda* warnings).

The trial court therefore did not err in denying defendant's motion to suppress.

C.　*Excusal of Jurors for Cause and Destruction of Completed Jury Questionnaires (Assignment Nos. 18-41, 44)*

During *voir dire*, the trial court excused several jurors for cause. Following *voir dire*, at the court's direction, the completed juror questionnaires that had been used during *voir dire* were destroyed. Defendant assigns error to the trial court's excusal of three prospective jurors and also to the destruction of the questionnaires. With regard to excusal of the three prospective jurors, defendant contends that the court improperly excused those jurors because of their general objections to the death penalty, in violation of the rule announced in *Witherspoon v. Illinois*, 391 US 510, 88 S Ct 1770, 20 L Ed 2d 776 (1968), under the Sixth Amendment to the United States Constitution.[25] With regard to destruction of the questionnaires, which contained information about the prospective jurors' personal backgrounds, as well as, to some degree, their views on the death penalty, defendant argues that the destruction violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution. We begin by discussing the court's excusal of the three prospective jurors and then turn to the court's decision to destroy the questionnaires.

1.　*Excusal of prospective jurors Hamlin, Porter, and Burns*

As noted above, defendant raises a *Witherspoon* challenge to the trial court's excusal of three prospective jurors—Hamlin, Porter, and Burns. In *Witherspoon*, the Supreme Court held that, under the Sixth Amendment right to an impartial jury, "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 US at

---

[25]  The Sixth Amendment provides, in part, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * *." The Sixth Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment. *Duncan v. Louisiana*, 391 US 145, 149, 88 S Ct 1444, 20 L Ed 2d 491 (1968).

522. The Court further noted that a prospective juror could constitutionally be excused for cause if it was "unmistakably clear" that he or she would "automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial." *Id.* at 522 n 21. In a later case, however, the Court retreated from the "unmistakably clear" formulation in *Witherspoon* because of its practical difficulties as a legal standard. *Wainwright v. Witt*, 469 US 412, 424, 105 S Ct 844, 83 L Ed 2d 841 (1985). Instead, the Court explained that "a juror may not be challenged for cause based on [the juror's] views about capital punishment unless those views would prevent or substantially impair the performance of [the] duties as a juror in accordance with [the juror's] instructions and *** oath." *Id.* at 420 (quoting *Adams v. Texas*, 448 US 38, 45, 100 S Ct 2521, 65 L Ed 2d 581 (1980) (internal quotation marks and emphasis omitted)). We thus must determine whether the trial court abused its discretion in applying that standard in this case. *See State v. Lotches*, 331 Or 455, 473-74, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001) (applying abuse of discretion standard of review to determine whether trial court erred in excusing jurors who expressed personal opposition to death penalty).

Before defendant's trial, as part of *voir dire*, the venire of prospective jurors was notified that the state was seeking the death penalty and that, if the jury found defendant guilty, the jury would be required to answer four additional questions during the penalty phase to determine whether defendant would receive the death penalty, including a fourth question that asked whether defendant "should receive a death sentence." *See* ORS 163.150(1)(b)(D) (jury in penalty phase must decide whether defendant should receive death sentence). The parties and the trial court then asked specific prospective jurors questions designed to determine if they would be able to follow the law during the penalty phase. Those questions led the court to excuse several prospective jurors, either because their views were too strongly in favor of or against the death penalty. On review, defendant challenges the court's excusal of three of those prospective jurors—Hamlin, Porter, and Burns—contending that they voiced only general moral objections to

the death penalty that did not rise to the level of "substantially impair[ing] the performance" of their duties as jurors. *Witt*, 469 US at 420. We examine each of those jurors' statements and answers during *voir dire* in turn.

We begin with prospective juror Hamlin. Defense counsel began *voir dire* by discussing a number of topics, such as the presumption of innocence, jury unanimity, and exposure to pretrial publicity. Defense counsel then asked Hamlin about his view of the death penalty. Hamlin responded, "I disagree with the death penalty on ethical grounds. I *** believe that people are fallible, and even 12 people could be wrong." Counsel followed up by asking, "I've read your juror questionnaire, and I guess I view it as— what what's important here is, do you think you can follow the law?" Hamlin and defense counsel then had the following exchange:

"JUROR (Hamlin):    Maybe I'm not understanding you here, *** or not understanding the question, but isn't [question] No. 4[, which asks whether a defendant should receive a death sentence, ORS 163.150(1)(b)(D)] subjective[?]

"[DEFENSE COUNSEL]:    You're absolutely right, it is a subjective question. There's no burden of proof. It's up to you to decide. But you have to follow the law, and what that means, I think, is that you have to consider what you've heard. You can't go into that jury room and say, Okay, my morals say I can't vote for the death penalty and thus I'm going to just—no matter what I've heard, I'm just going to answer No. 4 'no.' Does that make sense, what I'm saying?"

"JUROR (Hamlin):    Yeah, kind of. I don't know how I could answer that question. I've never been placed in that situation. ***

"[DEFENSE COUNSEL]:    I guess as you've taken an oath already, I think that oath is to try your best to follow the law, and I guess what I'm hearing you saying is that you would try to do that.

"JUROR (Hamlin):    I *** suppose you could say that, yes."

After that exchange, defense counsel asked other prospective jurors about the questions that they potentially would

face during the penalty phase. Counsel eventually returned to Hamlin:

> "[DEFENSE COUNSEL]: Mr. Hamlin, what about those questions? I think you've told me a little bit about your views on the death penalty. In thinking about it now, do you think you could follow through?

> "JUROR (Hamlin): To be honest, I *** don't know. I mean, on one hand, I think following the law is important; but on the other hand, *if the law tells me I have to put someone to death, that doesn't sit very well with me.*"

(Emphasis added.)

One of the prosecutors later followed up on Hamlin's answers:

> "[PROSECUTOR]: You also indicated on your jury questionnaire that you are opposed to the death penalty, and if I understand it, it is not for religious reasons.

> "JUROR (Hamlin): No, it is not.

> "[PROSECUTOR]: Now, you've obviously heard the discussion that I had with [a prior juror who had reservations about the death penalty]. When you go back in the jury room, if you find the defendant guilty of aggravated murder—the defendants, I should say, in this case, either one or both—those are the four questions that you're going to answer. Could you ever impose a death sentence, knowing that you would have to answer all four of those questions 'yes'?

> "JUROR (Hamlin): I believe it is possible that I could.

> "[PROSECUTOR]: On your jury questionnaire you specifically indicated that you believed it was possible if the prosecution made—I think the words you used were *** an impassioned argument.

> "JUROR (Hamlin): Emotional, I believe.

> "[PROSECUTOR]: Emotional. What if the judge instructs you, and I think he will, that essentially emotion doesn't play a part in this? You are to consider the evidence dispassionately; that means without passion. Okay? In

other words, you can't be emotional. You can't be emotional in favor of the victims. You can't be emotional in favor of the defendants. Okay?

"Knowing that, and the fact that that is the law, that you would have to consider this without emotion, would you be able to do so? Would you be able to deliberate?

"JUROR (Hamlin):   No.

"[PROSECUTOR]:   Okay, *would it be fair to say then, sir, that if you know you cannot consider emotion, you have to render your verdict dispassionately, that you would not be able to follow the law as to those four questions because of your own personal beliefs regarding the death penalty?*

"JUROR (Hamlin):   *I believe that's highly likely.*"

(Emphasis added.)

At that point, the prosecutor asked that Hamlin be excused for cause. The trial court then asked Hamlin directly, "Are you saying you won't follow the law as I instruct you?" Hamlin replied, "I don't know." After seeking further clarification from Hamlin about whether he understood the issue, the court asked, "Are you saying you can't do your job?" Hamlin replied, "I'm saying I don't think I could vote to put a man to death." The court then inquired again about Hamlin's ability to follow the law:

"JUROR (Hamlin):   I think I could consider the * * * points in question four, but I don't know if that would ever lead me to a response of 'yes.'

"THE COURT:   And why is that? *Because you just know what you want the answer to be before you have the facts to support it?*

"JUROR (Hamlin):   I suppose so, yes.

"THE COURT:   And do you think that's appropriate as a * * * citizen and your obligation under the law?

"JUROR (Hamlin):   *When it comes to the death penalty, I suppose so.*"

(Emphasis added.) The court then excused Hamlin for cause.

On review, defendant urges that Hamlin's answers were sufficiently equivocal to preclude his excusal from a

death penalty jury. We disagree. Hamlin's answers during *voir dire* reflected that, for sincere moral and ethical reasons, he was opposed to the death penalty. That fact alone is not disqualifying. Indeed, the point of the fourth question under ORS 163.150(1)(b) (whether the defendant "should receive a death sentence") is to have each juror, in deciding the appropriate punishment, view the facts of the crime and the defendant's culpability through the prism of the juror's personal moral and ethical beliefs. In doing that, however, each juror must be able to apply the law and, true to the oath that the jurors take, come to a decision within the boundaries that the law sets. If a juror—whether in favor of or against the death penalty on principle—holds such strong ethical or moral views that the juror's conclusion is effectively foregone, no matter the law or the evidence in the case, that juror may be appropriately excused for cause. *Witherspoon*, 391 US at 522; *see also Witt*, 469 US at 424 (question is whether juror's views would "prevent or substantially impair" performance of duties as juror).

In Hamlin's case, the *voir dire* exchanges quoted above show that Hamlin's completed juror questionnaire raised concerns about Hamlin's ability or willingness to vote to impose the death penalty. The trial court and both the prosecutor and defense counsel took pains during *voir dire* to clarify Hamlin's position. Although Hamlin's position may have been somewhat equivocal at the outset, as the *voir dire* continued, it became unequivocal: Hamlin conceded that he knew how he would answer the fourth question, even without knowing the facts or knowing whether, under the law, his consideration of the facts would support that answer. And he was candid in saying that, for him, "[w]hen it comes to the death penalty," he thought that approach was appropriate. For that reason, Hamlin did not think that there were any facts that could lead him to vote "yes" on the fourth question. Hamlin's categorical answers provided the trial court with grounds to conclude that Hamlin's personal beliefs would prevent or substantially impair his performance of his duties as a juror. Under *Witherspoon* and *Witt*, a prospective juror who takes that position may be excused from a capital jury for cause, and the trial court therefore did not abuse its discretion in excusing Hamlin.

We reach a similar conclusion as to prospective juror Porter. During *voir dire*, in response to defense counsel's inquiry about the prospective jurors' general positions on the death penalty, Porter volunteered, "I cannot make the decision. Nobody has nobody's life in their hands." Defense counsel noted that, although Porter's completed questionnaire suggested that Porter opposed the death penalty, she had answered that nothing would prevent or impair her ability to follow the trial court's instructions. Porter reiterated, "I'm saying 'no' to the death penalty" and would do so "regardless of the judge's instructions."

Later, the trial court suggested that it was not yet prepared to dismiss Porter for cause because Porter's statements about whether she could follow the court's instructions were inconsistent. The prosecutor then asked Porter if there were "any way that you could answer 'yes' to question four?" Porter replied, "No." The prosecutor asked her about a statement in her questionnaire that she "could not, no matter what the facts, impose death," and whether that was her "answer here today?" Porter stated, "Yes." The following exchange then occurred:

"[PROSECUTOR]: Okay. So again, no matter what the facts, no matter the instructions given to you by the court, you could not vote 'yes' to question four?

"JUROR (Porter): I think I will answer 'no.'

"[PROSECUTOR]: No, you could not.

"JUROR (Porter): I could not."

The trial court also addressed Porter, noting her inconsistent answers on the juror questionnaire and asking, "Are you telling me that you could not impose the death penalty no matter what?" Porter then explained her views and beliefs at length. Ultimately, Porter maintained that she would respond "no" to the fourth question, and the court excused her for cause.

The trial court's decision to excuse Porter, based on *Witherspoon* and *Witt*, is supported by the record, which, as set out above, contains numerous references to Porter's answers on her completed juror questionnaire and several

lengthy colloquies showing that Porter's position on the death penalty would prevent or substantially impair her performance of her duties as a juror. Under *Witherspoon* and *Witt*, the trial court did not abuse its discretion in excusing her from the jury.

The third juror excused for cause was prospective juror Burns. As defense counsel during *voir dire* began to explore Burns's ability to sit on a death penalty case, defense counsel asked, "Mr. Burns, I think from your questionnaire, I can gather what your views of the death penalty are, so I'm not going to ask you that question. But I guess my question is: Are you able to follow the rules?" Burns replied, "Absolutely." Later, the prosecutor talked to the prospective jurors about the death penalty, focusing in particular on whether the jurors would be able to answer "yes" to the fourth question. Burns responded:

> "JUROR (Burns):   *** I'm having *** a [little] trouble. The truth of the matter is that you've kind of gone to the heart of the matter for me, is *** you get to this point, and the thought of sitting here in judgment of a man on trial for his life just frightens the living daylights out of me. I'm getting very emotional about it just hearing you talk about it.
>
> "[PROSECUTOR]:   It's better to do this up front than to find out at the end—
>
> "JUROR (Burns):   On the other hand, I have tremendous respect for the law of the land—and I want to say that I could say 'yes' to question four. And I think I answered in my questionnaire that the crime would have to be particular[ly] heinous to me in order for me to put a man to death, which is what I'm doing, in essence.
>
> "[PROSECUTOR]:   Yes.
>
> "JUROR (Burns):   And it would be very, very tough for me to make that call. That said, if *** it was heinous enough, I think that I could go to that place, but it scares the hell out of me, just saying it to you.
>
> "[PROSECUTOR]:   It shouldn't be easy for anyone. *** I apologize in advance. I don't want to press you, but *** this is my last chance to speak to you about this. I want to be absolutely sure we consider this from all angles.

"So, you're on the jury. You're considering the four questions. There's already been a finding of guilt as to aggravated murder. All of the other jurors have answered all of the questions 'yes,' and it's down to you, and you're trying to make those decisions. And in your heart of hearts, you're convinced that questions one, two and three have been proved beyond a reasonable doubt. There is no burden of proof on the fourth question. It is simply considering the aggravating and mitigating circumstances and that first question that it poses: Shall a death sentence be imposed[?] Everything is moving forward toward a sentence of death.

"If you were convinced that the answer should be 'yes' to question four, there have been 47 'yes' votes to this point, and you hold that life in your hands, do you think you'll be able to do it?

"JUROR (Burns):   I don't know.

"[PROSECUTOR]:   You ***

"JUROR (Burns):   I mean, I'm really sort of tripping out as you tell this to me, and *** the safe way is to say 'no,' but in my head I'm thinking that the right way is to say 'yes.' You have to follow the law.

"[PROSECUTOR]: Uh-huh.  You  understand—you heard what [defense counsel] said, though, that is, that the law is always satisfied with life, and there's *** no formulation of this that ever mandates a sentence of death.

"So, knowing that, knowing that the law will never compel you to return a verdict of death, and you're holding *** that last vote—

"JUROR (Burns):  *I couldn't do it, I couldn't do it.* I would argue as strong as—first of all, I believe that 30 years [or] life without parole is a far worse punishment than death. I believe putting a man to death in such a situation as this, you're *** doing him a favor, in kind of a macabre sense.

"But I would argue, as strongly as I possibly could with my fellow jurors, not to put this man to death, I think."

(Emphasis added.)

After that line of questioning, the trial court excused Burns for cause. In response to the trial court's ruling, defense counsel argued:

"I think the rehabilitation or whatever you want to call it was unreasonable by the State. I think [Burns] was clear, he could do it. They just kept pounding on him, pounding on him, pounding on him.

"One of the things he did say is that it depended on— and I'm going to paraphrase[—]as the fourth question talks about, any circumstances of the offense, and he talked about a heinous offense. So if he considered this a heinous offense, he could say 'yes' to that. I think that's what he said, and the State just beat him, and that's when he said 'no.' ***"

The court disagreed, stating, "[W]ith regard to Mr. Burns, whom I already highlighted that I thought was going to be in, if it came down to the last vote and he was the one, that's when he said, 'No, I won't do that.' Which surprised me, but that—that's where he was."

The situation with prospective juror Burns differs somewhat from those of prospective jurors Hamlin and Porter. Viewed in context, the *voir dire* quoted above suggests that Burns's completed juror questionnaire did not contain answers that either counsel or the court viewed as likely requiring excusal under *Witherspoon* (or, at least, that some clarifying inquiry was required). In fact, based on the questionnaire alone, the trial court commented that he had marked Burns as "in," meaning that the court thought that Burns's answers would not disqualify him on that basis. But, when questioned at length, Burns's position either changed or became more apparent to Burns himself as he attempted to come to terms with how he in fact would feel about imposing death as a sentence. He initially suggested that he would consider imposing the death penalty for a crime that was sufficiently heinous. Then, when pressed specifically about what he would do if his was the final vote on the fourth question, and all the other jurors already had answered all four questions in favor of the death penalty, he ultimately declared that he "couldn't do it."

The issue posed by Burns's answers is similar to the *voir dire* issue that this court resolved in *State v. Nefstad*, 309 Or 523, 533-38, 789 P2d 1326 (1990), *cert den*, 516 US 1081 (1996), which was also a death penalty case. During *voir dire* in *Nefstad*, Myers, a prospective juror, made equivocal statements about his ability to apply the law, and, when pressed, he told the judge that, "[a]t the risk of contradicting [himself] again, [he] could not assure [the judge] that [he] would not let his feelings interfere." *Id.* at 537 (brackets in original). In concluding that the trial court's excusal of Myers was not error under *Witherspoon*, this court stated:

> "The trial court's question and Myers's response came after defendant['s] counsel and the prosecutor had completed their examination of Myers. The trial judge, who had an opportunity to hear Myers's responses and to observe his demeanor during the previous questioning, concluded that Myers's answers to the judge's question (and, by implication, his answers to the prosecutor's inquiries) should be believed. In such a case, particularly where the prospective juror has given admittedly contradictory responses, the trial court's conclusion with regard to his 'ultimate qualifications is entitled to great weight,' where the court had the advantages of 'observing [his] demeanor, apparent intelligence and candor, all of which are factors in the trial of a challenge for cause.'"

*Id.* at 537-38 (quoting *State v. Brumfield*, 104 Or 506, 528-29, 209 P 120 (1922)); *see also Witt*, 469 US at 426 (because trial court has opportunity to assess prospective juror's demeanor, deference should be paid to trial court in determining whether prospective juror would be unable to apply law faithfully and impartially); *White v. Wheeler*, 577 US ___, 136 S Ct 456, 461, 193 L Ed 2d 384 (2015) (trial court did not err in excusing prospective juror who initially suggested that he could follow law but eventually stated that his views would prevent him from imposing death penalty).

As a general rule, we accord "great deference" to the trial court's assessment of a prospective juror's qualifications, because "the trial court has the advantage of observing a challenged prospective juror's demeanor, apparent intelligence, and candor." *McAnulty*, 356 Or at 463 (internal quotation marks omitted). And we give "greatest deference

to the trial court when a juror's answers are contradictory or unclear." *State v. Compton*, 333 Or 274, 286, 39 P3d 833, *cert den*, 537 US 841 (2002). In this case, in Burns's owns words, he was getting "very emotional" as he discussed his ability to apply the death penalty, later stating that he was "tripping out." Given Burns's inconsistent statements, the statements in the record showing that Burns's thoughts on the question evolved over the course of *voir dire*, and the trial court's superior vantage point to assess Burns's demeanor and the import of his answers, the trial court properly exercised its discretion in accepting and relying on Burns's final statement—that he "could not do it"—as a basis for determining, under *Witherspoon* and *Witt*, that Burns was not qualified to sit as a juror in this case.

In short, the record supports the trial court's determination that Hamlin's, Porter's, and Burns's views on the death penalty would interfere with their respective abilities to follow the law. We therefore conclude that the trial court did not abuse its discretion in excusing those prospective jurors under the Sixth Amendment, under the standards that the Supreme Court announced in *Witherspoon* and *Witt*.

### 2. *Destruction of completed juror questionnaires*

We turn, then, to the trial court's order to destroy the juror questionnaires after *voir dire* was completed. Defendant contends that, without Hamlin's, Porter's, and Burns's completed questionnaires, this court cannot adequately review whether the trial court properly excused those jurors under *Witherspoon* and *Witt*, which, in turn, amounts to a violation of the Due Process Clause.[26] Defendant makes two alternative arguments on that point. First, he contends that the trial court's decision to destroy the juror questionnaires—instead of preserving them for the record—constituted *per se* reversible error under the Due Process Clause, one that

_____

[26] The Fourteenth Amendment to the United States Constitution provides, in part, "No state shall *** deprive any person of life, liberty, or property, without due process of law[.]" In arguing that the trial court erred in destroying the completed juror questionnaires, defendant also offers a general citation to the Equal Protection Clause of the Fourteenth Amendment ("[n]o state shall *** deny to any person within its jurisdiction the equal protection of the laws"), but he does not connect any part of his argument to that clause or the principles that it embodies.

obviates any need for defendant to make a predicate show-
ing of prejudice. Alternatively, even if he must show that the
destruction of the completed questionnaires actually preju-
diced him in this case, defendant argues that he has made
that showing and is therefore entitled to reversal. We first
provide the additional facts necessary to discuss defendant's
arguments; we then discuss why neither argument is well
taken.[27]

   a.   Additional facts

        In advance of *voir dire*, the prospective jurors were
asked to complete written questionnaires for use by coun-
sel and the trial court during jury selection. The trial court
included on the blank juror questionnaire form an express
statement that, at the conclusion of *voir dire*, the completed
questionnaires would be destroyed. The court did so because
it thought that the prospective jurors would feel more com-
fortable providing candid written answers if they were
assured that the completed questionnaires would later be
destroyed. Counsel for both parties had an opportunity to
review that form before it was given to the prospective jurors
to complete, but neither party objected or otherwise raised
any concern about the representation on the form that the
completed questionnaires would be destroyed.

        Instead, defendant raised an objection to the
destruction only after the jurors already had completed the
questionnaires, arguing at that point that the question-
naires should be preserved for the record on appeal. The
state agreed and likewise urged the trial court not to destroy
the questionnaires. In response, the trial court voiced con-
cern that the questionnaires would "clog the record." The

---

[27] Defendant raises additional arguments based on ORS 19.420(3) and
Article VII (Amended), section 3, of the Oregon Constitution, contending that
those provisions required the trial court to ensure preservation of an adequate
record for purposes of appellate review. *See* ORS 19.420(3) (appellate court may
reverse judgment and order new trial, "as justice may require," whenever it
appears that appeal cannot be prosecuted due to loss or destruction of reporter's
notes, audio records, exhibits, "or other matter necessary to the prosecution of the
appeal"); Or Const, Art VII (Amended), § 3 (right to jury trial; Supreme Court
may determine, "after consideration of all the matters thus submitted," whether
judgment should have been rendered or, instead, should be changed). Defendant's
arguments based on those sources of law are not preserved, however, and so we do
not address them.

parties then offered to scan the questionnaires to preserve them in digital form. The court rejected that solution, however, expressly noting its commitment to the representation that it already had made to the prospective jurors that the completed questionnaires would be destroyed after *voir dire*. As a solution to the parties' concerns about ensuring the adequacy of the record for review, the trial court gave the parties additional time at the conclusion of *voir dire* to review the completed questionnaires to determine what information, if any, should be read into the record to preserve it for appeal. After that time period passed, pursuant to the court's order, the questionnaires were destroyed.

### b. Analysis

Defendant first argues that that trial court's order to destroy the questionnaires is a ground for *per se* reversal because it deprived defendant of a record capable of meaningful appellate review, in violation of defendant's due process protections. He acknowledges that due process usually requires a showing of prejudice to obtain a reversal of a trial court judgment based on inadequacy of the record. *See, e.g.*, *Bransford v. Brown*, 806 F2d 83, 86 (6th Cir 1986) ("[T]o demonstrate denial of a fair appeal, petitioner must show prejudice resulting from the missing transcripts."). He contends, however, that some federal courts have indicated that a defendant's burden to show prejudice is relieved when the government's conduct in destroying or failing to preserve information for the record is "invidiously motivated" or made in "bad faith." *See id.* at 85-86 (no *per se* violation of due process right to fair appeal when transcript of jury instructions is simply missing and failure to produce it is not "invidiously motivated"); *see also Arizona v. Youngblood*, 488 US 51, 57, 109 S Ct 333, 102 L Ed 2d 281 (1988) (under Due Process Clause, defendant must show that lost evidence is material and exculpatory, unless evidence lost in bad faith).

Even if defendant's understanding of the cited cases is correct, they do not assist him here. The cases that defendant cites require a showing of "invidious motivation" or a similar kind of "bad faith." Defendant did not at trial, and does not now, suggest that the trial court in this case acted with invidious motivation or bad faith in destroying

the juror questionnaires. Instead, defendant argues that the questionnaires are missing from the record as a result of the trial court's intentional decision to destroy them. The record, to be sure, demonstrates that the court acted intentionally, rather than through inadvertence or mistake. But taking an action intentionally does not necessarily mean that the action was taken for an improper motive or purpose, such as to impair the fairness of the proceedings or to prevent meaningful review of the record by an appellate court. Nor does the record suggest that the trial court was so motivated in this case.

Neither party disputes what happened in this case or why it happened. The blank questionnaire form represented to the prospective jurors that the completed questionnaires would be destroyed after *voir dire*. That representation was made so that prospective jurors would provide more forthcoming information relevant to their personal experiences, backgrounds, and biases—information of value to the parties and the trial court in any case, but of particular value in a death penalty case. Both parties had an opportunity to object to the representation that the questionnaires would be destroyed; neither party did. When the trial court later had the questionnaires destroyed, it did so intentionally, but for one principal reason: To keep faith with the representation that it already had made to the prospective jurors and that was in place when they completed their questionnaires. Nothing in the cases that defendant cites suggests a legal rationale that would deem the destruction of the questionnaires in the circumstance of this case to be a *per se* violation of due process. We therefore reject defendant's argument that, even without a showing of actual prejudice, he is entitled under the Due Process Clause to a reversal of the judgment and a remand for a new trial in this circumstance.

Our conclusion that the trial court's order destroying the completed juror questionnaires did not *per se* deprive defendant of due process does not mean that we approve of the trial court's action. We recognize only that the trial court was well-intentioned in its reasons for destroying the questionnaires. We do not endorse as appropriate the representation on the form that the questionnaires would be

destroyed, nor do we endorse the practice of destroying the questionnaires pursuant to that representation. Trial courts are most likely to make such a representation and take such steps in cases of particular sensitivity, such as death penalty cases. The sensitive nature of such cases, however, makes it all the more important to preserve all aspects of the record for review. Administrative concerns of retaining and preserving voluminous paper questionnaires can be readily met in this digital age through scanning and electronic storage. Concerns about unduly exposing information that prospective jurors might be more willing to disclose on paper than in the public limelight of a courtroom can be accommodated, if otherwise authorized by law, by sealing the completed questionnaires after *voir dire* and advising the prospective jurors in advance that the questionnaires will be sealed and later opened, if at all, only pursuant to court order. We are confident that, through those or other resourceful solutions, trial courts can appropriately encourage and obtain candid information from jurors that will aid the parties and the trial court alike in conducting meaningful *voir dire*, without destroying that information and rendering it unavailable for later review.

The question remains, however, whether defendant was in fact prejudiced by the trial court's decision to destroy the jury questionnaires, entitling him to reversal under the Due Process Clause. To demonstrate prejudice, defendant must show that the record—without the juror questionnaires—is insufficient for this court to evaluate whether the trial court properly excused prospective jurors Hamlin, Porter, and Burns under *Witherspoon* and *Witt*. *See Boyd v. Newland*, 467 F3d 1139, 1142 (9th Cir 2006), *cert den*, 550 US 933 (2007) (granting federal writ of habeas corpus because missing part of transcript rendered it impossible to review petitioner's claim); *Brecht v. Abrahamson*, 507 US 619, 637-38, 113 S Ct 1710, 123 L Ed 2d 353 (1993) (similarly applying "actual prejudice" standard as whether error "had substantial and injurious effect or influence" in determining jury's verdict). As we will explain, both the nature of defendant's challenge and the specific record of this case defeats defendant's claim of prejudice.

The first problem for defendant's claim of actual prejudice is that the trial court gave defendant and the state alike an ample alternative avenue to create the record that defendant now claims is missing. In particular, before the completed juror questionnaires were destroyed pursuant to the trial court's directive, the court permitted the parties to review the questionnaires with the specific objective of supplementing the record, beyond anything that already had come out during the course of *voir dire*, with answers or other information in the questionnaires that either party thought was important to their case. Neither party opted to supplement the record pursuant to the court's invitation.

The second problem for defendant's claim of actual prejudice is that the *voir dire* itself—which is a matter of record in this case—was the natural way to explore the information on the completed juror questionnaires. The record reveals that the parties in fact used *voir dire* for that purpose and provides no basis to conclude that the questionnaires, if preserved, would have revealed anything on review that either was not explored during *voir dire* or was not effectively superseded by the *voir dire* record. Throughout *voir dire*, during which the parties still had full access to the questionnaires, counsel for both sides repeatedly referred to the answers that various prospective jurors had given and explored those answers—and made a record of them—as appropriate to their examinations of the individual jurors. That occurred in particular during the *voir dire* examination of the three prospective jurors—Hamlin, Porter, and Burns—that we have already quoted from and discussed at some length. For example, in the examination of Hamlin, defense counsel specifically commented that he had "read [Hamlin's] juror questionnaire" and went from that comment to asking Hamlin about his ability to follow the law. The prosecutor, in turn, referred to the fact that Hamlin's answers on the questionnaire suggested that he was opposed to the death penalty, which prompted the prosecutor to explore Hamlin's views in greater depth through *voir dire*. And likewise, the prosecutor asked Hamlin specifically about the suggestion on his questionnaire that he might be able to impose a death sentence if the prosecution

made "an impassioned argument." In examining Porter and Burns, both counsel similarly referred to answers that those prospective jurors had given on their questionnaires and explored those answers in meaningful depth in the course of *voir dire*.

Thus, the completed juror questionnaires served their usual purpose in this case: They were a springboard from which the parties—and, as necessary, the trial court—could examine and make a record in the depth necessary on each prospective juror's background, experiences, attitudes, and beliefs. In this instance, to the extent that the questionnaires contained information that had bearing on whether particular prospective jurors held views that would prevent or substantially impair their performance of their duties as a juror in a death penalty case, the normal process of *voir dire* gave the parties a full opportunity to make a record of that information. And, because the parties went through *voir dire* knowing that the court was not going to preserve the questionnaires for the record, they had every incentive to take full advantage of that opportunity. The record before us has provided us with a meaningful basis to review defendant's claims that the trial court erred in excusing Hamlin, Porter, and Burns. We have no reason to conclude that the questionnaires themselves—had they been preserved—would have materially aided our review.[28]

In asserting that the record is insufficient for that review, and that the destruction of the completed juror questionnaires therefore prejudiced him, defendant principally relies on the Ninth Circuit's decision in *Ayala v. Wong*, 693 F3d 945 (9th Cir 2012), *withdrawn and superseded*, 730 F3d 831 (9th Cir 2013), *amended and superseded*, 756 F3d 656 (9th Cir 2014), *rev'd and rem'd sub nom Davis v. Ayala*, 576

---

[28] In addition to specific arguments about the excusal of Hamlin, Porter, and Burns, defendant also makes a generic argument that the destruction of the completed juror questionnaires led to the improper excusal of 19 additional jurors. Other than bare citations to the transcript, he includes no information about the *voir dire* of those jurors; neither does he make any specific factual or legal arguments concerning them. We have reviewed the *voir dire* transcripts in full and the court's excusal of those jurors for various reasons. The record provides no basis to conclude that, if the questionnaires had not been destroyed and therefore were now available on review, defendant might be able to demonstrate some error in the excusal of those 19 jurors.

US \_\_\_, 135 S Ct 2187, 192 L Ed 2d 323 (2015).[29] *Ayala* was a federal habeas corpus case in which the Ninth Circuit concluded that the fact that completed juror questionnaires were inexplicably missing from the record violated the petitioner's right to an adequate record for purposes of review, and was both error and prejudicial.[30]

The Ninth Circuit's holding in *Ayala*, 756 F3d 656, does not aid defendant, because of the different kind of challenge to the excusal of prospective jurors that it involved. *Ayala* involved a so-called *Batson* claim—that is, a claim that the prosecutor, while articulating a legitimate basis to challenge a prospective juror, in fact did so for impermissible discriminatory reasons, such as race. *Batson v. Kentucky*, 476 US 79, 106 S Ct 1712, 90 L Ed 2d 69 (1986). As the Ninth Circuit explained, in analyzing a *Batson* challenge, an appellate court must engage in a "comparative juror analysis" to determine whether a prosecutor's reasons for challenging a racially diverse prospective juror were pretextual.[31] *Ayala*,

---

[29] Defendant relies on aspects of the Ninth Circuit's 2012 and 2013 decisions in *Ayala*. The Ninth Circuit issued its 2014 decision after defendant filed his opening brief in this case.

[30] Although the Supreme Court reversed the Ninth Circuit, its ground for doing so does not inform our resolution of the issue. The California Supreme Court, on direct appeal in the petitioner's case, had concluded that the petitioner had not been prejudiced by the loss of the questionnaires. *Davis v. Ayala*, 576 US at \_\_\_, 135 S Ct at 2195. In a subsequent habeas corpus proceeding, the Ninth Circuit determined instead that petitioner had been prejudiced and that the California Supreme Court thus had erred. *Id.* at 2196-97. On review, the Supreme Court concluded that the Ninth Circuit had incorrectly determined the prejudice issue anew. The Court determined that, properly framed, the question on habeas review was whether the California Supreme Court's resolution of the harmless error question had amounted to an unreasonable application of established federal law and concluded that it had not. *Id.* at 576 US at \_\_\_, 135 S Ct at 2202, 2208. The Court's answer to that question does not, however, compel the conclusion that the California Supreme Court was required to rule as it did on direct review of the petitioner's convictions. Consequently, it is for us to determine in the first instance whether we can engage in meaningful review of defendant's *Witherspoon* challenge to the excusal of prospective jurors Hamlin, Porter, and Burns, despite the destruction of the completed juror questionnaires. If defendant later files for federal habeas corpus relief and, in the course of that collateral proceeding, challenges our resolution of that issue, it will be a different question—as it was in *Ayala*—whether our answer amounts to an unreasonable application of established federal harmless error law.

[31] For example, permissible reasons for challenging a prospective juror might be related to the juror's other life experience or prior jury service. *See generally State v. Henderson*, 315 Or 1, 8, 843 P2d 859 (1992) (citing representative cases). But if completed juror questionnaires revealed—as *voir dire* itself might

756 F3d at 676; *see also Miller-El v. Dretke*, 545 US 231, 240-52, 125 S Ct 2317, 162 L Ed 2d 196 (2005) (engaging in comparative juror analysis to consider the petitioner's *Batson* challenge). In addition, in *Ayala*, some of the prosecution's proffered reasons for striking nonwhite jurors referred to the questionnaires that had been lost. *Ayala*, 756 F3d at 677. In combination with a related, but different, error that the Ninth Circuit determined had hampered the petitioner's ability to have his *Batson* challenge meaningfully reviewed, the Ninth Circuit concluded that the petitioner's due process interest in an adequate record for review had been prejudicially harmed. *Id*. at 672.

This case does not involve a racial-discrimination challenge under *Batson*; rather, it involves a death panel-eligibility challenge under *Witherspoon*. A *Witherspoon* challenge asks a different question than does a *Batson* challenge. A *Batson* challenge asks whether the prosecutor uniformly requested excusal of all prospective jurors who possessed a specific trait; such a challenge therefore is inherently comparative and entails looking for patterns in the backgrounds and profiles of the jurors that would reveal any hidden bias on a prosecutor's part. A *Witherspoon* challenge, by contrast, asks whether an *individual* prospective juror's views about the death penalty will so hinder that juror's judgment that he or she will be unable to follow the oath to consider the facts, follow the law, and decide the case impartially. A *Witherspoon* challenge therefore is not inherently comparative and does not necessarily entail considering the jury pool in the same aggregate way as does a *Batson* challenge. In this particular instance, at least, defendant's *Witherspoon* challenge depends on the specific juror's responses to the parties' and the trial court's inquiries about each juror's individual views on the death penalty. When—as in this case—the record on appellate review shows that the trial court excused a prospective juror because that juror indicated on the record an inability to follow the law and, in an

---

not—that the prosecutor had not challenged white prospective jurors with the same or similar life experience and prior jury service noted on their questionnaires, while challenging racially diverse prospective jurors on that purported basis, then the questionnaires themselves, more so than *voir dire*, would reveal the potentially pretextual nature of the prosecutor's explanation.

appropriate case, to impose the death penalty, the record is sufficient for appellate review of a *Witherspoon* challenge. For such a challenge, no *per se* prejudice to the defendant arises from the inability to make a comparative analysis of prospective jurors based on the aggregate information available only through their collective questionnaires.

For those reasons, we conclude that the record permits adequate review of defendant's challenges to the excusal of prospective jurors Hamlin, Porter, and Burns, and that the trial court's decision to destroy the completed questionnaires, while ill-advised, did not prejudice defendant and does not require reversal under the Due Process Clause.[32]

D.   *Evidence of Prior Bad Acts (Assignment No. 114)*

1.   *Additional facts*

Defendant next argues that the trial court erred in admitting evidence that, years earlier, he had called in a bomb threat to a different Woodburn bank. That evidence came from defendant's friend, Laughlin, who testified that, in 1995, he had gone to a job site in Woodburn where defendant was working, to meet defendant for lunch. As they prepared to leave the job site for a particular restaurant in Woodburn, defendant told Laughlin that he had just telephoned a bank near that restaurant, told the bank teller who answered that there was a bomb in the bank, and directed the teller to take $50,000 to an outhouse located in a construction area in the bank's parking lot. Laughlin and defendant then went to the restaurant and, from there, watched police vehicles arrive at the bank and officers examine the outhouse. The call had been a hoax. The bank involved was not either the Wells Fargo Bank or the West Coast Bank involved in the charged 2008 crimes, but it was near those banks.[33]

---

[32] In another assignment of error, defendant argues that the trial court erred in advising the prospective jurors—through the statement included on the blank juror questionnaire form—that the questionnaires would be destroyed following *voir dire*. Defendant did not make that argument to the trial court. We therefore do not address it, except to the extent that, as expressly stated earlier in this opinion, we disapprove of that practice and expect trial courts in future cases to find other ways to encourage juror candor without deleting materials from the record of the case.

[33] Testimony in the record, together with street photographs of the area from the 2008 bombing admitted into evidence, show that the restaurant from which

Anticipating that the state would seek to have Laughlin's testimony of the 1995 incident admitted, defendant moved *in limine* to exclude it. The state, in its written response, urged that the evidence was "related to motive, ability, planning and preparation," as well as "intent" and "knowledge," and it therefore was admissible under OEC 404(3). The state further suggested that the trial court should admit the evidence without balancing its prejudicial versus probative value, citing OEC 404(4). At a pretrial hearing on the matter, the court granted defendant's motion and ruled that the evidence would not be admitted. The court at that time was not persuaded that the evidence was relevant for anything other than propensity. The court, however, gave the state leave to ask the court to reconsider its ruling later, acknowledging that the relevancy of the evidence for one or more nonpropensity purposes might become more apparent during trial. The court further suggested that, if it were to later conclude that the evidence was relevant, then the evidence would still be subject to balancing under OEC 403. Because of the court's initial pretrial determination that the evidence was not relevant, the trial court directed the state not to refer to evidence of the 1995 bomb threat during *voir dire* and opening arguments.

During trial, the state sought to present evidence of the 1995 bomb threat, beginning with an offer of proof, and defendant objected on several grounds. First, he argued that the proffered evidence was insufficient to show that the event actually had occurred. Second, he suggested that the state was offering the evidence as proof of *modus operandi* and identity, and that the 1995 conduct was insufficiently similar to the 2008 bombing to be relevant for that purpose. Third, defendant argued that the incident was too remote in time to be relevant. Finally, defendant argued that the 1995 bomb threat was not relevant to prove intent. Consistently with its written argument, the state responded that—for some of the charged crimes—the state had to prove that the crimes related to an attempt to rob a bank. For those crimes,

defendant and Laughlin watched police arrive and inspect the outhouse outside the bank that had received the 1995 bomb threat was located across the highway from the Wells Fargo Bank that received the threatening phone call in this case, which, in turn, was located next door to the bombed West Coast Bank.

the state argued that evidence of the 1995 bomb threat was relevant to prove motive, ability, planning, preparation, intent, and knowledge. The state further urged that the past bomb threat was similar to the conduct charged, involved the same class of victim, and involved, in essence, a "dry run" of a bank robbery. The parties also debated whether the probative value of the evidence was significantly outweighed by its prejudicial impact, with defendant urging that it was not, and the state countering that the evidence was not "unfairly" prejudicial. Both parties relied on the analysis of admissibility outlined in *State v. Johns*, 301 Or 535, 725 P2d 312 (1986).

On the basis of those arguments, the trial court revisited and reversed its pretrial ruling. The trial court ruled, based on *Johns*, that evidence of the 1995 bomb threat was admissible because "it's similar, it's unique, and it's only separated in time." Consistently with that ruling, the state later introduced Laughlin's testimony describing the 1995 incident during its case-in-chief.

2. *Parties' arguments on review*

On review, the parties renew the arguments that they made to the trial court. Specifically, both parties rely significantly on the analytical framework announced in *Johns* to argue their respective positions on the admissibility of the evidence of the 1995 bomb threat.

In addition, both parties also advance supplemental arguments in light of this court's recent decision in *State v. Williams*, 357 Or 1, 346 P3d 455 (2015), which addressed OEC 404(4). Relying on *Williams*, defendant contends that a balancing exercise under OEC 403 still is required before uncharged prior bad act evidence may be admitted and that the admission of such evidence in cases other than those involving child sexual abuse (at issue in *Williams*) is still subject to the analytical framework announced in *Johns*. The state, likewise relying on *Williams*, contends that, in criminal cases, OEC 404(4) preempts the limitations that OEC 404(3) otherwise places on the admission of evidence of "other crimes, wrongs or acts," and that such evidence is always admissible under OEC 404(4) if it is relevant—even for a propensity purpose—as long as its admission does not

violate due process. Additionally, defendant relies on *State v. Leistiko*, 352 Or 172, 282 P3d 857, *adh'd to as modified on recons*, 352 Or 622, 292 P3d 522 (2012), to argue that, if the trial court properly admitted evidence of the 1995 bomb threat, then the court *sua sponte* should have instructed the jury not to consider that evidence without first determining whether defendant committed the charged acts to which that evidence was relevant. The state responds by urging that the limiting instruction required in *Leistiko* applies only to evidence that is relevant under a "doctrine of chances" theory, which is not the relevancy theory that applied to the evidence of the 1995 bomb threat in this case.

We address the parties' respective arguments below. As we will explain, we ultimately conclude that the trial court did not err in applying OEC 404(3) and in admitting the evidence, and that no limiting instruction was required.

    3.  *Analysis*

        a.  OEC 404(3), OEC 403, and OEC 404(4); statutory text and general principles

We begin by setting out the evidentiary rules at issue. OEC 404(3) provides:

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Evidence admitted or excluded under OEC 404(3) is often referred to as "prior bad acts" evidence. *See, e.g.*, *Johns*, 301 Or at 555 (citing treatises). OEC 404(3) is an "inclusionary" rule, as opposed to an "exclusionary" rule, expressly stating that prior bad acts evidence may be admissible as long as it is relevant for any purpose other than to prove "propensity"—that is, to prove the character of a person, to show that the person acted in conformity with that character. *Id.* at 548; *see generally Williams*, 357 Or at 16 n 15 (discussing rationale of general evidentiary ban on so-called "propensity" evidence).

If a trial court determines that prior bad acts evidence is relevant for a purpose other than to establish that a person has a propensity to act in a particular way, the admissibility analysis does not necessarily end, however.[34] At least unless OEC 404(4) otherwise directs—which we discuss next—admissibility still depends on a trial court determination, in response to a proper motion, that the probative value of the evidence outweighs the danger of unfair prejudice under OEC 403. *See* OEC 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."); *Johns*, 301 Or at 550 (discussing balancing analysis required under OEC 403); *see also Williams*, 357 Or at 19 ("When a party objects, under OEC 403, to 'other acts' evidence offered under OEC 404(4), a trial court must engage in the balancing anticipated by OEC 403.").

OEC 404(4), enacted in 1997, Or Laws 1997, ch 313, § 29, applies more specifically to prior bad acts evidence in "criminal actions." It provides:

"In criminal actions, evidence of other crimes, wrongs or acts by the defendant is admissible if relevant except as otherwise provided by:

"(a) [OEC 406 through 412] and, to the extent required by the United States Constitution or the Oregon Constitution, [OEC 403];

"(b) The rules of evidence relating to privilege and hearsay;

"(c) The Oregon Constitution; and

"(d) The United States Constitution."

---

[34] And, as explained in other cases, a court's determination that evidence is relevant for a nonpropensity purpose in turn may require further analysis, depending on the asserted purpose. *See, e.g.*, *State v. Garrett*, 350 Or 1, 10, 248 P3d 965 (2011) (to be relevant to establish motive, prior bad acts evidence need not have same physical elements as charged crime); *Johnson*, 340 Or at 339 (to admit prior crimes evidence as relevant to proof of identity based on *modus operandi*, trial court must find "very high degree of similarity" between charged and uncharged crimes, together with "highly distinctive" methodology).

As described, the parties, relying on this court's analysis of that provision in *Williams*, 357 Or 1, dispute the extent to which that analysis controls in this case. In effect, the state's position is that, under *Williams*, evidence of the 1995 bomb threat was admissible under OEC 404(4), even if relevant as propensity evidence, and no balancing of the probative value of the evidence against its potential for undue prejudice under OEC 403 was required. Because the state's argument, if correct, would negate the need to examine the admissibility of the 1995 evidence under OEC 404(3), we examine our holding in that case in some detail.

    b.   *Williams* and its analysis of OEC 404(4)

The defendant in *Williams* was convicted on two counts of first-degree sexual abuse of a child victim. At trial, the defense theory was essentially that, if the defendant had touched the victim at all (which he disputed), any touching had been inadvertent, instead of for a sexual purpose, as the state was required to prove. 357 Or at 3. The state offered evidence that children's underwear had been found secreted at several locations in the defendant's home, arguing that that evidence was relevant to demonstrate that he had touched the victim with a sexual purpose and not accidentally. *Id.* at 4. The defendant asserted that the evidence was not admissible under OEC 404(3), pursuant to the analytical framework that *Johns* had announced. The state, however, urged that OEC 404(3) had been superseded by OEC 404(4). This court agreed with the state, concluding that "the legislature intended OEC 404(4) to supersede OEC 404(3) in criminal cases, except, of course, as otherwise provided by the state or federal constitutions." *Id.* at 15.

This court then considered whether, under OEC 404(4), due process required the exclusion of "propensity" evidence previously not admissible under OEC 404(3), based on principles of fundamental fairness. *Williams*, 357 Or at 18. The court ultimately concluded that, in child sexual abuse prosecutions where the state offered prior bad acts evidence to prove that the defendant had a propensity to sexually abuse children, due process "at least requires that, on request, trial courts determine whether the probative value of the evidence is outweighed by the risk of unfair prejudice."

*Id.* at 19. The court specifically reserved, however, the question whether—in assessing the admissibility of propensity evidence—that due process analysis requires the same "traditional" or "subconstitutional" balancing that OEC 403 requires, or whether the due process analysis requires some greater or different showing of prejudice before exclusion of the evidence is constitutionally compelled. *Id.* at 19 n 17. The court ultimately concluded in *Williams* that the trial court had correctly admitted the disputed evidence under principles of relevancy and a "traditional" type of balancing. *Id.*; *id.* at 23-24. It was therefore unnecessary in *Williams* to decide whether the challenged evidence "also would be admissible under any distinct 'due process' balancing test." *Id.*[35]

*Williams* thus answered one question (propensity evidence can be admitted in a child sexual abuse case under OEC 404(4) if due process permits) and reserved two questions: (1) the extent to which prior bad acts evidence can be admitted solely for propensity purposes in criminal cases other than ones involving child sexual abuse; and (2) whether, in criminal cases in which evidence is admitted for propensity purposes, due process requires traditional OEC 403 balancing or requires a greater showing of unfair prejudice than traditional OEC 403 balancing would require to exclude otherwise probative evidence. We need not resolve those questions in this case, however, because this case differs from *Williams* in two ways that render *Williams* distinguishable and not controlling.

First, this case does not involve child sexual abuse. Thus, the holding in *Williams* that propensity evidence is relevant in child sexual abuse cases to show that a defendant committed the charged acts is not on point here. Second, this case does not squarely present the issues that *Williams* specifically reserved. Most notably, unlike *Williams*, this case does not present the question whether the contested evidence could have been admitted solely for *propensity* purposes, in reliance on OEC 404(4). The state's theory of admissibility

---

[35] This court in *Williams* ultimately determined that the trial court had not erred in admitting the disputed evidence because the evidence met the minimal logical relevancy requirements of OEC 401. 357 Or at 23-24.

was not that the 1995 bomb threat evidence showed that defendant had the character trait of being a bank robber or bomber, and that the jury therefore should infer from his propensity to rob or bomb banks that he bombed West Coast Bank in 2008. Instead, the state introduced that evidence to show that defendant effectively had made a trial run at robbing a Woodburn bank in a particular location, by making a threat, instructing a teller to go to a location outside, and then watching the police response to the threat. Succinctly stated, the state's theory of relevance included that the 1995 incident was part of defendant's planning process for committing several of the *charged* crimes.[36] That theory falls squarely within the nonexclusive list of nonpropensity purposes for which prior bad acts evidence historically has been admissible, which are largely codified in OEC 404(3). *See Williams*, 357 Or at 9-12 (discussing long history of permitting admission of prior bad acts evidence for nonpropensity purposes; quoting *Dowling v. United States*, 493 US 342, 352-53, 110 S Ct 668, 107 L Ed 2d 708 (1990), for proposition that prior bad acts evidence admitted for a nonpropensity purpose does not create due process "fundamental fairness" problem, in part because "the trial court's authority to exclude potentially prejudicial evidence adequately addresses" the possibility that the jury would use the evidence improperly).

We therefore decline the parties' invitations to examine whether our holding in *Williams* extends to other kinds of propensity evidence not presented by these facts or to consider the circumstances in which such evidence is and is not admissible, consistently with due process.[37] As

---

[36] The state raises additional theories for admission of the 1995 bomb threat evidence under OEC 404(3), including motive, intention, and knowledge. We do not address those additional theories, because, as explained further below, the evidence was relevant to show defendant's plan, and which in turn permitted the trial court to admit the evidence under OEC 404(3).

[37] Were we to conclude that the trial court erred in its determination that the 1995 bomb threat evidence was relevant and admissible for nonpropensity purposes, we could consider whether, in light of *Williams*, the trial court was nonetheless "right for the wrong reason" or whether any error was harmless. (As noted, in *Williams*, this court explained that the legislature intended OEC 404(4) to supersede OEC 404(3) in criminal cases.) But, given our conclusion below that the evidence was properly admitted under settled cases interpreting OEC 404(3), we need not address the potential application of OEC 404(4) here.

in *Williams*, we leave those issues to another day and to a case in which we must reach them to resolve the dispute before us. This case is more readily resolved by settled principles under OEC 404(3) and OEC 403, to which we now turn.

      c.   *Johns* and its analysis of OEC 404(3)

We begin with defendant's argument under OEC 404(3). As we earlier described, defendant argued in the trial court, and maintains on review, that the trial court misapplied the relevancy framework for OEC 404(3) announced in *Johns* and therefore improperly admitted evidence of the 1995 bomb threat. In particular, defendant focuses—as did the parties and the trial court below—primarily on the various factors that *Johns* identified for assessing relevancy, such as whether the victim in the prior act was the same victim or in the same class as the victim in the present case; whether the type of prior act was the same or similar to acts involved in the charged crime; and whether the physical elements of the prior act and the present act were similar. *See Johns*, 301 Or at 555-56 (outlining potential factors). As we will explain, however, the analytical framework that *Johns* announced was specific to the "doctrine of chances" relevancy theory at issue in that case, which is not at issue in this case. We examine *Johns* at greater length to explain why it does not provide the proper framework for analysis of the relevancy of the 1995 bomb threat evidence that defendant challenges.

The defendant in *Johns* had been charged with intentional murder after shooting his wife. In his defense, he did not dispute that he was holding the gun when it discharged and his wife was shot. He did claim, however, that the gun had discharged accidentally as he attempted to take it from his wife, who initially had fired the gun when defendant first entered their darkened bedroom. *Id.* at 537-38. The state offered evidence that the defendant previously had attempted to use a rifle in the course of an assault on his former wife. *Id.* at 540. This court described that evidence as evidence of "prior acts to prove intent or lack of mistake," *id.* at 551, and recognized that theory of relevance as the "doctrine of chances":

"'*** The doctrine teaches us that[,] the more often the defendant performs the actus reus, the smaller is the likelihood that the defendant acted with an innocent state of mind. The recurrence or repetition of the act increases the likelihood of a mens rea or mind at fault. In isolation, it might be plausible that the defendant acted accidentally or innocently; a single act could easily be explained on that basis. However, in the context of other misdeeds, the defendant's act takes on an entirely different light. The fortuitous coincidence becomes too abnormal, bizarre, implausible, unusual or objectively improbable to be believed. The coincidence becomes telling evidence of mens rea.' Imwinkelried, Uncharged Misconduct Evidence 8, § 5:05 (1984) (footnotes omitted)."

*Johns*, 301 Or at 552-53 (ellipsis in original). After surveying numerous treatises discussing the doctrine of chances theory of relevance, this court then stated:

"[I]n evaluating prior crime evidence on the issue *of intent or absence of mistake*, the trial judge should make these determinations:

"(1)   Does the present charged act require proof of intent?

"(2)   Did the prior act require intent?

"(3)   Was the victim in the prior act the same victim or in the same class as the victim in the present case?

"(4)   Was the type of prior act the same or similar to the acts involved in the charged crime?

"(5)   Were the physical elements of the prior act and the present act similar?"

*Id.* at 555-56 (emphasis added).

Thus, the particular analytical framework outlined in the quote above was specifically fashioned to determine the relevancy and admissibility of evidence offered to prove a defendant's "intent or absence of mistake" under the theory of doctrine of chances—that is, evidence countering a defendant's claim that he or she performed the act alleged but did so by mistake. *See id.* at 550 (describing issue in *Johns* as "whether the defendant acted with intent and not by mistake or accident"; observing that case did not involve "any

theory of motive, opportunity, preparation, plan, knowledge or identity or any other unlisted theory" from OEC 404(3)); *accord Leistiko*, 352 Or at 182-83 (multi-factor analysis in *Johns* pertained specifically to doctrine of chances theory of admissibility), 184 n 9 (under doctrine of chances, term "intent" generally signifies "the absence of accident, inadvertence, or [causality]," which differs from mental state of "intentionally" defined in ORS 161.085(7) (internal quotation marks omitted)).

In this case, as discussed later in this opinion (in resolving defendant's challenge to the trial court's denial of his motion for judgment of acquittal), most of the charges required the state to prove that defendant acted "intentionally." *See* 359 Or at 456-58 (so explaining). That does not mean, however, that the state's proof of that element was governed by *Johns*. Prior bad acts evidence can be relevant to a defendant's intent on theories other than the doctrine of chances. To give just one example, suppose that a defendant told the victim on one day that he would strangle her to death if she dated another man, and then, one or several days later, he saw her on a date with another man and shot and killed her. In that example, the evidence of the prior threat would be relevant to prove the defendant's motive, and perhaps a plan, and, in turn, that he had acted intentionally, even if the defendant's theory of the case was *not* that he had killed the victim by accident (or otherwise with a nonculpable mental state, such as in self-defense). Such evidence would not depend on the doctrine of chances for its logical relevance to those theories on which it permissibly may be admitted, and, because the doctrine of chances would not be at work, the factors that *Johns* identified would not apply. Admissibility of the prior threat thus would not depend on whether the threatened physical act (to strangle to death) differed from the ultimate physical act that killed the victim (shooting with a gun). Rather, the prior threat would be directly relevant to establish the defendant's motive, plan, and willingness to commit the charged crime, and the logical relevance of the evidence as to that purpose would not depend on any inference that the defendant had committed similar past acts with sufficient frequency that it becomes increasingly unlikely—with each new act

committed—that he committed the act inadvertently or by accident. Put another way, a prior threat of that kind is not "intent" evidence based on a doctrine of chances theory: It would not be offered to show that the defendant acted intentionally, rather than inadvertently; rather, it would be offered to show that the defendant had a motive to commit the charged murder (jealousy), and a plan (to kill the victim if she dated another person), and that he acted intentionally, in the sense that he acted "with a conscious objective to cause the result or to engage in the conduct so described." ORS 161.085(7).

The relevance of the evidence of the 1995 bomb threat at issue in this case similarly does not depend on application of the "doctrine of chances." Defendant did not advance any sort of defense (such as inadvertence or self-defense) that customarily would be countered by a doctrine of chances theory of relevancy. And the state did not offer that evidence to prove "intent" in the "absence of mistake" sense of the term. OEC 404(3); *Leistiko*, 352 Or at 182; *Johns*, 301 Or at 555. Rather, the state sought to introduce evidence of the 1995 bomb threat to show, among other things, that defendant had a plan to commit at least some of the charged crimes, as demonstrated by an earlier trial run involving both calling in a threat to a bank teller and observing the police response to the threat.[38] That theory of logical relevance is bolstered in the context of other evidence that the state introduced, without objection, about defendant's prior statements about robbing banks.

d.   Proving a plan under OEC 404(3)

We turn to a consideration of the nature of the proof required to render prior bad act evidence relevant and thus admissible for the nonpropensity purpose of proving "plan" under OEC 404(3). This court discussed that issue in *Leistiko*, which involved a "doctrine of chances" theory of relevancy. The defendant in *Leistiko* had been charged with multiple counts of rape, involving three different

---

[38] Of course, the 1995 bomb threat had been a hoax, and the 2008 bombing was not. But, as illustrated further below, the jury reasonably could have inferred from the 1995 bomb threat a plan on defendant's part to commit at least some of the charged crimes and underlying felonies.

victims, and the state sought to introduce evidence of his involvement in an earlier, uncharged sexual encounter with a fourth woman, for several purposes: to show the state of mind of each victim in the charged crimes; to show the defendant's state of mind, so as to negate his assertion at trial that he had not acted with the required *mens rea* to commit the charged crimes; and to show that defendant had a plan that he had carried out with each victim. 352 Or at 180-81.

In its discussion of the relevance of the evidence to prove "plan," the court principally focused on the scenario in which the state seeks to introduce prior bad act evidence to prove a plan, to permit the jury to infer that a defendant had acted consistently with that plan in committing a subsequent crime. The court first cited John Henry Wigmore, 2 *Evidence* § 304, to distinguish between two distinct, nonpropensity uses of prior bad acts evidence, both of which were at issue in *Leistiko*: (1) use of the evidence to prove intent by negating an asserted innocent state of mind; and (2) use of the evidence to prove a plan or design aimed to show a precedent design that in turn shows, by probability, "'the doing of the act designed.'" 352 Or at 188 (quoting Wigmore, 2 *Evidence* § 304 at 249). In Wigmore's view, to be logically relevant to prove the latter, the proponent must show not only a similarity between the prior act and the charged act, but also "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." 352 Or at 188 (citing Wigmore, 2 *Evidence* § 304 at 249 (emphasis from *Leistiko* omitted)). The court contrasted Wigmore's view with a slightly different view set out in Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 3:24. In Imwinkelried's view, where the prosecution seeks to establish an inference of a plan or design to prove that a defendant acted consistently with that plan or design, the prior bad acts evidence should be admissible only if sufficient to establish a *modus operandi*. 352 Or at 188-89 (citing Imwinkelried, *Uncharged Misconduct Evidence* § 3:24 at 3-163-3-167). Otherwise, the evidence "is vulnerable to the claim that the prior bad acts are merely propensity evidence." 352 Or at 188; *see also id.* at 189

(Wigmore would require lesser degree of similarity than Imwinkelried).

Ultimately, this court in *Leistiko* did not have to decide between Wigmore's or Imwinkelried's views, because both sources required—in the context of showing a plan or design aimed to establish, by probability, the commission of charged crime—"something more than the similarity required for other crimes evidence to be admissible to prove intent is necessary for it to be admissible to prove a plan." 352 Or at 189. The challenged evidence in *Leistiko* was not sufficiently similar for it to be relevant and thus admissible to provide intent; *a fortiori*, that evidence was not sufficient to prove plan under either Wigmore's or Imwinkelried's views. *Id.*

In reaching that conclusion, this court specifically highlighted the distinction that Imwinkelried made between prior bad acts evidence that is in the nature of a "spurious plan," as opposed to a "true plan." 352 Or at 188 n 13. Evidence of a "spurious plan" is, as just described, prior bad act evidence offered to show that a defendant engaged in a pattern or systematic course of conduct *from which* the existence of a plan is to be inferred. Imwinkelried, *Uncharged Misconduct Evidence* § 3:24 at 3-161-3-163; *see also Leistiko*, 352 Or at 188 n 13 (describing "spurious plan" evidence as evidence of series of prior similar acts offered to establish plan or design to commit those acts). In a "true plan" scenario, on the other hand, the prosecution offers prior bad act evidence to show that the defendant "in fact and in mind formed a plan[,] including the charged and uncharged crimes as stages in the plan's execution." Imwinkelried, *Uncharged Misconduct Evidence* § 3:22 at 3-147.[39] In other words, the challenged evidence is proof of part of the planning process (even if it is a bad act itself) and establishes one or several preliminary steps that culminate in the commission of a charged

---

[39] The distinction between "true plan" and "spurious plan" evidence is not limited to criminal cases or charged crimes. Relevancy requirements, and the limits on bad acts evidence under OEC 403, apply equally in civil cases. But we frame the distinction here in the context of criminal prosecutions, because that is what this case involves and that is the context in which Imwinkelried discusses it.

crime.[40] To be relevant, evidence of a "true plan" need not be similar to the charged crime. *Id.* Indeed, the charged crime "need not have been contemplated originally." *Id.* at 3-149-3-150.[41]

Unlike *Leistiko*, this case involves "true plan," not "spurious plan," evidence. Here, the state did not introduce evidence of the 1995 bomb threat to show, first, that defendant had a plan in 1995 to commit a bank robbery using a bomb and, *because* he had such a plan on a past occasion, the jury should *infer* that he acted consistently with that plan by also later committing the 2008 bombing. If that were the state's theory, then, under *Leistiko*, the relevancy of the 1995 bomb threat would require some heightened degree of similarity between the two incidents.[42] Instead, the state has argued that the 1995 bomb threat showed evidence of a trial run of a bank robbery. That qualified as "true plan" evidence, as described by Imwinkelried. The 1995 bomb threat (under the state's theory) was an actual preparatory step in the commission of the later, 2008 bank bombing, one that aided defendant in gathering information about how the bank and law enforcement personnel would respond to a caller who claimed that a bomb had been planted outside the bank. The heightened degree of similarity between the prior bad act and the charged crime required to establish the relevancy of a "spurious plan"—as explained and applied in

---

[40] One example of "true plan" evidence would be evidence that a defendant stole a gun to commit a robbery. *Leistiko*, 352 Or at 188 n 13. There, of course, the two crimes both involve theft. Another example, however, would be theft of a gun to commit murder. In that case, the prior bad act (theft) has no similarity with the planned crime of murder. It is relevant, however, because it was a step in committing the murder and is evidence that, in Imwinkelried's words, the defendant had "in fact and in mind formed a plan" to kill the victim using a gun. Imwinkelreid, *Uncharged Misconduct Evidence* § 3.22 at 3-147.

[41] An example of a prior bad act not initially committed in contemplation of the charged act would be evidence that a defendant formed a plan to gain an inheritance by killing other possible heirs, A, B, and C, but, at a later point, D was born, and the defendant then killed D. Evidence of the defendant's attempts to kill A, B, and C would be relevant under a "plan" theory to prove that the defendant killed D. Imwinkelried, *Uncharged Misconduct Evidence* § 3:22 at 3-150.

[42] Because this case does not involve "spurious plan" evidence, as did *Leistiko*, 352 Or at 189, we need not resolve any difference between the approaches set out by Wigmore and Imwinkelried as to the degree of similarity required for the prior bad act to be relevant. Neither do we need to decide whether the 1995 bomb incident was sufficiently similar to the 2008 bombing be admissible under such a theory.

*Leistiko*, 352 Or at 188-89 & n 13—therefore does not apply here. Instead, the admissibility of the 1995 bomb threat evidence depended simply on whether it was logically probative of a "true plan" on defendant's part; if so, then the evidence was relevant and admissible.

In that regard, several aspects of the 1995 bomb threat that we earlier described show that that evidence was logically probative to prove that defendant had made the threat as a preliminary step (that is, a trial run) to accomplishing the charged crimes in this case. *See* Imwinkelried, *Uncharged Misconduct Evidence* § 3:22 at 3-147 (in true plan case, test is whether prior crime evidence is logically relevant to show that defendant formed a plan with both uncharged and charged crimes as stages in plan's execution). Both the 1995 threat and the current crimes involved banks in the small town of Woodburn, located in the same general area; indeed, the jury could have found from evidence presented during the state's offer of proof and admitted in the record that all three bank locations were within view of the restaurant from which defendant and Laughlin had watched police respond to the 1995 bomb threat. The 1995 incident also supports the inference that, in placing the bomb in 2008, defendant and Bruce purposely selected that same general location—conveniently located near Interstate 5—which was familiar to defendant from the 1995 incident. Also, both incidents involved threatening calls made to bank tellers with instructions to go to specific locations outside, but in the immediate vicinity of, the banks in question, which, again, suggests that the 1995 incident served as trial run for the later planting of a real bomb. Finally, defendant learned from the 1995 bomb threat the nature of the police response when a life-threatening call is placed to a bank. It is true, as defendant urges, that there was a significant lapse of time between the two events. But in the case of "true plan" evidence, that does not necessarily detract from the relevancy of the evidence. As long as it is logical to infer that the past act was a preparatory step in the commission of the charged crimes—and here, it is—the prior steps of a plan do not have to be proximate in time to the charged crimes to be

relevant. *Id*. at 3-149 (for "true plan" evidence, uncharged crimes and charged crimes need not be proximate in time; for logical relevance, "it makes no sense to adopt a categorical rule that the crimes be proximate to each other").

In short, the evidence of the 1995 bomb threat qualified as "true plan" evidence. Because it was relevant for that nonpropensity purpose, the trial court properly held under OEC 404(3) that the evidence was admissible.[43]

### e. Balancing under OEC 403

As discussed earlier, if a trial court determines that prior bad acts evidence is relevant to a nonpropensity purpose under OEC 404(3), the court, on a proper motion, must weigh the probative value of the evidence against its potential to unduly prejudice the defendant, per OEC 403, before admitting the evidence. *Williams*, 357 Or at 19. And as noted earlier, as part of their arguments about OEC 404(4), the parties debate whether the trial court was required to, and did, engage in OEC 403 balancing here. Specifically, as part of his supplemental argument submitted after *Williams* was decided (but not in his opening brief that raised this

---

[43] As summarized earlier, in evaluating whether to admit the evidence of the 1995 bomb threat, the trial court considered some of the factors set out in *Johns*. In our discussion of *Johns* set out above, relating to prior bad acts evidence in the context of the doctrine of chances, and in light of the state's argument as to why the evidence here should have been admitted, we do not mean to suggest that the trial court erred in considering those factors. Depending on the state's asserted relevancy rationale for admitting contested prior bad act evidence, a variety of factors may apply, as our discussion above about proof of a "plan" demonstrates. *Compare Leistiko*, 352 Or at 188 (to establish *modus operandi*, similarities must be notably significant), *with Garrett*, 350 Or at 10 (to establish motive, prior bad acts evidence "need not have the same physical elements as the crime charged" (citing *State v. Hampton*, 317 Or 251, 855 P2d 621 (1993))).

Relatedly, prior bad acts evidence offered to demonstrate "knowledge" might or might not require similarities to the charged crime to be logically relevant. The state might, for example, offer evidence that a person charged with burglary had knowledge of an alarm system by showing that he had previously burgled a location with a similar alarm system. But it might also offer evidence showing that he had stolen a book that explained and provided diagrams of how to disarm such an alarm system. The burglary of the first location would bear significant similarities to the second and would be relevant because of those similarities. The theft, on the other hand, would bear little resemblance to the charged conduct, but that fact would not detract from its logical relevance given the subject matter of the theft.

assignment of error), defendant contends that, notwithstanding OEC 404(4), the trial court was required to balance under OEC 403 to ensure that admission of the 1995 bomb threat evidence did not violate due process. According to defendant, the trial court admitted that evidence without assessing whether it was more probative than unfairly prejudicial, and thus erred.

To be sure, as defendant observes, the trial court did not specifically articulate its findings in terms of the "probative" versus "prejudicial" value of the evidence. The trial court, did, however, refer to factors that play into the balancing analysis. The court noted—necessarily on the "prejudice" side of the equation—that the 1995 bomb threat incident was remote in time. *See Johns*, 301 Or at 555 ("As to the time element, the closer in time of the prior act to the act charged, the greater the probative value; the more remote, the less probative value.") The court also noted—necessarily on the "probative" side of the equation—the high degree of similarity between the 1995 incident and the charged crimes. *See id.* ("[T]he less similarity, the less probative value."). Moreover, when the trial court at the pretrial motion *in limine* hearing gave the state leave to later ask it to reconsider its ruling on the admissibility of the 1995 bomb threat evidence, the court expressly declared that, if it did reverse its ruling, it would admit that evidence only if it determined that the evidence was relevant; the court further noted that the balancing test set out in OEC 403 also would apply. When the trial court reversed its relevancy ruling at trial and admitted the evidence, defendant did not raise any objection or note any concern that the trial court had failed to engage in the balancing that the trial court said that it would perform. On this record, we conclude that, contrary to defendant's argument now, the trial court performed the balancing under OEC 403 that OEC 404(3) requires.

f.   Limiting jury instruction under *Leistiko*

Finally, we consider defendant's argument that, under *Leistiko*, 352 Or 172, the trial court was required *sua sponte* to give the jury a particular limiting instruction and that its failure to do so amounted to plain error. The state

responds that any error that might have occurred is neither preserved nor plain. Because this court issued its decision in *Leistiko* after the trial in this case, and because *Leistiko*—as discussed further below—raised a doctrine of chances issue that is related to our earlier discussion of *Johns*, we address defendant's contention on the merits. We begin by explaining this court's decision in *Leistiko*.

In *Leistiko*, the challenged evidence was relevant for a nonpropensity purpose under only a doctrine of chances theory. There, the defendant was charged with the forcible rape of three women; in his defense, the defendant did not concede sexual contact with all three women, but he asserted that, if the contact had occurred, it had been consensual. 352 Or at 177. To show forcible compulsion and rebut defendant's claim of consent, the state offered evidence that, on a separate and distinct occasion that was not part of the charges that the state had brought, the defendant had engaged in forcible sexual intercourse with a different woman. Although the defendant's consent defense differed somewhat from an "absence of mistake" defense described in the "doctrine of chances" discussion from *Johns*, it similarly involved a contention that the defendant—if he committed the charged acts at all—did not do so with a culpable mental state. Accordingly, this court specifically addressed the "intent" argument in *Leistiko* in terms of the "doctrine of chances." *Id.* at 185. In rejecting the state's argument that the disputed evidence had been properly admitted under the doctrine of chances, this court observed that "the doctrine of chances rests on the proposition that the defendant either concedes the act that requires proof of a mental state *or the trial court instructs the jury* not to consider uncharged misconduct evidence offered to prove intent unless and until the jury finds the act that requires proof of intent to have been done and is proceeding to determine intent." *Id.* (emphasis added).[44] Defendant argues that *Leistiko* controls here, so that the trial court was required to *sua sponte* instruct the jury that it could not consider the evidence of the 1995 bomb

---

[44] Defendant also cites and relies on *State v. Pitt*, 352 Or 566, 293 P3d 1002 (2012). *Pitt*, like *Leistiko*, was a case involving a doctrine of chances relevancy theory and therefore is not on point here.

threat until it first determined that defendant had committed the required *actus rea* for the charged crimes.

However, consistently with our earlier discussion, although a *Leistiko*-styled limiting instruction may be required when prior bad acts evidence is offered to prove "intent" or "absence of mistake" under the doctrine of chances theory of relevancy, such an instruction is not required when prior bad acts evidence is admitted for other relevant purposes. *Leistiko*, in effect, was predicated on the fact that, under the doctrine of chances, the prior bad act is only conditionally relevant—that is, its relevancy depends on whether the factfinder first agrees that the defendant committed the charged criminal act, which it can do if the defendant concedes as much or if, before considering the prior bad act evidence, the factfinder resolves any dispute of fact on the point against the defendant. 352 Or at 185-86. That same rationale does not generally apply to other theories on which prior bad acts may be relevant, however. *Modus operandi* or "signature crime" evidence is illustrative. The point of requiring a high degree of similarity between a defendant's past criminal acts and the charged acts is to establish identity—that is, that the defendant is the perpetrator of the crime. *See, e.g.*, *State v. Johnson*, 313 Or 189, 197, 832 P2d 443 (1992) (when prior bad acts are sufficiently similar to charged acts to give rise to an inference of "signature crime," factfinder can infer defendant's identity as perpetrator of charged offense). Given that purpose, the factfinder must necessarily consider such evidence as part of determining whether the defendant committed the *actus reus*, not afterwards.

So, too, here. As we have concluded, the 1995 bomb threat evidence went to defendant's affirmative plan to rob a bank, a relevant and admissible purpose under OEC 404(3). If believed by the jury for that purpose, the evidence tended to show both that defendant engaged in the charged conduct and did so with the required mental state. For the evidence to be relevant, the jury was not first required to conclude that defendant in fact had engaged in the charged criminal conduct. Rather, the 1995 bomb threat evidence was independently probative of that very fact. For those reasons, the

trial court did not err in failing to give a *Leistiko*-style lim-
iting instruction.

## III.   GUILT PHASE

A.   *Evidence of Defendant's Views About Law Enforcement
     and Other Political and Related Beliefs (Assignment
     Nos. 45-48)*

As earlier described, during the joint guilt-phase
trial, the state introduced the testimony of several witnesses
who testified about defendant's anti-establishment political
views, including his negative views toward law enforcement.
On review, defendant challenges the admission of testimony
of six of those witnesses, raising a relevancy argument
under OEC 401 and related challenges under the First and
Fourteenth Amendments to the United States Constitution.
Because the state responds that some of defendant's chal-
lenges are not preserved, we first describe both the testi-
mony and the nature of defendant's objections—or lack
thereof—to that testimony. As explained below, we conclude
that defendant preserved his relevancy and federal consti-
tutional challenges to most, but not all, of the testimony at
issue. We then address defendant's challenges on the merits,
which, as we will explain, we reject.

1.   *Additional facts, witness testimony, and preservation*

Before trial, defendant moved *in limine* to exclude
evidence of the 1995 bomb threat incident, described ear-
lier. In resolving that motion, the trial court agreed that the
evidence was not admissible and precluded the state from
mentioning that incident in its opening statement, but gave
the state leave to revisit the issue during trial. In response
to the court's ruling, the state asked if the ruling extended
to other anticipated testimony, from additional witnesses,
about statements that defendant and Bruce had made over
the years expressing their political and related views. The
court then clarified that its ruling was directed to only the
1995 bomb threat evidence. Defendant did not object to the
limited scope of the court's ruling and thus did not preserve
any pretrial challenge to the anticipated evidence of his
political and related views. In effect, before trial, defendant's

only objection was to the evidence of the 1995 bomb threat.

At trial, the state introduced testimony about defendant's views from several witnesses, beginning with Sherwood. Sherwood testified that defendant had stated that he had no respect for law enforcement, had made disparaging statements about police, and was concerned about the upcoming presidential election and its effect on his right to bear arms and the stability of government. Defendant did not object to that testimony at any point; his challenge to that testimony on review therefore is not preserved, and we do not address it.

Next, the state introduced testimony from McLaughlin. McLaughlin first testified to a derogatory statement that defendant had made about women generally. Defendant objected on relevancy grounds, and the trial court overruled the objection. Defendant did not object on First Amendment grounds. Consequently, defendant's relevancy challenge—but not any First Amendment challenge—to that part of McLaughlin's testimony is preserved and properly before us on review. As we note below, however, even if the trial court erred in admitting that testimony, any such error was harmless. 359 Or at 449 n 46.

McLaughlin next testified to statements that defendant had made reflecting his negative views of government generally, banks and law enforcement more specifically, and the then-leading Democratic candidates for president, including statements disparaging one candidate's gender and another's race. Defendant did not object to that testimony, and nothing in his earlier objection to McLaughlin's testimony relating to defendant's derogatory statement about women can be construed as raising a general objection to the rest of McLaughlin's testimony. Defendant's challenge to those latter aspects of McLaughlin's testimony—describing defendant's views of government, banks, law enforcement, and the presidential candidates—therefore is not preserved, and we do not address it. *See State v. Clemente-Perez*, 357 Or 745, 752, 359 P3d 232 (2015) (citing *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000), for proposition that party

must provide trial court with explanation of objection specific enough to ensure that court can identify alleged error and with sufficient clarity to permit immediate consideration and correction of error).

Later, the state introduced testimony from Laughlin about the 1995 bomb threat incident, as described above. As the state prepared to ask Laughlin about defendant's views of law enforcement more generally, defendant objected on relevancy grounds, also citing the First and Fourteenth Amendments to the United States Constitution. The trial court overruled that objection, but permitted defendant to have a standing objection to all similar evidence. The state then introduced testimony from Laughlin to the effect that defendant would "hate cops" if he were pulled over, given a ticket, or arrested. In light of defendant's objection, defendant's challenges to that testimony—based both on relevancy and the First Amendment—are properly before us on review.

After Laughlin testified, the state introduced testimony from three more witnesses whose testimony defendant challenges on review. Defendant's standing objection during Laughlin's testimony operated to preserve his relevancy and First Amendment challenges to the testimony of those three witnesses. The first additional witness was Warner, who was an employee at an establishment where defendant had been a regular morning coffee customer. Warner had told defendant that she had obtained a new job working for a 9-1-1 call center, to which defendant had replied that he would not be able to work with police every day and that, if he had a job like that, "he would have to kill someone because he fucking hated police." After Warner later quit her 9-1-1 job, defendant told her, "I knew you weren't a fucking Nazi." Another witness, Wood, who had worked in 2008 as an assistant for Bruce's brother, testified that defendant quickly went from cordial to agitated when she told him that she previously had worked for another state's public safety department and that her husband worked in corrections; defendant declared that he hated officers, who he said should "go deal with the illegal immigrants that were breaking the law instead of the law abiding white men."

Finally, the state introduced testimony from Chasteen, who briefly had been engaged to defendant. Chasteen was dining with defendant and his father in April 1995 when the television news reported the Oklahoma City bombing. She testified that both defendant and Bruce were "jubilant" about the bombing; that Bruce cheered the bombing and pumped his fist; that Bruce declared that the bombing "needed to happen" "[t]o teach the government a lesson" because of the government's role in earlier events at Ruby Ridge, Idaho, and Waco, Texas; and that defendant "definitely agreed" with Bruce's excitement about the bombing.[45]

### 2. *Relevancy under the Oregon Evidence Code*

We turn to defendant's challenges to the testimony to which he did object—that is, the testimony of Laughlin, Warner, Wood, and Chasteen—beginning with defendant's relevancy argument under OEC 401, followed by his related argument under the First and Fourteenth Amendments.[46]

---

[45] The state introduced testimony from additional witnesses, whose testimony is not at issue on review, also to the effect that defendant spoke to them about governmental and law enforcement overreaching, and that, while in jail awaiting trial, defendant had referred to law enforcement on the scene of the bombing as "[s]tupid fucking pigs [who] got what they deserved."

[46] Defendant's four assignments of error raising both relevancy and First Amendment issues categorize the evidence at issue as relating to defendant's views on four topics—minorities, women, police, and government generally. We do not consider the particular topics of "minorities" and "women." Regarding minorities, defendant made derogatory racial comments about a then-presidential candidate and also made the comment about "illegal immigrants *** breaking the law." In reviewing the record as a whole, those comments can be viewed as part and parcel of the general evidence relating to defendant's anti-establishment sentiments, and we view them accordingly. We reach a similar conclusion about negative comments that defendant made about a female presidential candidate.

Otherwise, McLaughlin also testified about a negative comment that defendant had made about women generally, which was different in character from his other statements that described his anti-establishment views. After reviewing the record, we conclude that—even assuming, as defendant asserts, that the trial court erred in overruling his relevancy objection to that testimony—any error in that regard was harmless. (Defendant did not object to that evidence on First Amendment grounds.) We therefore do not discuss that aspect of McLaughlin's testimony any further.

On review, defendant also cites the "unfair prejudice" rule, OEC 403, but he does not make any particular argument about prejudice. Similarly, he asserts without argument that admission of the "political beliefs" evidence violated his right to a fair trial. We do not consider those sources of law, neither of which defendant relied on at trial.

OEC 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is admissible, except as otherwise provided by the Oregon Evidence Code, Oregon statute, case law, or state or federal constitutional provisions. OEC 402. Defendant asserts that evidence of his political beliefs and views toward law enforcement was not relevant under OEC 401 to prove that he intentionally caused the deaths of Captain Tennant and Trooper Hakim. Defendant specifically argues that, although the state is generally permitted to introduce evidence of motive to prove its case, the state failed to sufficiently demonstrate in this case why his political beliefs made it more likely that he committed the charged crimes. The state responds that the evidence showed defendant's animus toward law enforcement, thus serving to prove that, in participating in building and planting the bomb, defendant acted with intent to kill or harm law enforcement officers.

OEC 401 requires a "rational relationship" between the evidence offered "and the substantive issues properly provable in the case." *State v. Guzek*, 322 Or 245, 251, 906 P2d 272 (1995). As defendant frames it, the question is whether a sufficient logical connection exists between the evidence of his anti-establishment, anti-law enforcement views and the state's asserted motive for the crimes. We agree that some sort of logical connection is required. Contrary to defendant's position, however, to establish relevancy, the state need not affirmatively prove "why" defendant's political beliefs made it more likely that he committed the crimes. Instead, the required connection can be inferred when the nature of the evidence at issue, evaluated in light of the circumstances of the crime, makes the inference a logical one. *See State v. Hampton*, 317 Or 251, 258, 855 P2d 621 (1993) (citing *State v. Rose*, 311 Or 274, 283 & n 7, 810 P2d 839 (1991) (motive is relevant circumstantial fact that makes it more probable that defendant committed the crime; when evidence of motive is admitted, it must be considered with other evidence surrounding commission of crime and given weight jury deems proper)).

Several of our cases illustrate that general proposition and its limits. *State v. Flett*, 234 Or 124, 380 P2d 634 (1963), is an example of the state's evidence of logical relevancy falling short—that is, no connection could be logically inferred between the evidence and the defendant's motive or intent. In *Flett*, the defendant was accused of killing her husband, and she argued at trial that his death had occurred during a violent fight. The state introduced evidence that the defendant had told a neighbor several months before that she had had a one-time affair. This court assumed that the state permissibly could use evidence of marital infidelity (particularly, recently occurring infidelity) "in a proper case," because it might have "some slight probative value," such as proving motive, particularly where ill will toward the deceased spouse might be an issue. *Id.* at 126-27. The court stated, however, that "the connection between isolated acts of marital infidelity and the purposeful slaying of a spouse is extremely tenuous in any case." *Id.* at 127. Turning to the record, the court observed that the defendant and the victim regularly had quarreled and drunk excessively, and "no evidence [tended to show] that the hostility, if any, of one spouse toward the other had anything to do with marital fidelity." *Id.* at 127-28. Given those circumstances, the court concluded that the trial court abused its discretion in admitting the evidence, which "had nothing to do with the issues the jury was called upon to decide." *Id.* at 128. In noting further that the state had attempted to "blacken the defendant's character by proof of collateral misconduct having so little to do with the crime as to be virtually irrelevant," the court commented that the evidence was improper "unless the state is prepared to show some substantial connecting link between the two acts." *Id.*

In contrast to *Flett*, this court in *State v. Hayward*, 327 Or 397, 963 P2d 667 (1998), and *State v. Brumwell*, 350 Or 93, 105, 249 P3d 965 (2011), *cert den*, 565 US ___, 132 S Ct 1028 (2012), determined that a connection between contested evidence and the defendants' motives and intent could be logically inferred, given the nature of the evidence as evaluated in light of the circumstances of the charged crimes. Those defendants together with other codefendants, some of whom considered themselves satanists, had

committed a brutal robbery and murder. During Hayward's guilt phase and Brumwell's penalty phase trials, the state introduced evidence of their satanic beliefs and interests in death metal music to prove motive and intent. In both cases, this court concluded that the circumstances of the crimes—specifically including the defendants' desire to commit murder, not just robbery; to carve satanic symbols in the victims; to pay homage to a death metal band member; and to leave other blood evidence of satanism at the scene—were connected to the defendants' satanic beliefs and interest. Because of that relationship, the court determined that the challenged evidence was sufficiently connected to motive and intent to be relevant under OEC 401, and was not merely coincidental with the crime. *Hayward*, 327 Or at 407; *Brumwell*, 350 Or at 105-07.

Here, as in the cases just summarized, the question is whether a connection between the disputed evidence of defendant's anti-government views—offered by witnesses Laughlin, Warner, Wood, and Chasteen—and the state's theory about defendant's motive can be logically inferred. The state asserts that the evidence was relevant to prove defendant's animus toward law enforcement officers, which in turn demonstrated a motive from which the jury reasonably could infer defendant's intent to engage in actions aimed at killing or harming officers. On review of the record, and evaluating the contested evidence in light of the circumstances of the crimes, we agree with the state. As described earlier—and as we discuss later in added detail—the state presented evidence from which the jury could find that defendant, together with Bruce, committed the following acts, which led to the deaths of Captain Tennant and Trooper Hakim, and the critical injuries to Chief Russell: Defendant purchased component parts for a highly explosive bomb; he built such a bomb; he planted the bomb at West Coast Bank; and he called and issued the threats to Wells Fargo Bank and West Coast Bank, thereby drawing law enforcement to the scene to search for suspicious packages. At trial, defendant disputed not just whether he took those actions at all; he also disputed whether, even if he took them, he did so with the intent to cause death or injury to anyone. The evidence of defendant's anti-establishment

views and, more particularly, his negative views toward law enforcement, were logically relevant to the state's theory that defendant took those actions intending to kill others, including law enforcement. In essence, the fact that defendant held vehement anti-government, anti-establishment, and anti-law enforcement views supplied evidence of his motive for his participation in the ultimate explosion that killed and injured law enforcement officers. The inference that defendant's actions were motivated by his beliefs was a logical one on this record. *See State v. Lewis*, 352 Or 626, 635, 290 P3d 288 (2012) (threshold for relevance under OEC 401 is low). Because it was, the trial court did not err in admitting the testimony as relevant under OEC 401.

### 3.  *First Amendment*

Defendant relatedly argues that, even if the evidence was relevant and admissible under OEC 401, admitting evidence of his political beliefs violated his free expression rights under the First and Fourteenth Amendments.[47] He relies on *Dawson v. Delaware*, 503 US 159, 167, 112 S Ct 1093, 117 L Ed 2d 309 (1992), in which the Supreme Court held that a trial court had erred in admitting evidence of the defendant's involvement in the Aryan Brotherhood during the penalty phase of a capital trial, when the prosecution had not demonstrated a connection between that evidence and any issue in the penalty phase.[48] In defendant's view, this case provides a more extreme example of a constitutional violation than *Dawson*, because the evidence at issue was offered during the guilt phase to prove defendant's motive to commit the charged crimes, which is not itself an element of those crimes. Defendant further repeats his earlier argument—which we rejected above—that the state did not sufficiently show any connection between the disputed evidence and the charged crimes.

---

[47] The First Amendment to the United States Constitution provides that "Congress shall make no law *** abridging the freedom of speech[.]" It applies to the states through the Due Process Clause of the Fourteenth Amendment. *Presley v. Georgia*, 558 US 209, 211-12, 130 S Ct 721, 175 L Ed 2d 675 (2010).

[48] The victim in *Dawson* had been white, and the murder had been carried out in the course of a robbery that the defendant allegedly committed after escaping from prison. 503 US at 160-61, 166.

Defendant is correct that, in *Dawson*, evidence of "mere abstract beliefs" that a jury might find "morally reprehensible" is not admissible in the penalty phase of a capital case; the beliefs must have some connection to an issue in the proceeding. *Id.* at 167. In so holding, however, the Supreme Court explained that evidence of a defendant's beliefs may be admitted if it is relevant to an issue before the jury. In that regard, the proponent of the disputed evidence must establish a sufficient factual connection between a defendant's beliefs and the circumstances of the crime to make those beliefs probative of some issue in the case. *Id.* Otherwise, the disputed evidence is inadmissible, because it "ha[s] no bearing on the issue being tried." *Id.* at 168; *see also State v. Moore*, 324 Or 396, 419-23, 927 P2d 1073 (1996) (explaining and applying *Dawson* in case involving penalty-phase evidence of defendant's belief in white supremacy; evidence of defendant's specific beliefs and related conduct admissible because probative of future dangerousness, which was at issue).

Unlike in *Dawson*, the state's collective proof in this case showed why defendant's anti-government views and hostile attitude toward law enforcement were relevant to the issues being tried during the guilt phase. In seeking to prove that defendant intentionally committed the charged crimes—which involved building and placing a highly explosive bomb outside a bank, with law enforcement drawn to the scene as a result of a threatening phone call—the state sought to prove that defendant was motivated by his anti-establishment views and his negative attitudes toward law enforcement. Because the disputed evidence was logically connected to, and thus relevant to, an issue at trial, its admission did not violate the First and Fourteenth Amendments. *Dawson*, 503 US at 168.

B.  *Motion for Judgment of Acquittal, Proof of "Intent," "Causation," and "Personally" Elements; Related Jury Instructions (Assignment Nos. 119-137)*

1.  *Additional procedural facts, statutory provisions, and parties' general arguments on review*

At the close of the state's case, defendant moved for judgment of acquittal. As pertinent to the issues that

defendant raises before this court, defendant's motion focused on the sufficiency of the state's evidence to prove that he acted intentionally, as required by the charges of aggravated murder, attempted aggravated murder, assault (counts 1 through 15), and conspiracy to commit aggravated murder (count 18). Defendant also disputed whether the evidence was sufficient to prove that his acts caused the victims' deaths and injuries (all counts except count 18, conspiracy). Finally, defendant argued that the evidence did not show that he "personally" caused the victims' deaths, as required by the aggravated felony murder charges (counts 7 through 10). The trial court denied defendant's motion; later, at the close of all the evidence, defendant made his motion again, and the court again denied it. Defendant now challenges that ruling, renewing his challenges to the sufficiency of the evidence as to intent, causation, and his personal involvement in the charged crimes. Relatedly, he also challenges the trial court's failure to give certain jury instructions that reflected his position on the legal meaning of the intent and causation elements.

The standard by which we review a denial of a motion for judgment of acquittal is a familiar one. In testing whether the record is sufficient to support a jury's verdict, we view the evidence in the light most favorable to the state, drawing all reasonable inferences and credibility choices in the state's favor. *State v. Lupoli*, 348 Or 346, 366, 234 P3d 117 (2010); *Cunningham*, 320 Or at 63. Frequently, however, a defendant's motion for judgment of acquittal also frames threshold disputes over whether some fact is an element of a charged crime or the legal meaning of an element (issues that often are framed as well by the defendant's requested jury instructions). When legal disputes are encompassed in the arguments for and against a motion for judgment of acquittal, we resolve them as we would any other legal question—that is, we determine and announce the correct rules of law that apply. *Cf. State v. Gonzalez-Valenzuela*, 358 Or 451, 456, 365 P3d 116 (2015) (parties' dispute over adequacy of evidence involved disagreement over meaning of statutory terms, which court resolved as legal issue of statutory construction).

Defendant's contentions here involve both the factual adequacy of the evidence, as well as certain legal contentions about the nature of the elements that the state had to prove. We separately analyze, as do the parties, the sufficiency of proof on each of the three elements that were the focus of defendant's motion: intentional mental state, causation, and personal involvement. Before doing so, however, we briefly review the homicide statutes involved.[49]

Under Oregon's Criminal Code, there are four basic levels of homicide offenses. In ascending order in terms of the seriousness of the offense and the severity of the penalty, those levels are criminally negligent homicide (ORS 163.145), manslaughter (first and second degree, ORS 163.118 and ORS 163.125 respectively), murder (ORS 163.115), and aggravated murder (ORS 163.095). Criminal homicide is the "baseline" offense—it provides the foundation on which the other homicide offenses build.

Beginning with that baseline, a person commits criminal homicide when, without justification or excuse, the person "causes" the death of another human being with any of four mental states—intentionally, knowingly, recklessly, or with criminal negligence. ORS 163.005(1). If criminal homicide is committed with criminal negligence, the offense is criminally negligent homicide. ORS 163.145. If it is committed recklessly, the offense elevates to manslaughter in either the first or second degree.[50] If crimi-

---

[49] As we have noted, defendant's motion was directed to the assault and conspiracy as well as aggravated murder counts. On direct review, defendant's brief mentions those counts as well, but his argument focuses almost exclusively on the aggravated murder counts. We likewise focus our discussion on those counts, recognizing that our analysis as to both intent and causation similarly resolves defendant's challenges to the assault and conspiracy charges.

[50] *See* ORS 163.118(1)(a) (criminal homicide constitutes first-degree manslaughter when committed "recklessly under circumstances manifesting extreme indifference to the value of human life"); ORS 163.125 (criminal homicide constitutes second-degree manslaughter when committed "recklessly"). Manslaughter can also be committed with other mental states under limited circumstances not relevant here. *See, e.g.*, ORS 163.118(1)(b) (criminal homicide constitutes second-degree manslaughter when a person intentionally causes or aids another in committing suicide); ORS 163.125(1)(d) (criminal homicide constitutes first-degree manslaughter when a person with criminal negligence operates a motor vehicle while under the influence of intoxicants).

nal homicide is committed intentionally, the offense elevates to murder. ORS 163.115(1)(a) (so-called "intentional murder"). Criminal homicide can elevate to murder in other ways as well, ones that do not require an intentional mental state. As relevant here, a person also commits murder by committing criminal homicide (that is, causing death) in the course of committing, attempting to commit, or during immediate flight from the commission of certain specified felony crimes. ORS 163.115(1)(b) (so-called "felony murder"). Among the felonies that can give rise to felony murder are, again as relevant to this case, first-degree robbery and first-degree criminal mischief by means of an explosive. ORS 163.115(1)(b)(B), (G).[51]

Finally, murder elevates to aggravated murder when a person commits intentional murder under specified circumstances. Those circumstances include three that were the basis for six of the aggravated murder charges in this case: the murder of more than one victim in the same criminal episode, ORS 163.095(1)(d) (counts 1 and 2); the murder of a police officer when related to performance of the officer's official duties in the justice system, ORS

---

[51] ORS 163.115 provides, in part:

"(1) [With exceptions that do not apply here], criminal homicide constitutes murder:

"(a) When it is committed intentionally ***; [or]

"(b) When it is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit any of the following crimes and in the course of and in furtherance of the crime the person is committing or attempting to commit ***, the person, or another participant if there be any, causes the death of a person other than one of the participants:

"*****

"(B) Criminal mischief in the first degree by means of an explosive as defined in ORS 164.365; [or]

"*****

"(G) Robbery in the first degree as defined in ORS 164.415;

"*****."

*See also* ORS 164.055(2)(b) (defining "explosive" as "a chemical compound, mixture or device that is commonly used or intended for the purpose of producing a chemical reaction resulting in a substantially instantaneous release of gas and heat"). The state did not charge defendant with either first-degree criminal mischief or first-degree robbery; instead, it charged defendant with aggravated felony murder under ORS 163.095(2)(d), based on commission of those two underlying felonies.

163.095(2)(a)(A) (counts 3 and 4); and murder committed by means of an explosive, ORS 163.095(2)(c) (counts 5 and 6). Also, as alleged in the four remaining aggravated murder charges in this case (counts 7 through 10), felony murder elevates to aggravated murder (so-called "aggravated felony murder") if the defendant "personally and intentionally committed the homicide" that resulted in the course of the felony. ORS 163.095(2)(d).[52]

Thus, two of the elements that were the focus of defendant's motion for judgment of acquittal—intent and causation—are common to all 10 aggravated murder charges on which defendant was convicted. The third—whether defendant "personally" caused the deaths—is an element in only four of the 10 that alleged aggravated felony murder. Although defendant makes discrete arguments as to each of those proof requirements, his arguments share a common factual theme. For each, defendant emphasizes that the state offered no evidence from which a jury could find that he performed an act that directly triggered the detonation of the bomb. Rather, the evidence established that the bomb detonated as a result of some other force that could not be definitively determined. According to defendant, the evidence most strongly pointed to Trooper Hakim's own

---

[52] ORS 163.095 provides, in part:

"*** '[A]ggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"(1) ***

"*****

"(d) There was more than one murder victim in the same criminal episode as defined in ORS 131.505.

"*****

"(2)(a) The victim was one of the following and the murder was related to the performance of the victim's official duties in the justice system:

"(A) A police officer as defined in ORS 181A.355;

"*****

"(c) The defendant committed murder by means of an explosive as defined in ORS 164.055.

"(d) Notwithstanding ORS 163.115 (1)(b), the defendant personally and intentionally committed the homicide under the circumstances set forth in ORS 163.115 (1)(b).

"*****"

actions in handling the bomb, which defendant asserted below involved negligence or recklessness on Hakim's part. Alternatively, but less likely in defendant's view, in light of the state's evidence at trial, a stray radio signal of some kind may have triggered the bomb's detonation. Either way, however, the important point from defendant's perspective is that the record provides no basis to find that defendant engaged in an act that triggered the bomb to detonate, and the state does not assert otherwise.

Relying on that lack of evidence, and in combination with certain legal arguments as to the nature of the elements that the state had to prove, defendant contends that, as a matter of law, (1) the state established at most that defendant acted recklessly, not intentionally; (2) some superseding factor (such as a stray signal or the victims' own negligence or recklessness) detonated the bomb and that factor, not defendant's conduct, "caused" the victims' deaths; and (3) defendant therefore likewise did not "personally" commit the homicides, as the aggravated felony murder counts required. We take up each of those arguments in turn, together with defendant's related legal arguments about the elements and his proposed jury instructions.

## 2. *Proof of intent, analysis*

As just described, common to all the aggravated murder charges against defendant was the allegation that defendant acted "intentionally" in causing the victims' deaths. In support of his motion for judgment of acquittal, defendant urged that, to satisfy the intent element, the state had to prove that he acted with a conscious objective to kill the "specific people" that he allegedly killed (Captain Tennant and Trooper Hakim). Defendant further maintained that the state's evidence was insufficient for a reasonable jury to find that he "intended to kill *** anyone, let alone a particular human being." Defendant therefore reasoned that, even if the state did not have to prove that defendant had a specific victim in mind and, instead, had to prove only a more general intent to kill, the evidence did not establish even that general intent. Rather, according to defendant, the state's evidence at most permitted the jury to find that defendant had acted with a reckless

mental state, as required for the lesser offense of man-slaughter. Defendant renews those arguments on review to this court.

We begin by examining the mental state of "intentionally" in the context of the homicide statutes. In Oregon, criminal liability generally requires the commission of an act that is combined with a culpable mental state. *State v. Rutley*, 343 Or 368, 373, 171 P3d 361 (2007). For most Oregon criminal offenses, the culpable mental state is either intentionally, knowingly, recklessly, or criminally negligent. *See generally State v. Crosby*, 342 Or 419, 427-28, 154 P3d 97 (2007) (discussing general mental state requirements of Oregon criminal statutes). Each of those mental states is expressly defined by statute. *See* ORS 161.085(7)-(10) (setting out definitions). And each definition requires the mental state to be directed, depending on the definition, towards either conduct, a result, or a circumstance, depending on the elements of the substantive offense involved. *Crosby*, 342 Or at 428. Under the definition of "intentionally," what must be intended is either a result or conduct, as described in the substantive offense:

> "'Intentionally' or 'with intent,' when used with respect to a result or to conduct described by a statute defining an offense, means that a person acts with a conscious objective to cause the result or to engage in the conduct so described."

ORS 161.085(7). The mental state of recklessly, by contrast, attaches to a result or a circumstance described by the substantive offense, but not to conduct:

> "'Recklessly,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists."

ORS 161.085(9).[53] To determine, then, what the mental state element actually requires of the state's proof for any

---

[53] Those definitions apply to Oregon's homicide offenses. *See Crosby*, 342 Or at 429 (applying definition of "recklessly" in ORS 161.085(9) to criminal homicide); *State v. Wille*, 317 Or 487, 494, 858 P2d 128 (1993) (because statutes defining criminal homicide and murder do not separately define "intentionally," general definition in ORS 161.085(7) applies).

particular charge, the starting point is to identify the result, conduct, or circumstance "described" by the statute setting out the elements of the offense. *State v. Simonov*, 358 Or 531, 541, 368 P3d 11 (2016).

For criminal homicide, which (again) is the baseline for murder and aggravated murder, the mental state element "ha[s] as its object 'causing the death'" of another human being. *Crosby*, 342 Or at 433-34; *see also State v. Woodman*, 341 Or 105, 118-19, 138 P3d 1 (2006) (for intentional murder, intent applies to "causing the death" of the victim). Death is a "result" for purposes of the mental state elements. *Crosby*, 342 Or at 430-31. Thus, a person commits criminal homicide "intentionally" if the person acts "with a conscious objective" that his or her actions would result in the death of another human being or otherwise engages in conduct "intended to cause the death of another." *Woodman*, 341 Or at 119. A person commits criminal homicide "recklessly," by contrast, if the person was "aware of and consciously disregard[ed] a substantial and unjustifiable risk of causing * * * death." *Crosby*, 342 Or at 431 (internal quotation marks omitted).[54]

As a threshold matter, we reject defendant's position that the intent required for murder and aggravated murder generally is an intent to cause the death of a specifically identified person. The plain text of the statutes does not support defendant's position. Criminal homicide is committed when, with any of the four accompanying mental states, a person causes the death of "another human being." ORS 163.005(1). The words that the legislature chose do not suggest that a defendant's actions must target a particular, identifiable person. They lead to the exact opposite conclusion—as long as a defendant intends the death of

---

[54] "Death" readily qualifies as a result within the meaning of the various mental state definitions of ORS 161.085, as *Crosby* expressly held, 342 Or at 430-31, and *Woodman* earlier assumed, *see* 341 Or at 119 (intent for homicide requires conscious objective that actions will "result" in death). Whether "causes death" is conduct as well as a result is less clear. The distinction may be of more academic than practical significance, however, at least in this context. *See Crosby*, 342 Or at 434 (in *Woodman*, it made no difference whether "causing death" is result or conduct, so court did not decide that question); *cf.* ORS 131.235 (for purposes of jurisdiction, both death and conduct that causes death is result).

"another" human being, that is enough. The identity of the person does not matter.[55]

In context, that conclusion is all the stronger. Criminal homicide consists of causing the death of "another human being" regardless of the culpable mental state with which it is committed—for example, regardless whether the person acts with criminal negligence or intentionally. If the victim's specific identity is an aspect of the described result, it would be an element for all levels of homicide, not just intentional homicide. That would mean, for example, that a person would commit criminally negligent homicide only if the person failed to be aware of a substantial and unjustifiable risk of causing the death of a specifically identifiable person. *See* ORS 161.085(10) (defining criminal negligence). That added element would eliminate many if not most circumstances in which criminally negligent homicide typically arises. *See, e.g.*, *Lewis*, 352 Or 626 (distracted and inattentive driver of commercial semi-truck, who diverted eyes from road ahead for extended length of time and failed to see truck stopped in turn lane, collided with truck, killing its driver). The same would be true for second-degree manslaughter, which requires a reckless mental state. *See, e.g.*, [State v. Moore/Coen](#), 349 Or 371, 245 P3d 101 (2010), *cert den*, 563 US 996 (2011) (driver, who had prior DUII convictions, guilty of reckless manslaughter where he drove intoxicated and hit another vehicle, killing other driver). And any number of intentionally committed homicides could not be prosecuted as any form of unlawful homicide, let alone as intentional or aggravated murder.[56] Defendant's proposed reading of the statute is simply too strained.

---

[55] Perhaps because the meaning of "another human being" is so straightforward for most purposes, it received little attention when ORS 163.005 was enacted as part of the 1971 Oregon Criminal Code. The Commentary to the code merely explains that a "human being" means "one who has been born and was alive at the time of the criminal act," which was intended to preclude the criminal homicide statute from applying to lawful abortions. Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 87, 84 (July 1970). Nothing in the legislative history suggests that the phrase required proof of a specific victim's identity.

[56] For example, a mass killing in a public venue where the killer has no idea who will be present not only would not be intentional murder, it would not be criminal homicide at all. The same would be true of targeted but random killings, such as when a sniper shoots and kills the driver of a car on the freeway, picking the victim arbitrarily.

We conclude, therefore, that the state satisfies its burden to show that a criminal homicide was intentionally committed if it proves—as the state sought to prove in this case—that the defendant had the conscious objective of causing the death of any or all persons in harm's way. In other words, the intent element common to murder and aggravated murder is satisfied if the defendant intends, in an undifferentiated way, to cause the death of one or more other human beings; the defendant does not have to know the identity of his victims or target them based on identity.[57]

We turn to defendant's remaining argument—that, on this record, the evidence at most supported a finding that defendant acted recklessly, not intentionally. For the "intent" element of the various counts of aggravated murder, the trial court advised the jury that a person acts intentionally if that person "acts with a conscious objective to cause a particular result," which, in the context of the aggravated murder charges, meant that the person "acts with a conscious objective to cause the death of another human being." Defendant did not at trial, and does not on review, take issue with that instruction. Defendant argues only that the evidence that the state produced was inadequate, as a matter of law, to permit a reasonable jury to find that he acted with that conscious objective.

The crux of defendant's challenge to the factual sufficiency of the evidence is that, because the state presented

---

[57] Defendant relatedly argues that the state could not rely on the doctrine of "transferred intent" in this case, urging that the doctrine was abolished with the adoption of Oregon's current homicide statutes. That doctrine arose at common law to address the situation where A engages in conduct intended to kill B, and instead kills C, an "unintended" victim. *See State v. Grayson*, 126 Or 560, 568, 270 P 404 (1928) (explaining doctrine). Defendant similarly argued to the trial court that the doctrine of transferred intent had been abolished under the current homicide statutes, noting that he was raising the point only because he thought that the state might rely on the doctrine to prove its case. The state's theory and proof, however, was not that defendant intended to kill one or more specific individuals, and that the individuals actually killed in the blast were "unintended" or mistaken victims to whom defendant's intent should transfer. Rather, the state's theory and proof were that defendant intended to kill anyone and everyone in harm's way. This case therefore does not present a circumstance in which the transferred intent doctrine traditionally has applied, and so we need not determine whether the doctrine is either a necessary or viable one for the state to pursue in an appropriate case.

no evidence that defendant had performed an act that caused the bomb to detonate, or that he otherwise acted with certainty that it would detonate, the jury could not reasonably infer that defendant—even if it found that he played a role in making and planting the bomb—had the conscious objective of causing anyone's death. Defendant asserts that, cast in the light most favorable to the state, the state proved that defendant had financial problems, made statements to others about wanting to rob a bank, and had previously called in a bomb threat to a bank. On the basis of that evidence, defendant concedes on review that the record contains evidence from which the jury could find that he intended to commit robbery. And defendant further concedes that there was at least some evidence—his purchase of the TracFones and airtime cards, his welding experience and knowledge about explosives, and the threatening call to Wells Fargo Bank at a time when he was near Woodburn—sufficient to show that he committed attempted robbery. But, defendant emphasizes,

> "[t]here was no evidence that defendant directed the explosion in this case: there was no evidence that he lit a fuse; pulled a trigger; ordered someone to pull a trigger; or set up the device in such a way that it would inevitably trigger."

As a result, in defendant's view, the state's evidence and its theory of guilt invited the jury to infer an intent to kill from the fact that defendant, in the course of a robbery attempt, planted a "dangerous weapon" in a public place and then "abandoned" it there, even if it might not inevitably explode. Without evidence that defendant triggered the bomb's detonation or planned for events to play out exactly as they did, defendant insists that the jury could not find that his actions were "consciously directed at causing the explosion and deaths."[58] At most, in defendant's view, the state proved that he acted recklessly by leaving a dangerous instrumentality in a public place, indifferent to the risk that leaving it there posed.

---

[58] Specifically, defendant argues that the state had to demonstrate that "defendant planned on leaving a device at the bank, planned that a bomb technician would respond and incorrectly identify the bomb as a hoax device, planned that the bomb technician or someone would take the device inside a public building, and planned or known with certainty that the device would be triggered by either someone hitting it or a random radio frequency setting it off."

Defendant's argument offers one view of the record that a factfinder could take, but not the only view. The jury was not compelled on this record to conclude that this was an aborted robbery attempt and nothing more—one in which defendant, acting together with Bruce, merely "abandoned" a dangerous bomb in a public place, indifferent to the risk that it posed to human life. Rather, consistently with the state's theory of the case, the jury reasonably could infer from the circumstances as a whole that defendant's "conscious objective" throughout was to cause death, an objective that he achieved.

We have already recited the evidence in detail at the outset of our opinion. But by way of summary, and viewed most favorably to the state, the jury reasonably could have found the following. First and most essentially, defendant, together with Bruce, designed, built, planted, and left the bomb at West Coast Bank. As to the nature of the bomb, it was sophisticated and complex. It contained—in a concealed area—three to five pounds of a dangerous high explosive that was readily capable of causing devastation and death. The explosive was set high in the structure of the bomb, so that, upright on the ground as it was placed outside the bank, the blast would go farther and with more force than if the explosive were directly on the ground. Because the explosive was encased in a metal box—with additional thick pieces of metal and steel inside—on detonation, the metal structure and internal metal and steel would blast apart into ragged fragments that would be violently projected into any nearby person, object, or building. In designing and building the bomb, defendant, together with Bruce, had ensured their own safety while handling it, by installing an external safe-arm switch that first had to be flipped for the bomb to be armed and ready for detonation. In short, by its inherent nature, the bomb was dangerous to handle, even for someone who knew what it was and how it was designed, and the bomb had a single purpose: Massive destruction.

Equally significantly, the evidence permitted the jury to find that the bomb, although designed to be deadly, was also designed to appear to be fake—a hoax device, safe for handling. With its purposefully green-painted exterior

and its purposeful placement among the bushes outside West Coast Bank, visible in the daylight, it could pass as a landscaping or other utility box. It required close examination to determine that it was not something ordinary and harmless. But even on close examination, its critical, deadly components were concealed inside. A battery and wires were visible, but the explosive material was not. Instead, the explosive was hidden in a way that made it appear that there was none.

The jury could further find that, once the bomb was planted outside West Coast Bank, defendant then called Wells Fargo Bank, issuing direct threats and explicit instructions to bank employees, intending to draw law enforcement to both banks. And the jury could infer that responding law enforcement played directly into defendant's hands. That is, defendant, with his distrust and dislike of government, wanted law enforcement officers to do exactly what they did—conclude that the bomb was a hoax and attempt to process it as a nonexplosive device. Meanwhile, though, the safe-arm switch was not protecting them, as the jury could have found that it did while defendant and Bruce handled it. In all, the jury could find from the evidence that defendant had laid a trap for law enforcement officers and others, and had done so successfully.

That was an ample basis on which the jury could reasonably infer that defendant, in planning, building, and planting the bomb, acted with the "conscious objective" of causing the death of one or more other human beings. *See generally State v. Allison*, 325 Or 585, 590 n 5, 941 P2d 1017 (1997) (mental state may—and often must—be inferred from evidence of acts taken and surrounding circumstances); *Rose*, 311 Or at 282 (intent rarely susceptible to direct proof). To be sure, if the evidence had been that defendant had "lit a fuse; pulled a trigger; [or] ordered someone to pull a trigger" that detonated the bomb, the inference that defendant intended to cause death would be all the stronger. But the fact that the state could have had a stronger case—one that might have all but eliminated any competing inference that defendant might want the jury to draw—does not mean that the state's proof was not sufficient to defeat defendant's motion for judgment of acquittal. From the evidence of the bomb's

sophisticated design and construction, together with its strategic, destructive placement and the threatening phone call to the bank, the jury could find that defendant acted with the conscious objective to kill one or many people. And, contrary to defendant's argument, the jury's ability to draw inferences to support that finding did not depend on evidence that defendant had "set up the device in such a way that it would inevitably trigger." A person can act with a conscious objective of causing death without certainty or even likelihood of succeeding. Aggravated murder, for the completed crime, requires only that the defendant act with that intent and in fact succeed. That possibility that success was not guaranteed, or even that it was a long-shot, would not negate the conscious objective with which the defendant acted.

Finally, defendant makes much of the prosecutor's statement in closing argument to the jury that it "doesn't matter" whether defendant or some other force had triggered the bomb's detonation, focusing instead on defendant's acts in building the bomb and planting it in a public place. Relying on a limited excerpt from the prosecutor's closing, defendant urges that the prosecutor invited the jury to find defendant guilty of aggravated murder based merely on defendant having engaged in intentional conduct that "*recklessly resulted*" in a death. (Emphasis in original.)

In testing the evidence for sufficiency, we review the evidence, not the parties' arguments, to determine what facts a reasonable jury could find. Even so, defendant's characterization of the prosecutor's argument does not accurately portray it. The prosecutor emphasized the facts that we have summarized above (along with others, and all in greater detail), told the jury that the trial court would instruct them that "intentionally" requires that a person act "with a conscious objective to cause a particular result," and repeatedly urged the jury to conclude from the circumstances as a whole that defendant and Bruce designed the bomb to kill and to kill more than one person, intended it to explode, and planted it at the bank with the plan and intent to kill. The prosecutor argued to the jury that, for defendant (and Bruce), the explosion was, in their minds, "their big McVeigh moment." The only part of the plan that went awry, he continued, was that the bomb was taken inside the

near-empty bank, where the blast—by being significantly contained—killed and injured far fewer people than defendant (and Bruce) had planned for and intended. In response to defendant's argument to the jury that, because the state had not proved that defendant had detonated the bomb, the jury should not infer that he intended to kill anyone, the prosecutor urged: "You know how you build a bomb you don't want to go off? It's easy. You don't build a real bomb." In short, the prosecutor did not misdirect the jury's consideration of the evidence or urge the jury to convict defendant for having engaged in his actions with reckless indifference to the risk the bomb posed to human life. Instead, the prosecutor, relying on logical inferences from the evidence, urged the jury to infer that defendant and Bruce acted with the conscious objective to cause the death of others.

To summarize, defendant was not entitled to a judgment of acquittal on the theory that the state, to satisfy the "intentionally" element of the various aggravated murder charges, had to prove that defendant intended to kill Captain Tennant and Trooper Hakim specifically, as opposed to intending to kill whomever was in harm's way of their lethal bomb.[59] Neither was defendant entitled to a judgment of acquittal on the theory that, as a matter of law, the evidence supported his guilt only on a theory that he acted recklessly, not intentionally, so that he was guilty of at most manslaughter. The trial court therefore did not err in denying defendant's motion for judgment of acquittal on the ground that the state failed to prove intent under ORS 163.005(1) (criminal homicide), ORS 163.115(1)(a) (murder), and ORS 163.095(2)(d) (aggravated felony murder).

### 3. *Proof of causation, analysis*

Defendant's second ground for his motion for judgment of acquittal was that the state failed to prove that defendant engaged in conduct that had "cause[d]" the death of another, as required for the aggravated murder charges (as well as several of the lesser charges). In support of his

---

[59] Because we reject defendant's legal position in that regard, we likewise conclude that he was not entitled to have the jury instructed that, for purposes of proving all counts in which intent was an element, the "identity of the victim is a material element" and the state was required to "prove that the defendant intended to kill the specific person killed[.]"

motion, defendant argued that the causation element for intentional and aggravated murder requires evidence of both factual and "legal" cause, and the court must decide legal cause based on "policy factors which are relevant to the determination of criminal responsibility." (Internal quotation marks omitted.) Building on that premise, defendant asserted that, even if the jury found that he had planted the bomb outside West Coast Bank, or had aided Bruce in doing so, "that action did not cause any deaths." The deaths did not occur until the bomb detonated, which, according to defendant, was due to law enforcement's "unforeseeable reckless conduct in, first, determining the *** bomb was a 'hoax device,' and then in the unforeseeably reckless manner" in which in the bomb was handled until it detonated. That asserted recklessness, defendant contended, was "independent of the placement of [the] bomb," with the result that defendant's conduct—even if the jury found that he had placed the bomb—was not the "legal" cause of the victims' deaths. Defendant therefore urged that he was not criminally responsible for aggravated murder.

On review to this court, defendant essentially renews the arguments that he made to the trial court. In response, the state takes issue with defendant's premise that the "cause" element of Oregon's homicide statutes encompasses "legal cause" as well as factual cause. In the state's view, defendant incorrectly focuses on only the "final act" when, instead, principles of causation operate to hold him responsible for setting in motion a "chain of events" that was intended to cause and did cause death.

The parties' arguments thus frame two principal questions. The first is whether, to "cause" the death of another human being under the criminal homicide statute, the legislature intended the causal element to encompass the concept of "legal" or "proximate" cause, as well as actual cause (or factual cause or cause-in-fact). The second question arises only if we conclude that the answer to the first is "yes." Then, the question is: What is the test for proximate or legal cause in this context, and did the state's evidence fail to satisfy it as a matter of law, entitling defendant to a judgment of acquittal on most of the charges, including all the aggravated murder charges? After determining the

meaning of "cause" in this context, we then assess whether the state's evidence was legally sufficient to prove that defendant's intentional actions were a cause of the victims' deaths. To provide context for our analysis, we begin with a brief overview of the traditional approach to proof of causation in the law. We then turn to Oregon's homicide statutes and the causation element in particular.

"The law has long considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause [also termed proximate cause]." *Burrage v. U.S.*, 571 US ___, 134 S Ct 881, 887, 187 L Ed 2d 715 (2014) (citing H. Hart & A. Honore, Causation in the Law 104 (1959)).[60] Actual cause is simple cause-in-fact—that is, one thing happened and, because it did, something else happened. To say that a person "caused" harm to another expresses, at least for most purposes in the law, the idea that, "but for" a person's act or conduct, the harm would not have happened:

> "[The "but for" rule of causation] may be stated as follows: The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it."

W. Page Keeton, *Prosser and Keeton on The Law of Torts* § 41, 265-68 (5th ed 1984) (Prosser & Keeton);[61] *accord Joshi v.*

---

[60] *Black's Law Dictionary* 265-66 (10th ed 2014), provides a long list of synonyms for "cause," including "legal cause," which is defined by cross-reference to "proximate cause." The effort to shift the terminology to "legal" cause and away from "proximate" cause was led by the original *Restatement of Torts* and continued through the *Restatement (Second) of Torts*. The *Restatement* has now abandoned both terms in favor of straightforwardly identifying the principles that should limit the "scope of liability" for conduct that causes harm in fact, rather than treating the issue as one of causation at all. *See Restatement (Third) of Torts: Physical and Emotional Harm* § 26 comment a and Reporter's Note comment a (2010) (for 75 years, *Restatement* embraced "legal cause" terminology for traditional concept of "proximate cause," but "legal cause" has not been widely used in practice, and neither term is illuminating).

[61] As Professor Keeton further explains, "but for" as a rule for factual causation is not the only rule that the law applies, because it provides an inadequate test of cause-in-fact in those circumstances in which "two causes concur to bring about an event, and either one of them, operating alone would have been sufficient to cause the identical result[.]" Prosser & Keeton, *Torts* § 41, 266. In that situation, a person's conduct is considered a factual cause of the harm as long as it was "a substantial factor in bringing it about." *Id.*; *see also Joshi v. Providence Health System*, 342 Or 152, 161-62, 149 P3d 1164 (2006) (citing

*Providence Health System*, 342 Or 152, 161, 149 P3d 1164 (2006) (citing passage with approval)*; see also* Wayne R. LaFave, 1 *Substantive Criminal Law* § 6.4(b), 467 (2d ed 2003) (to same effect, in criminal context). Conduct can be a cause-in-fact of harm without being the only cause of harm; it can concur or combine with other factual causes, as well. For example, one person's conduct may occur early in the chain of causation and, depending on the circumstances, may be a "but for" cause by resulting in a series of forces or events that follow to cause the injury, each of which is also a link in the causal chain without which the injury would not have resulted. *See, e.g.*, *Palsgraf v. Long Island R.R. Co.*, 248 NY 339, 162 NE 99 (1928) (railroad employee cause-in-fact of plaintiff's injury by causing passenger to drop fireworks package, which exploded; explosion caused scales some distance away to fall; scales fell on and injured plaintiff).

Legal or proximate cause, in contrast, expresses a policy judgment as to whether conduct that factually caused harm *should* result in liability or responsibility. The idea generally is that some conduct, although an actual cause of harm, nevertheless should not result in liability or responsibility for that harm. "[T]o say that one event was a proximate cause of another means that it was not just any cause, but one with a *sufficient connection* to the result." *Paroline v. U.S.*, ___ US ___, 134 S Ct 1710, 1719, 188 L Ed 2d 714 (2014) (emphasis added). Proximate cause doctrine has been a product of incremental common-law development, with the courts announcing and modifying the appropriate limits of liability over time. And although the doctrine has developed principally in the area of civil tort law and negligence in particular, in theory it extends to the analysis of causation for crimes that require "not merely conduct but also a specified result of conduct." LaFave, 1 *Substantive Criminal Law*

---

statement with approval; observing that, in Oregon, both "but for" and "substantial factor" tests apply). The two tests, in all but rare circumstances, usually lead to the same conclusion. *Joshi*, 342 Or at 162. We do not dwell on the "substantial factor" test, because the circumstances of this case fit those appropriate for a "but for" analysis and defendant does not dispute that the evidence permitted the jury to find that he built and planted the bomb, which as explained later below, satisfies "but for" causation.

§ 6.4 at 464.[62] There, too, the causal connection between the conduct and the result "requires something more than mere coincidence as to time and place," *id.* § 6.4(a) at 466, and requires instead "a *sufficient* causal connection between the defendant's conduct and the result of his conduct," *id.* § 6.4(a) at 467 (emphasis added). Beyond those general observations, however, the concept of proximate cause "defies easy summary." *Paroline*, ___ US at ___, 134 S Ct at 1719. "There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion." Prosser & Keeton, *Torts* § 41 at 263; *see also United States v. Matusiewicz*, No CR 13-83, 2015 WL 9305641 at *2 (D Del Dec 21, 2015) (even though "much ink has been spilled on the topic of proximate cause, the concept remains a convoluted one").

That backdrop brings us to the interpretative issue before us: Did the legislature intend the "causation" element in the criminal homicide statute ("causes the death of another," ORS 163.005(1)), to mean only actual cause (*i.e.*, cause-in-fact)? Or, instead, did the legislature also intend that word to encompass the concept of proximate or legal causation, leaving it to the courts to announce the policy limits on criminal responsibility that will apply? In resolving that interpretative issue, the slate that we write on is not blank. This court's decisions in *State v. Murray*,

---

[62] Long-standing observations by other scholars point out that civil law tort principles of causation are an uneasy fit in the criminal law context, due in part to the different policy objectives of tort and criminal law. *See, e.g.*, Paul K. Ryu, *Causation in Criminal Law*, 106 U Pa L Rev 773, 773, 803 (1958) (discussion of causation has received "scant attention" in area of criminal law, as opposed to civil tort law; in criminal law field, courts have not applied a uniform law of causation, and principles should not necessarily track civil law principles, because the policy objectives of tort and criminal law are not the same); James Angell McLaughlin, *Proximate Cause*, 39 Harv L Rev 149, 151 & n 12 (1925) (proceeding, for purposes of discussing proximate cause doctrine, on "the theory that the same principles of causation obtain in torts and crimes," but declaring that to be "a bold assumption which may be challenged").

One difficulty with extending the common-law doctrine of proximate cause in the criminal law context is that criminal offenses, unlike torts, usually are defined by statute. Thus, the inquiry in the criminal law area is one of legislative intent. Interpreting general causation elements of statutory schemes to encompass "proximate cause" concepts raises its own set of issues. *See* Sandra F. Sperino, *Statutory Proximate Cause*, 88 Notre Dame L Rev 1199, 1232-43 (2013) (discussing range of problems posed by implying proximate cause concepts into statutory terms of general causation).

343 Or 48, 162 P3d 255 (2007), and *State v. Petersen*, 270 Or 166, 526 P2d 1008 (1974), are all but on point. At first blush, however, they suggest different answers. We therefore examine those cases in some detail, starting with *Petersen*.

In *Petersen*, the defendant and a friend agreed to participate in a "drag race" on a public street. Each had a passenger in his vehicle. In the course of the race, the two approached an intersection at high speed. The defendant, who was in the lead, slowed and stopped; his friend did not. As his friend passed the defendant and went through the intersection at high speed, a truck crossing the intersection collided with the friend's car, killing both the friend and the friend's passenger. *Id.* at 167 (describing some factual details and incorporating those set forth in Court of Appeals opinion); *State v. Petersen*, 17 Or App 478, 484-86, 522 P2d 912 (1974) (setting out facts in full). The defendant in *Petersen* was charged with and convicted of second-degree manslaughter by having recklessly "cause[d] the death of another human being." ORS 163.125(1)(a); ORS 163.005(1).

The issue in *Petersen* was whether the defendant was entitled to a judgment of acquittal on the theory that his participation in the drug race was not the "legal cause" of the two deaths. *Petersen*, 17 Or App at 489. On appeal to the Court of Appeals, the defendant drew from civil tort concepts of proximate cause, intervening cause, and foreseeability of harm to argue that his friend's recklessness had been a "supervening cause" of the deaths and, more generally, that his friend's and the passenger's voluntary participation in the reckless activity of drag racing should relieve him of criminal liability for their deaths. *Id.* at 489-90. The majority rejected his position, concluding that the "words of the statutes are inclusive" and provided for "no exception," so that, as long as the defendant's conduct was a cause-in-fact of the deaths (which the majority concluded that it was), criminal liability attached. *Id.* at 490-91.

Chief Judge Schwab dissented. In his view, the concept of "legal causation"—which he described as not an issue of causation at all, but one of criminal responsibility for

conduct that is a factual cause of harm—was proper to consider under the manslaughter statute. *Id*. at 495 (Schwab, C.J., dissenting). And, moreover, legal causation was "ultimately a policy question," one traditionally committed to the courts, that posed the question "whether we are willing to hold a defendant responsible for a prohibited result." *Id*. at 495, 498. On the facts in *Petersen*, Chief Judge Schwab would have declined to hold the defendant criminally liable for the deaths of coparticipants in the high-risk activity of drag racing. *Id*. at 498.

*Petersen* then came to this court on review, and the court resolved the case summarily. It adopted Chief Judge Schwab's dissent "as the opinion of this court," without elaboration. The court merely characterized the dissent as "expressing the opinion that ORS 163.125 should not be interpreted to extend to those cases in which the victim is a knowing and voluntary participant in the course of reckless conduct." *Petersen*, 270 Or at 167-68.

More than 30 years later, in *Murray*, 343 Or 48, this court revisited the meaning of "causes" for purposes of the Criminal Code. *Murray* involved a prosecution for third-degree assault, which had, as an element, "[r]ecklessly causes serious physical injury to another." ORS 163.165. The defendant owned a business that modified cars for racing, and the victim was his employee. The victim voluntarily accompanied the defendant on a "test-drive" of a modified racing car, as he had done in the past. In testing the car, the defendant drove it at more than 90 miles per hour in a residential area with a maximum speed limit of 35 miles per hour. Defendant lost control and crashed, and the victim was severely injured. *Murray*, 343 Or at 50. The issue presented was the same as in *Petersen*: Whether, given the evidence that the victim had been a knowing participant in the reckless activity, the state's evidence failed, as a matter of law, to establish "legal causation" on which to base a conviction. *Murray*, 343 Or at 50-51.

Unlike in *Petersen*, however, this court approached the issue in *Murray* as one of statutory interpretation. Using its interpretative methodology from *PGE*, 317 Or at 610-12,

the court examined the word "cause" in the third-degree assault statute and observed:

> "The word 'cause' is not defined in the criminal statutes. It is, however, a word of common usage, which we presume the legislature intended to be given its plain, natural, and ordinary meaning. *** The dictionary defines the verb 'cause' as follows: '1: to serve as a cause or occasion of: bring into existence: MAKE (careless driving *** accidents) *** 2: to effect by command, authority or force.' *Webster's Third New Int'l Dictionary* 356 (unabridged ed 2002)."

*Murray*, 343 Or at 52. The court further observed that the third-degree assault statute does not express any limit on criminal responsibility based on the victim's role or mental state, or otherwise "carve out an exception for harm done to willing participants in the conduct." *Id*. at 52. From the text of the statute, the court concluded that a person "causes" serious physical injury to another, within the meaning of the third-degree assault statute, if the person "brings about, makes, or effects by force the serious injury of another person with a dangerous weapon, no matter the role of the other person in the reckless conduct." *Id*.

The court in *Murray* did not ignore the holding in *Petersen*. Although *Petersen* had involved a charge under the manslaughter, not the assault, statute, the court viewed *Petersen* as authoritative on the meaning of the word "cause" in the context of a criminal offense that has, as a statutory element, conduct that causes a result described in the statute. *Murray*, 343 Or at 55. And although *Petersen* had been grounded in policy considerations and had not followed anything akin to the later-announced *PGE* approach to statutory interpretation, the court considered itself "bound" to follow *Petersen* as a matter of *stare decisis*, because the legislature had not changed the statute at issue in that case in response to the court's holding. *Murray*, 343 Or at 55.[63] It therefore turned

---

[63] *Murray* appeared to follow what is termed the "rule of prior interpretation," which in its strict form gives unyielding binding force to this court's prior interpretation of a statute, subject only to later revision of the statute by the legislature. *See* Farmers Ins. Co. v. Mowry, 350 Or 686, 695-97, 261 P3d 1 (2011) (discussing rule). In *Farmers*, this court disavowed that rule. *Id.* We now use the

to *Petersen* as context relevant to the meaning of the term "cause." *Murray*, 343 Or at 52.

After describing the facts in *Petersen* and Chief Judge Schwab's dissent, the court in *Murray* sharpened the focus to "what was actually before the court in *Petersen* and what the court actually held there." *Id.* at 55. The court observed:

> "In *Petersen*, the defendant's conduct—even if it was reckless—did not cause the victim's death; the defendant's contribution was limited to participation in the speed contest. The victim was killed when a different person—the driver of the car in which the victim was riding—recklessly chose to speed into a busy intersection."

*Id.* Likewise, the court pointed out, various examples that Chief Judge Schwab had given in his dissenting opinion—in which he similarly would have concluded that there was no "legal causation"—also were not ones "in which a potential defendant, by his or her own conduct other than mere participation in the risky activity, caused a victim's death."[64] *Id.* at 55-56. The court therefore read *Petersen*—based on Chief Judge Schwab's dissent and this court's adoption of it—as standing for only the proposition that "the mere fact that two people both participate in reckless conduct at the same time and place does not mean that one of the participants necessarily brings about, makes, or effects by force a harm to the other participant"; for a defendant's actions to cause that harm "requires something more." *Id.* at 56. What *Petersen* did not hold, the court emphasized, was that someone whose conduct did in fact "bring about, make, or effect by force an injury to or the death of another" could escape criminal liability for that conduct on the basis that the victim voluntarily

---

same prudential *stare decisis* considerations that we use for constitutional and common-law precedents in deciding when to adhere to a prior authoritative interpretation of a statute. *Id.* at 697-98.

[64] As illustrations of the legal limits that he would place on the criminal responsibility of persons who mutually and recklessly participate in a risky activity, Chief Judge Schwab cited a game of Russian roulette where one participant shoots and kills himself; an automobile race at a race track where one racer is involved in a fatal crash; and dangerous recreational activities such as skydiving, deep sea diving, and ocean fishing in inclement weather. *Petersen*, 17 Or App at 496-97 (Schwab, C.J., dissenting).

had placed himself or herself in a position to be injured or killed. *Murray,* 343 Or at 56.

In essence, this court in *Murray* concluded that what was missing in *Petersen* was evidence of actual causation. Mutual participation in a risky activity may mean that the participants' reckless conduct coincides in "time and place" with the harm, but that is not enough to be a cause-in-fact of an injury—that is, conduct that "brings about, makes, or effects by force" that injury. *Id.* Turning to the facts before it, the court in *Murray* observed that "it is undisputed that, in that sense, [the] defendant caused [the victim's] serious physical injuries; he stipulated that he was driving recklessly and that his reckless driving led directly to the crash that injured [the victim]." *Id.* Because the defendant's reckless conduct of driving and crashing the car at 90 miles per hour was a factual cause of the victim's injuries, the defendant was guilty of third-degree assault, regardless of whether the victim's own recklessness was also a cause.

After *Murray,* no room remains to argue that "cause," as used in this statutory context, requires legal or proximate causation, as well as causation-in-fact. In that respect, *Murray* did not mark a departure in the role of proximate or legal cause in Oregon case law, but instead fell into line with both long-standing and evolving precedents.

In Oregon criminal cases specifically, proximate cause doctrine—as a concept distinct from factual causation that limits responsibility for otherwise culpable conduct that is a cause-in-fact of harm—has not played an appreciable role in the analysis of criminal responsibility. In particular, this court has never held that it has the authority or responsibility to invoke common-law proximate cause principles to relieve a defendant of criminal responsibility for culpable conduct that in fact caused harm as proscribed by a criminal statute. Our cases instead suggest the opposite. *See generally [State v. Ramos](),* 358 Or 581, 595, ___ P3d ___ (2016) (legislature determines criminal responsibility based on proscribed conduct and mental state); *State v. Boag,* 154 Or 354, 359-60, 59 P2d 396 (1936) (trial court properly refused to instruct jury that intoxicated driving must be without due care to be "proximate cause" of accident, where conduct

proscribed by statute was act of driving intoxicated, regardless of exercise of due care).[65]

Nor is there any basis to conclude that proximate cause concepts were introduced into the criminal law with the 1971 adoption of Oregon's revised Criminal Code, which enacted the current criminal homicide statutory provisions, including the "causes" wording. The 1971 revised criminal homicide provisions were based principally on those of the Model Penal Code. *See* Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 88, 86 (July 1970) (so stating); *see also* Model Penal Code, §§ 210.1-210.4 (Proposed Official Draft 1962) (setting out homicide offenses). Thus, under both the Model Penal Code and Oregon's 1971 revised code, criminal homicide—the baseline offense for the elevated homicide offenses—is defined as "caus[ing] the death of another human being" with

---

[65] In older criminal cases, this court has sometimes mentioned the term "proximate cause." It has done so most frequently in the context of the former negligent vehicular homicide and homicide manslaughter statutes, which, for a time, expressly referred to "proximate result" and "proximate cause." *See former* ORS 163.090 (1953), *repealed by* Or Laws 1957, ch 396, § 1 (negligent vehicular homicide committed "[w]hen the death of any person ensues within one year as the proximate result of injuries caused" by negligently operating vehicle); *former* ORS 163.040(2) (1953), *repealed by* Or Laws 1971, ch 743, § 432 (manslaughter committed when person "in the commission of any unlawful act, or a lawful act without due caution or circumspection, involuntarily kills another" but not where "the proximate cause of such killing is an act or omission defined as [negligent vehicular homicide]"). Many of those older cases quoted one or the other of those offenses, but involved no issue of the meaning of "proximate" as used in those statutes. *See, e.g.*, *State of Oregon v. Wojahn*, 204 Or 84, 88, 282 P2d 675 (1955) (quoting manslaughter statute). Other cases involved some discussion of "proximate" causation on the facts before the court, either under those or other offenses involving negligent conduct. Those few cases—which appear to have viewed the legislature as having incorporated civil negligence concepts into the statute—uniformly held that a defendant is not relieved of criminal responsibility for negligently inflicted harm as long as the defendant's conduct was a cause of injury, regardless of whether someone else's conduct was a concurrent or contributing cause. *See, e.g.*, *Berry and Walker*, 204 Or at 80-81 (negligent vehicular homicide; defendant criminally responsible even if negligence of another is a concurrent cause); *see also State of Oregon v. Dewey*, 206 Or 496, 539-40, 292 P2d 799 (1956) (Tooze, J., dissenting) (negligent vehicular homicide; "It takes but one negligent act, if it be the proximate cause, to constitute the crime [of negligent vehicular homicide]; but just as it is in civil actions for damages based upon negligence, several acts [of negligence] may be alleged, and the proof of one or more is sufficient."); *State v. Newberg et al.*, 129 Or 564, 573, 278 P 568 (1929) (manslaughter; same principles of law apply as in civil negligence action; fact that negligent act of deceased contributed as cause-in-fact to bring about death "does not defeat the prosecution" or provide defense).

any of several specified mental states. Model Penal Code § 210.1; ORS 163.005(1). Oregon did not, however, adopt a companion section of the Model Penal Code, Section 2.03, which specifically defines when conduct is the "cause" of a result. Under that section, factual "but for" causation is required; the section also limits criminal responsibility based on factors that reflect the types of policy-based considerations traditionally dealt with under the rubric of proximate cause.[66] The drafters of Oregon's revised Criminal Code not only declined to adopt Section 2.03, they included no similar provision either defining the term "cause" or limiting criminal responsibility based on proximate or legal cause types of considerations. Oregon was not alone in making that choice; the majority of jurisdictions that adopted or considered revised codes modeled on the Model Penal Code likewise rejected Section 2.03 and omitted any provision analogous to it. *See* American Law Institute, Model Penal Code and Commentaries, § 2.03, comment 5 at 265 (1985) (describing majority approach).[67]

As importantly, when Oregon's revised Criminal Code was drafted and enacted, this court, in the area of civil tort law, had abolished not only the terms but also the concept, of "proximate" and "legal" cause. *See Lasley v. Combined Transport, Inc.*, 351 Or 1, 6-7, 261 P3d 1215 (2011) (citing cases for proposition).[68] Thus, for decades, "cause" in

[66] *See generally* American Law Institute, Model Penal Code and Commentaries, § 2.03, explanatory note at 254 (1985) (factual causation required, but not itself sufficient; liability for conduct that factually causes result subject to specified additional requirements or limitations); comment 1 at 255 (discussing effort to deal with circumstances "currently dealt with as issues of 'proximate causation'" and that present "enormous difficulty (especially in homicide) because of the obscurity of that concept").

[67] The Commentary to Oregon's 1971 Criminal Code revision does not mention Section 2.03 of the Model Penal Code and provides no insight into why the drafters did not incorporate it.

[68] The demise of the proximate or legal cause doctrine in Oregon traces to Justice O'Connell's lengthy concurrence in *Dewey v. A. F. Klaveness & Co.*, 233 Or 515, 539, 379 P2d 560 (1963), where he observed:

"[T]he law of causation under existing practice is so ill-defined and confused that it offers little or no aid either to the courts or to the juries in the solution of the problems of liability ***. The principal source of confusion is the treatment of causation, both as a *factual* concept, i.e., as to whether defendant's conduct is physically connected with the injury, and as a *liability* concept, i.e., as to whether, under the circumstances, the defendant should be held liable for the injury he caused."

Oregon has been understood to mean factual causation only, not a hybrid of factual and proximate cause:

> "Causation in Oregon law refers to causation in fact, that is to say, whether someone examining the event *without regard to legal consequences* would conclude that the allegedly faulty conduct or condition in fact played a role in its occurrence."

*Sandford v. Chev. Div. Gen. Motors*, 292 Or 590, 606, 642 P2d 624 (1982) (so holding and citing cases; emphasis added). The legislature adopted Oregon's 1971 revised Criminal Code against the backdrop of that general common-law development. Consequently, in interpreting the meaning of the term "cause" for purposes of Oregon's homicide offenses, even if we were to assume that "the legislature intended its legal meaning," rather than common and ordinary meaning, as we did in *Murray*, the meaning would be the same: Cause means cause-in-fact.[69] *See Joshi*, 342 Or at 158 (so holding in civil wrongful death action; statutory element of causing death of another requires only causation in fact).

---

(Emphasis in original.) Justice O'Connell urged that "causation" should be understood to be "a pure question of fact," one that "calls for no judgment as to whether [the] defendant is to be held liable for what he factually caused." *Id.* at 540. The majority of the court was not ready to so quickly make that shift in the court's common law doctrine. *Id.* at 518. But the court called the doctrine into question in a series of cases that followed in the next few years. *See, e.g., Babler Bros. v. Pac. Intermountain*, 244 Or 459, 463, 415 P2d 735 (1966) (describing proximate cause as "an opaque way" of limiting legal consequences for conduct that causes harm, one that sheds little light in difficult cases, and results in courts "hiding the ball"). And the doctrine was dealt its final blow in *Stewart v. Jefferson Plywood Co.*, 255 Or 603, 606-07, 469 P2d 783 (1970) (discarding rubric of proximate or legal cause), one year before the legislature enacted the revised 1971 Oregon Criminal Code.

[69] That conclusion is bolstered by the fact that the legislature knows how to use the term "proximate cause," when that is what it means, and it has done so in a small handful of statutes. *See* ORS 74.4020(2) (bank liable only for damages "proximately caused" by wrongful dishonor of negotiable item); ORS 468A.030 (persons violating air pollution standards not liable for condition "as to which any negligence or willful misconduct on the part of such person was not the proximate cause"); ORS 653.285 (employer liable for breach of statutory duty to reasonably safeguard employee's trade equipment if breach is "proximate cause" of damage to or theft of equipment); ORS 477.993 (violation of specified statutes relating to protection of forests and vegetation from fires punishable as misdemeanor offense if violation "proximately cause[s]" human injury, loss of human life, or property damage of $10,000 or more); *see also former* ORS 163.040(2) (1953) (former manslaughter statute expressly provided that provisions did not apply "where the proximate cause" of death was "an act or omission defined as negligent homicide in [*former*] ORS 163.090 [(1953)].").

Consequently, we adhere to our holding in *Murray*, which in turn clarified the holding in *Petersen* and reaffirmed it as clarified. Under *Murray* and *Petersen*, and consistently with our precedents more generally, the term "cause," when used in a statute that attaches liability or responsibility for conduct that causes a result, means cause-in-fact. It does not also mean the now-discredited—under Oregon law at least—concepts of proximate or legal cause.[70] Rather, the only inquiry to be made by the jury, or by a court testing the evidence for sufficiency to go to the jury, is whether there is evidence from which the conduct alleged could be found to be a factual cause of injury.

As to whether the jury in this case reasonably could find defendant's conduct to have been a cause-in-fact of Captain Tennant's and Trooper Hakim's deaths, defendant did not at trial, and does not on review, argue that the evidence in this case was insufficient as a matter of law. Nor would such an argument have merit. The chain of causation in this case was simple and direct. Viewed in the light most favorable to the state, a reasonable jury could have found that defendant, together with Bruce, designed, built, and planted a highly lethal bomb outside a bank; he then made sure that bank employees would know that they were in danger, so that law enforcement would respond. The trap was thus laid. The bomb exploded; two victims died from the blast; two more were injured, but survived; and one of those survivors suffered permanent disability from his injuries. The test of causation for most circumstances is whether, "but for" the defendant's conduct, the event would not have occurred. *Joshi*, 342 Or at 161 (discussing test; explaining that it fits all but unusual circumstances). Here, had defendant not designed, built, and planted the bomb at the bank, there would have been no explosion, and no one would have died or been injured. The state's evidence of defendant's role in building and planting the bomb, as well as placing the life-threatening call, provided

---

[70] At least some courts have approached the issue based on the fact that their common-law case law continues to view causation as a hybrid concept of both actual and proximate causation. *See, e.g.*, *People v. Schaefer,* 473 Mich 418, 435-36, 703 NW2d 774, 784-85 (2005) (in context of statute criminalizing causing death of another by driving vehicle while intoxicated, legislature presumed to use term "cause" intending unique, technical legal meaning, which includes proximate causation as well as "but for" causation).

an ample basis for the jury to find that defendant's conduct was a cause-in-fact of those devastating results. Defendant's role did not have to be the last link in the chain, or the only one, for the jury to make that determination.

For those reasons, defendant was not entitled to a judgment of acquittal on the aggravated murder counts on the theory that the state was required to prove that his conduct was both a legal as well as factual cause of death. Because the evidence was sufficient to show that defendant's conduct was a cause-in-fact of Captain Tennant's and Trooper Hakim's deaths, the trial court properly denied defendant's motion for judgment of acquittal.

4. *Jury instructions on causation, analysis*

After the trial court denied defendant's motion for judgment of acquittal on the "legal causation" ground, and before the case was submitted to the jury, defendant requested jury instructions that would have directed the jury to resolve the causation element on proximate or legal cause types of theories. Those instructions approached causation ultimately as a relative concept, one that turned on the degree to which defendant's conduct was the factual cause of harm, as compared to any other contributing factor that the jury might determine was also a cause-in-fact of the harm.

To that end, defendant's proposed instructions were a mix of theories and concepts, including concepts of "substantial factor," "superseding cause," "intervening cause," "reckless conduct of a third party," "proximate cause," and the reasonable foreseeability of the result. Several proffered instructions would have told the jury that, to "constitute aggravated murder" or "intentional homicide," or otherwise to find that a death or injury was "intentionally caused" by the defendant, "[t]he burden rests on the state to prove that the defendant's conduct was *the proximate cause* of the death or injuries." (Emphasis added.) One instruction would have advised the jury that it was a "defense to homicide" if the death was caused by an "independent intervening act or omission of the deceased" that defendant "could not reasonably have anticipated as likely to happen." Another, rather than

cast the issue as a defense, would have told the jury that, for aggravated murder specifically, defendant's conduct could not be considered "a proximate cause of the death" if "a proximate cause of the death" was a "new independent intervening act of the deceased" that defendant "should not reasonably have anticipated as likely to happen[.]" Yet other proffered instructions would have directed the jury to find defendant "not guilty" of the charges requiring "intentional conduct" if it found that Trooper Hakim's "reckless conduct" was a "superseding cause" of the explosion and deaths.

Each of defendant's variously worded proposed instructions injected concepts into the assessment of "cause" that did not belong there. As we have concluded, the "causes" element of criminal homicide, which in turn is an element of intentional murder and aggravated murder requires proof of a factual causation only; "proximate cause" is not part of the analysis. Neither does factual causation depend on a comparison of a defendant's causal role with that of the victim or some third party. As *Murray* held, a defendant's conduct "causes" a result if it brings about, makes, or effects by force that result, "no matter the role" of another person and regardless of other person's reckless participation. 343 Or at 52, 56; *see also State v. Newberg et al.*, 129 Or 564, 573-75, 278 P 568 (1929) (for crimes, like torts, third person's concurrent or contributory causal conduct does not relieve defendant of responsibility for causing harm).

The same is true of the concepts of "foreseeability" that defendant's proposed instructions would have injected into the analysis—that is, whether defendant should have reasonably anticipated an intervening cause, such as Trooper Hakim's efforts to dismantle the bomb. As with the proximate cause and comparative cause aspects of defendant's proposed instructions, foreseeability is not a concept of causation. Causation is "an assessment of whether a particular act or omission in fact resulted in the particular harm that a plaintiff suffered—it turns on what *retrospectively did* happen." *Towe v. Sacagawea, Inc.*, 357 Or 74, 87, 347 P3d 766 (2015) (emphasis in original; internal quotation marks omitted). Foreseeability, on the other hand, is "a prediction of the risk that an act or omission will result in a particular kind

of harm—it turns on what *prospectively might* happen." *Id.* (same). The concept of foreseeability has potential relevance to crimes (as well as civil torts) that have recklessness or negligence as a mental state, both of which turn on a prospective risk assessment.[71] But defendant requested his special "causation" instructions only in the context of the charges of *intentionally* committed conduct—intentional aggravated murder in particular. Whatever the propriety of a special instruction on foreseeability for a crime that has recklessness or negligence as a mental state—an issue not before us here—foreseeability has no place in assessing, first, factual causation, and second, responsibility for the *intended* consequences of a defendant's act. *Cf. American Fed. Teachers v. Oregon Taxpayers United*, 345 Or 1, 16-17, 189 P3d 9 (2008) (for ORICO violation, person who intends consequences of act is liable for act, regardless of how remote or attenuated those consequences); *Restatement (Third) of Torts* § 5 ("An actor who intentionally causes physical harm is subject to liability for that harm."), § 33 ("An actor who intentionally causes harm is subject to liability for that harm even if it was unlikely to occur.").[72]

---

[71] *See* ORS 161.085(9) ("recklessly" is being "aware of and consciously disregard[ing]" risk; must be "gross deviation from the standard of care that a reasonable person would observe"); ORS 161.085(10) ("criminal negligence" is failure to be "aware of a substantial and unjustifiable risk"; must be "gross deviation from the standard of care that a reasonable person would observe"); *Stewart*, 255 Or at 609 (liability limited to "foreseeable" consequences of conduct for civil torts given definition of negligence, which assigns fault to conduct only when injury was reasonably likely to occur and therefore should have been anticipated).

[72] The *Restatement (Third) of Torts* § 33 takes the position that "risk" does not provide the appropriate limiting principle on responsibility for an intentional civil tort. Comment a at 562. The Restatement provides an example that serves to illustrate our point here:

"Mike, who suffered from manic depression, was injured while walking through a high-school parking lot by a bomb that exploded. The homemade bomb was placed there by Dick and Anna with the intent that it explode and harm those in the vicinity. A year after he was injured by the bomb, Mike committed suicide. The administrator of Mike's estate sues Dick and Anna within the applicable limitations period. Damages for Mike's death may be found by the factfinder to be within the scope of Dick's and Anna's liability for their intentional conduct. However, before Dick and Anna may be found liable for Mike's death, the factfinder must determine that the injury from the bomb was a factual cause of Mike's suicide."

*Id.* § 33, comment e at 565. The problem posed by that example is one of cause-in-fact only, not one of liability or responsibility for harm intended and actually caused, no matter how unlikely the manner in which the intended harm occurs.

For all those reasons, the trial court properly refused to give defendant's requested special instructions on causation.

### 5. *Proof of personally committing homicide, analysis*

The final prong of defendant's motion for judgment of acquittal took issue, as earlier described, with whether the state's proof satisfied the "personally" element required for aggravated felony murder (counts 7 through 10). As explained earlier, felony murder is committed when a defendant or an accomplice, if any, causes the death of another person in the course of committing certain enumerated felony crimes. ORS 163.115(1)(b).[73] Felony murder is elevated to aggravated felony murder under ORS 163.095(2)(d) by the added element of "personally and intentionally" committing the homicide in the course of committing the felony. As we have discussed, the element of "intentionally" causing death is an element of all 10 aggravated murder charges in this case, including aggravated felony murder. The requirement of "personally" committing the homicide, however, is distinct to aggravated felony murder. Relying again on the lack of evidence that he engaged in an act that triggered the bomb to detonate, defendant argues (as he did in challenging the adequacy of the evidence on intent and causation) that a reasonable jury could not find on this record that defendant's conduct satisfied the element of "personally" causing the deaths.

On that aspect of defendant's argument, the parties do not dispute the applicable law.[74] Both parties rely extensively on this court's decision in *State v. Link*, 346 Or 187, 208 P3d 936 (2009), which considered the meaning of "personally" in the context of aggravated felony murder.

---

[73] ORS 163.115(1)(b) also states that the death may be caused during the attempted commission of a felony or "during the immediate flight therefrom," but those elements are not issue here. Our discussion below accordingly does not mention them.

[74] Unlike the intent and causation elements, defendant did not request any special instruction on the meaning of "personally." The trial court instructed the jury in the words of the aggravated felony murder statute, advising the jury simply that, as an element of the counts charging felony aggravated murder, one of the elements was that the person "personally and intentionally causes" the death of a person in the course of and in furtherance of committing the charged felony.

Because *Link* is central to the parties' arguments and instructive to our analysis here, we begin with our decision in that case.

In *Link*, the defendant and several accomplices planned to steal a car belonging to the victim, who was the mother of one of the accomplices. The defendant told the other accomplices that they would have to kill the victim to prevent her from reporting their theft. The group devised several ways to carry out the murder and then waited for the victim to arrive home. Two accomplices hid inside with broken wine bottles; defendant waited outside. When the victim arrived home and went inside, the accomplices inside struck her several times. She attempted to flee. The defendant, who saw her run out the back door, told the others that she looked "really bad" and one of them needed to shoot her. One of the defendant's accomplices then shot and killed the victim. 346 Or at 190-91.

At issue in *Link* was whether the trial court had erred in denying the defendant's motion for judgment of acquittal, based on the state's purported failure to prove that he "personally" had committed the homicide in the course of committing first-degree robbery, as aggravated felony murder (ORS 163.095(2)(d)) requires. As part of its analysis, the court examined the function of the "personally" requirement in elevating felony murder to "aggravated" murder. Felony murder, the court explained, gives rise to responsibility for a criminal homicide committed in the course of committing an enumerated felony as to a defendant who participated in that felony, "even though the defendant did not participate in the murder, cause the death, or intend that the death occur." 346 Or at 205 (discussing ORS 163.115(1)(b)). If, in the course of participating in the felony, the defendant also plays an intentional role in causing the criminal homicide, then the defendant commits both intentional murder and felony murder. *Id.* at 205 (discussing ORS 163.115(1)(a)).

What elevates the crime to aggravated felony murder is the "even more stringent" requirement that a defendant "personally" as well as intentionally play a causal role in the death of another person. *Id.* at 206 (discussing

ORS 163.095(2)(d)). "The distinction between the crimes is [therefore] the nature of the defendant's participation in the homicide." *Id.*; *see also State v. Cohen*, 289 Or 525, 529-30, 614 P2d 1156 (1980) (demonstrating that "personally" element elevates felony murder to aggravated felony murder).[75] Turning to that "personally" element, the court in *Link* summarized the analysis from an earlier decision, *Nefstad*, 309 Or 523, in which a defendant and a codefendant had been accused of killing a victim by jointly stabbing him. The defendant in *Nefstad* argued that the state had not produced any evidence that he, rather than his codefendant, had inflicted the fatal wound. He therefore urged that, "as a matter of law, stabbing a victim without delivering the death blow[,] or pinioning the victim so that the death blow can be struck, does not constitute personally committing a homicide." 309 Or at 543. This court disagreed, explaining: "To state [that] contention is to refute it. Joining in the stabbing of a dying victim or restraining the victim so that he cannot avoid the fatal knife thrusts constitutes 'personally' committing the homicide." *Id.*; *see also Link*, 346 Or at 207 (summarizing and quoting *Nefstad*).

The court in *Link* understood *Nefstad* to stand for two propositions: First, for aggravated felony murder, the defendant must participate in the murder itself, not just the underlying felony; and second, physically assisting another person in committing the murder—such as by restraining the victim so that the other can deal the fatal blow—is sufficient to satisfy the "personally" requirement. *Link*, 346 Or at 208. This court in *Link* had "no quarrel with either conclusion, but neither answer[ed]" the question that the court faced on the facts before it: "[G]iven that [the] defendant did not perform the act of homicide himself, nor physically act to restrain the victim so that she could not avoid being shot, was his participation in the murder sufficient to establish that he committed the murder personally?" *Id*. The court rejected the state's argument that a defendant "personally" commits the homicide if he or she has an "actual role in causing death." Having an actual role in causing death is

---

[75] In 1981, after this court decided *Cohen*, 289 Or 525, the legislature added to ORS 163.095(2)(d) the additional element—intentionally—that distinguishes aggravated felony murder from felony murder. Or Laws 1981, ch 873, § 1.

required for the lesser crimes of homicide, felony murder, and intentional murder. *Id.* at 208-09.[76]

The court in *Link* therefore explored in greater depth the meaning of the word "personally." As a matter of its common and ordinary meaning, the court concluded that, in the context of aggravated felony murder, "an individual 'personally *** commit[s]' murder when he or she does or performs the act in question, the act of homicide, in a personal manner." *Id.* at 210 (internal quotation marks omitted). In turn, a homicidal act is done or performed in a personal manner if a defendant "performs it in person without the intervention of another," or performs it "direct from [the defendant] to [the victim]," or, simply, performs the act "himself or herself." *Id.* (brackets in original; internal quotation marks omitted).

The court in *Link* also examined the legislative history of the aggravated murder statute generally, ORS 163.095, which the legislature enacted in 1977 as part of House Bill (HB) 2011. That history at one point specifically discussed the "personally" element for aggravated felony murder, with a witness explaining why it had been added:

> "'The insertion of the word "personal[ly]" *** was made to get at the person who deliberately committed murder in the course of a felony but not any of the other individuals who may have participated in the course of the felony. (Whether it be robbery or theft or whatever.) What is meant *** is that the person must have pulled the trigger or used the knife or what have you, himself ***.'"

*Link*, 346 Or at 210 (quoting *Nefstad*, 309 Or at 540 n 8 (quoting Minutes, Senate Judiciary Committee, HB 2011, May 31, 1977, at 3 (statement of Edward Sullivan, chairman of Governor's Task Force on Corrections))).

This court in *Link* ultimately concluded that, "from the structure of the murder statutes, and from the wording and legislative history of the aggravated murder statute," to

---

[76] Our resolution of defendant's "causation" argument in this case confirms that observation. As we have held, to "cause" death means to have an actual role in bringing about the death of another. Thus, to say that someone had an "actual role in causing death" is the same as saying that he or she caused death, which adds nothing to the baseline offense of criminal homicide.

prove aggravated felony murder, "the state must prove that a defendant performed the physical act of homicide himself or herself." 346 Or at 210. The court clarified:

> "That does not mean that the defendant must have acted alone or that the act of homicide need be a solitary physical act, or limited to the final fatal act. As in *Nefstad*, people acting together each may 'personally *** commit[]' the physical act of homicide. And, as in *Nefstad*, it may take a confluence of physical acts to effectuate the act of homicide."

*Id.* at 210-11.

On the record in *Link*, the court concluded that a jury could not find the "personally" element of aggravated murder satisfied. The court reasoned that "the act of homicide was one act—the act of shooting—committed by one person—[the defendant's accomplice]." *Id.* at 211. The defendant had not shot the victim himself and had not been physically present when his accomplice shot the victim. And although the defendant had encouraged and even directed the shooting, the evidence fell short of establishing that the defendant's accomplice was "so completely within [the] defendant's control" as to be the equivalent of "an instrument to accomplish [the] defendant's purpose." *Id.* The court therefore did not decide whether a defendant's control over another person who commits the only homicidal act involved could satisfy the "personally" element. It was enough to conclude that, on the record before it, that circumstance was not presented. *Id.* at 211-12.

In this case, in contending that the state's evidence was not sufficient to prove that he "personally" committed the homicides, defendant emphasizes the lack of evidence that he committed an act that triggered the bomb's detonation or otherwise had the ability to control any other possible triggering event (such as a third party's handling of the bomb or a stray radio signal). Defendant therefore urges that he did not, and legally could not have, "personally" caused the bomb to explode. The state, in response, focuses on the physical acts that a jury could find that defendant did take—including designing, building, and planting the bomb outside the bank. Those actions, in the state's view, were enough to satisfy the "personally"

element, so that the issue was properly submitted to the jury for its resolution.

We agree with the state. This is not a case, as *Link* was, in which there is only "one homicidal act." Instead, the state's evidence showed that the homicidal conduct here was cumulative in nature and composed of sequential acts. The homicidal conduct began with the design and construction of the bomb and continued with its placement outside West Coast Bank, under circumstances in which, the jury reasonably could infer, defendant had armed it and left it in a lethal state, poised to kill as intended. Defendant then took the further step of calling in the threat to Wells Fargo Bank, which drew attention, and law enforcement, to the bomb. This court emphasized in *Link* that, to commit the murder personally, the "act of homicide" need not be "a solitary physical act, or limited to the final fatal act." *Id*. at 210. The "act of homicide" in this case, unlike the act in *Link*, did not consist of the solitary act of one person shooting at and killing another. Instead, it consisted of a sequence of subsidiary, skilled, and purposeful actions required to construct a sophisticated and lethal bomb that, through its appearance as a hoax, served as a trap. It was more akin to the example in *Nefstad*, where one person holds another, while someone else deals the fatal blow. Here, though, the jury could find that, instead of physically holding a victim down, defendant lured the murder victims into dealing with something that, through defendant's own physical conduct, was disguised to look benign when in fact it was armed and deadly. And instead of cooperating with, goading, or commanding an independent accomplice into dealing the fatal blow, as happened in *Link*, defendant, with Bruce, designed the bomb in such a way that any number of other forces could detonate it, rendering someone else his unknowing and innocent agent for what was just the "final fatal act" in the homicidal sequence of actions. 346 Or at 210.

By way of analogy, had defendant and Bruce designed, built, and planted an armed landmine under the ground outside the bank, then called in a bomb threat designed to prompt law enforcement officials or others to inadvertently step on the landmine while looking for a bomb,

we would have no difficulty concluding that, even though the final fatal detonation required someone to step on the bomb, defendant's actions up to that point would satisfy the "personally" element of the aggravated murder statute. So, too, here. The evidence permitted the jury to find that defendant, with Bruce, physically engaged in conduct that was an integral part of the homicidal act, even if defendant did not himself perform the final fatal step of that composite homicidal act.

The state's evidence was therefore sufficient to submit to the jury the question whether defendant "personally" played a causal role in the victims' deaths, as required for the four charges of aggravated felony murder. The trial court did not err in denying defendant's motion for judgment of acquittal on that ground.

C.  *Jury Instructions and Verdict Form, "Acquittal-First" (Assignment Nos. 147-148)*

  1.  *Additional procedural facts and defendant's argument on review*

Defendant next argues that, with respect to the ten aggravated murder charges, as well as the two assault charges, the trial court erred by giving the jury a so-called "acquittal-first" jury instruction based on ORS 136.460(2), which provides:

> "The jury shall first consider the charged offense. Only if the jury finds the defendant not guilty of the charged offense may the jury consider a lesser included offense. If there is more than one lesser included offense, the jury shall consider the lesser included offenses in order of seriousness. The jury may consider a less serious lesser included offense only after finding the defendant not guilty of any more serious lesser included offenses."

On counts 1 through 6 (intentional murder committed under certain aggravating circumstances), the trial court separately advised the jury on each count that the charged crime of aggravated murder had "lesser included offenses of the crimes of manslaughter in the first degree and manslaughter in the second degree," and explained the elements of those offenses. The court then instructed the jury:

"When you deliberate, you should first consider the charged offense of aggravated murder. Only if you find the defendant not guilty of the charged offense, you may consider the lesser included offense of manslaughter in the first degree. Only if you find the defendant not guilty of the lesser included offense of manslaughter in the first degree may you consider the additional lesser included offense of manslaughter in the second degree."

The trial court similarly instructed the jury on counts 7 through 10 (aggravated felony murder) that, as to each count, the charged crime had "a lesser included offense [of] the crime of felony murder" and that, when deliberating, it should first consider the charged offense of aggravated murder and only consider the lesser included offense of felony murder if it found defendant not guilty of the charged offense. The court gave parallel instructions on the two assault charges.[77] After giving the jury those instructions, the court provided a verdict form to the jury that did not require the jury to render any verdict on the lesser-included offenses.

Defendant challenges the constitutionality of ORS 136.460(2), and the trial court's jury instructions based on that statute, under the Eighth and Fourteenth Amendments to the United States Constitution.[78] Relatedly, he contends that the trial court erred by submitting the verdict form that did not require the jury to reach a verdict on the lesser-included offenses. In support of his position, defendant relies on *Beck v. Alabama*, 447 US 625, 100 S Ct 2382, 65 L Ed 2d 392 (1980), in which the Supreme Court held unconstitutional a state statute that precluded jurors in a death penalty case from considering whether a defendant had committed any lesser-included offense.

---

[77] The indictment charged defendant with committing first-degree assault as to Chief Russell and second-degree assault as to Perkett. The trial court instructed the jury, similarly to the instructions set out above, that each assault charge had lesser-included offenses (second- and third-degree assault as to the first-degree assault charge, and third- and fourth-degree assault as to the second-degree assault charge), and that the jury must first consider the charged offense before proceeding to consideration of the lesser-included offenses.

[78] The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Eighth Amendment applies to the states through the Fourteenth Amendment. *Panetti v. Quarterman*, 551 US 930, 934-35, 127 S Ct 2842, 168 L Ed 2d 662 (2007). The Fourteenth Amendment provides, in part, that no state shall "deprive any person of life, liberty, or property, without due process of law."

2.   *Analysis*

As context for our analysis, we begin by examining the Oregon cases that led to the adoption of ORS 136.460, the statute that requires a jury to acquit a defendant on the charged offense before considering any lesser-included offenses. The issue whether an "acquittal-first" instruction should be given to a jury arose in a Court of Appeals case, *State v. Ogden*, 35 Or App 91, 580 P2d 1049 (1978). At that time, no statute directed the order in which a jury was to consider charged and lesser-included offenses. Over the defendant's objection, the trial court in *Ogden* instructed the jury to consider the lesser-included offense only if it reached a verdict of acquittal on the charged offense. *Id.* at 94. The Court of Appeals reversed the trial court, concluding, as a matter of common law, that "it is proper for a court to instruct [the jurors] that they are first to consider the charge in the accusatory instrument and *if they cannot agree upon a verdict* in that charge they are to consider the lesser included offenses." *Id.* at 98 (emphasis added). In other words, the jury did not have to acquit the defendant before considering the lesser-included offenses as the trial court in *Ogden* had instructed; rather, it only had to be unable to reach a verdict on the greater charge.

A uniform jury instruction was later devised based on that ruling, one that this court endorsed in *State v. Allen*, 301 Or 35, 717 P2d 1178 (1986). In doing so, this court acknowledged that, until the Court of Appeals decision in *Ogden*, the alternative "acquittal-first" instruction that the trial court gave in *Ogden* had been "the standard instruction given in this state for over 75 years" and was used in many other state and federal jurisdictions. *Id.* at 38-39. This court viewed that former long-standing instruction as having "inherent problems," however. *Id.* at 39. The court cited studies showing that jurors who initially voted in the minority were more apt to change their votes than majority voters were likely to be persuaded to switch to the minority position. Relying on those studies, the court observed that an "'acquittal first' instruction exacerbates the risk of coerced decisions, a risk that is probably inherent in any jury deliberation." *Id.* at 40. The court concluded that "[t]he [new uniform] instruction and the majority opinion in

*Ogden* set forth a more ordered procedure without creating any coercion." *Id.*

In 1997, the legislature amended ORS 136.460 to its present form, legislatively overruling *Allen* and *Ogden.* Or Laws 1997, ch 511, § 1. *See State v. Zolotoff,* 354 Or 711, 716-17, 320 P3d 561 (2014) (tracing statute's evolution). In effect, "the legislature now requires that jurors follow a procedure—acquittal of the charged offense before consideration of a lesser-included offense—that *Ogden* and *Allen* prohibited." *Id.* at 716.

Defendant challenges the constitutionality of ORS 136.460, asserting that the "acquittal-first" procedure that it now requires violates the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment, for essentially the same reason that the Supreme Court invalidated the statute at issue in *Beck*, which had precluded any consideration of the lesser-included offense. Specifically, defendant asserts that "[t]here is no meaningful difference between failing to instruct a jury that it may consider a lesser-included offense and apprising the jury that a lesser-included offense exists while instructing that jury that it may not consider the lesser-included offense while deciding between guilt and innocence on the capital charge." Contrary to defendant's position, however, there *is* a difference—one of constitutional significance—between the statute that *Beck* invalidated and the Oregon statute that defendant challenges here.

*Beck* involved an Alabama statute that provided that, when a defendant is charged with the capital offense of intentional felony murder, the jury may not be instructed on the lesser-included offense of felony murder. "Instead, the jury is given the choice of either convicting the defendant of the capital crime, in which case it is required to impose the death penalty, or acquitting him, thus allowing him to escape all penalties for his alleged participation in the crime." 447 US at 628-29.[79] The defendant argued, and the

---

[79] The statutory scheme at issue in *Beck* required the jury, if it found the defendant guilty of the capital offense, to impose a sentence of death. However, the trial court could set aside the death penalty after considering mitigating evidence. *Beck*, 447 US at 628-29 & n 3.

Supreme Court ultimately agreed, that "in a case in which the evidence clearly establishes the defendant's guilt of a serious noncapital crime such as felony murder, forcing the jury to choose between conviction on the capital offense and acquittal creates a danger that it will resolve any doubts in favor of conviction." *Id.* at 632.

The Supreme Court began its analysis by noting that, at common law, a jury could find a defendant "guilty of any lesser offense necessarily included in the offense charged." *Id.* at 633. The Court recognized that the common-law rule could "be beneficial to the defendant because it affords the jury a less drastic alternative than the choice between conviction of the offense charged and acquittal." *Id.*; *see also id.* at 634 ("[p]roviding the jury with the 'third option' of convicting on a lesser included offense ensures that the jury will accord the defendant the full benefit of the reasonable-doubt standard[.]"). The Court further noted the near-universality of the requirement in American jurisdictions that lesser-included instructions be given. *Id.* at 635-36. The Court continued:

> "While we have never held that a defendant is entitled to a lesser included offense instruction as a matter of due process, the nearly universal acceptance of the rule in both state and federal courts establishes the value to the defendant of this procedural safeguard. That safeguard would seem to be especially important in a case such as this. For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction."

*Id.* at 637.

Defendant argues that the same concerns as those identified in *Beck*—that is, the coercive pressure on the jury and the risk of an unwarranted conviction—exist when a jury is instructed on a lesser-included offense but told that it must first reach a verdict on the charged offense before considering the lesser-included offense. Just as this court

observed years ago in *Allen*, we agree that an "acquittal-first" instruction exerts some coercive pressure and creates at least some risk of a conviction that the jury would otherwise not reach. *See Allen*, 301 Or at 39-40 (so stating). But we disagree that the problem equates with the one that the Supreme Court addressed in *Beck*. The Alabama statute at issue in *Beck* precluded the jury from considering the lesser-included offense of felony murder. The issue did not involve the order of deliberations and *when* a jury could consider the lesser offense instead of the charged offense; rather, the jury could not consider the lesser offense *at all*. As a result, the jury was forced into an all-or-nothing decision. The jury's only options were to convict the defendant on the charged offense and impose the death penalty, or acquit the defendant in full and release him. In a circumstance where the jury was satisfied from the evidence that the defendant committed *some* serious criminal offense—even if not the charged capital offense—that all-or-nothing choice placed the jury in a particularly difficult position, one that ran a uniquely high risk of skewing the jury's deliberations in favor of guilt on the charged offense.[80] The Court therefore stressed the importance of the "third option"—that is, the opportunity for the jury to consider whether the defendant is guilty of a lesser offense.

An acquittal-first instruction that directs the jury, consistently with ORS 136.460(2), to consider the charged offense first, and then to consider any lesser-included offenses only if it finds the defendant not guilty of the charged offense, does not deprive the jury of consideration of the "third option." Instead, consistently with the statute, the jury remains aware of and fully instructed on the elements of the lesser-included offense when it retires to deliberate. *See Zolotoff*, 354 Or at 717 ("The legislative mandate that the jury consider the applicable offenses in a particular order does not affect or eliminate the underlying legislative directive that, on request, the jury also be instructed on the elements of relevant lesser-included offenses."). In fact, as this

---

[80] The facts in *Beck* starkly illustrated the problem. There, the defendant had made admissions sufficient to satisfy the elements of the lesser-included offense of felony murder. His factual defense disputed only the elements that elevated the crime to a capital offense. *Beck*, 447 US at 629-30.

court recognized in *Zolotoff*, 354 Or at 718, ORS 136.460(2) does not preclude the jury from "contemplating the law as it applies to lesser-included offenses when deliberating about the charged offense." Rather,

> "[t]here may be circumstances in which the elements of the charged crime are clearer when they are viewed in contrast with the elements of a lesser-included offense. So, for instance, an instruction on the elements of a lesser-included offense may disclose a legal distinction that is not otherwise patent and that would be particularly helpful to the jury in deciding whether the defendant is in fact guilty of the charged offense."

*Id.* at 719.

Unlike the jury in *Beck*, the jury in this case was not faced with having to choose between convicting defendant of the charge crimes and acquitting him outright. When the jury in this case retired to deliberate, it had been fully instructed on the elements of all the lesser-included offenses as well as the greater, charged offenses. The acquittal-first instruction, moreover, ensured that the jury knew that the "third option"—the consideration of the lesser-included offenses—would come into play if the jury were not satisfied that the state had proved the charged crimes beyond a reasonable doubt. The instruction directed the order of the jury's deliberations, requiring it to first consider and reach a verdict on the charged crimes before considering the lesser-included offenses. Such an instruction does not carry the coercive force and undue risk of an unwarranted conviction that concerned the Court in *Beck*.

Although we recognize, as in *Allen*, that an acquittal-first instruction places some constraint on how a jury deliberates, that constraint does not rise to the level of a violation of either the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment. The trial court therefore correctly gave the acquittal-first instruction as required by ORS 136.460(2).[81]

---

[81] Defendant also assigns error to the jury verdict form, which set out entries for verdicts on only the charged crimes, but he makes no separate argument about that assignment. For the reasons state above, we conclude that the verdict form—like the acquittal-first instruction—was proper.

D.  *Jury Instruction, Intent as to Aggravating Circumstances (Assignment Nos. 150-151)*

1.  *Additional procedural facts and defendant's argument on review*

In addition to the special instructions discussed earlier in connection with defendant's arguments on intent and causation more generally, defendant also asked the trial court to advise the jury that,

> "[i]n those counts where the state has charged the defendant acted 'intentionally[,]' the state must prove beyond a reasonable doubt that the defendant acted with intent as to every material element of the charged offense."

Defendant argued to the trial court that that proposed instruction was necessary because, to prove aggravated murder as charged in counts 1 through 6, the state had to prove not only that defendant acted with an intent to cause death, but also that defendant acted with intent as to each "material element," including the aggravating factors charged in those counts. As we earlier described, counts 1 and 2 were based on the aggravating factor that there was more than one murder victim in a single criminal episode (ORS 163.095(1)(d)); counts 3 and 4 were based on the aggravating factor that each victim was a police officer and his murder was related to the performance of his official duties in the justice system (ORS 163.095(2)(a)(A)); and counts 5 and 6 were based on the aggravating factor that defendant committed murder by means of an explosive (ORS 163.095(2)(c)). Defendant's position was that the state could not prove those theories of aggravated murder by relying only on evidence that defendant intended to cause death; instead, the state also had to show that defendant intended more than one murder victim to die from the explosion (counts 1 and 2); that he intended to kill police officers in the performance of their official duties (counts 3 and 4); and that he intended an explosive to be the means of death (counts 5 and 6). Defendant's requested instruction, by telling the jury generally that the state must prove intent as to "every material element" of every charged offense, was defendant's way of requiring intent to attach to each aggravating circumstance for all six counts.

The trial court refused to give defendant's proposed instruction. On review, defendant asserts that the trial court's refusal was error, arguing that he was entitled to the instruction for each of the three alleged aggravating factors involved. The state responds in turn, likewise examining each of the three alleged aggravating factors and urging that defendant was not entitled to the instruction as to any of the three.

In our analysis below, we examine whether, for counts 1 and 2, the state was required to prove that defendant acted with the intent to cause the death of more than one murder victim in the same criminal episode. As we will explain, we conclude that the aggravated murder statute did not impose that requirement.[82] Because it did not, our analysis ends there. Defendant's proposed instruction, which was not specific to the different alleged aggravating factors in the six counts, would have been legally incorrect as to counts 1 and 2; the trial court therefore properly did not give the instruction.

2.  *Analysis*

The parties do not dispute the essential legal principles that guide our analysis. ORS 161.095(2) provides:

> "Except as provided in ORS 161.105, a person is not guilty of an offense unless the person acts with a culpable mental state with respect to each material element of the offense that necessarily requires a culpable mental state."

As this court has observed, that statute states the general, but "somewhat circular," rule that a culpable mental state is required for each material element of an offense that "necessarily" requires a culpable mental state. *State v. Rainoldi*, 351 Or 486, 490, 268 P3d 568 (2011). Even if the material element is one that necessarily requires a mental state, however, another statute—ORS 161.105(1)(b)—sets out an exception. Under that statute, "[n]otwithstanding ORS

---

[82] Defendant also makes an unpreserved argument that the trial court's refusal to give his proposed instruction violated principles of due process. We do not consider that unpreserved argument.

161.095," no culpable mental state is required for an element of an offense "defined by a statute outside the Oregon Criminal Code" when the offense "clearly indicates a legislative intent to dispense with any culpable mental state requirement for the offense or for any material element thereof."

We assume, for purposes of analysis, that ORS 163.095, the aggravated murder statute, is outside the Oregon Criminal Code.[83] Thus, to determine whether a mental state attaches to the "more than one murder victim" aggravating circumstance at issue for in counts 1 and 2, we use a two-step analysis. We first ask whether the aggravated murder statute "clearly indicates a legislative intent to dispense" with a mental state requirement as to the aggravating factor that there was "more than one murder victim." ORS 163.095(1)(d). If the answer is no, we then ask whether the "more than one murder victim" aggravating factor is a "material element" that "necessarily requires a culpable mental state." *See Rainoldi*, 351 Or at 491 (synthesizing two-step test from statutes and prior case law). On the first question—whether the legislature intended to dispense with a mental state—four factors guide us: (1) the text of the statute defining the offense, including the overall structure of the law of which it is a part; (2) the nature of the element at issue; (3) the legislative history of the statute that defines the offense at issue; and (4) the purpose of the statute. *Id*. at 492-96. We therefore turn to an examination of those factors. Because those factors lead to the conclusion that no mental state applies, we do not reach the second step of the test explained in *Rainoldi*.

---

[83] In past cases, we have determined whether a statute is within or outside the Oregon Criminal Code based on whether it was enacted as part of the revised Oregon Criminal Code of 1971 or is listed in ORS 161.005, which enumerates the statutes that may be cited as part of the Oregon Criminal Code. *See, e.g.*, *Rainoldi*, 351 Or at 491 (so explaining). The aggravated murder statute, ORS 163.095, was not enacted until 1977, Or Laws 1977, ch 370, § 1, and is not listed in ORS 161.005. The analysis may be more complicated for this offense than for others, however, because aggravated murder—as we have described—incorporates into its definition the offense of murder, which in turn incorporates the offense of criminal homicide, both of which *are* in the Oregon Criminal Code, *see* ORS 161.005 (listing those statutes). We analyze the issue assuming that ORS 161.105(1)(b) applies, however, because it does not, in this case, change our conclusion.

As a starting point, the text and the overall structure of the aggravated murder statute points strongly to a conclusion that the legislature did, in fact, intend to dispense with any mental state as to the enumerated aggravating circumstances generally. ORS 163.095 begins by declaring that "'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances ***." As pertinent here, murder in turn, consists of intentionally causing the death of another. ORS 163.115(1)(a). Textually, then, the aggravated murder statute defines the offense as intentionally causing the death of another when any of several enumerated "circumstances" accompanies the murder.

That much alone is a powerful indication that no culpable mental state applies to the enumerated factors generally, for two reasons. First, the legislature expressly provided for a mental state element—intentionally—and it specifically tied that mental state to the result of causing death, as we have already discussed at length. Unless the legislature similarly tied that or some other culpable mental state to the aggravating factor elements as well (which it did, but not for this one, as we discuss shortly), that alone strongly points to a conclusion, at least as an initial matter, that no mental state attaches to those other elements.

But a second aspect of the text, one that relates to the "nature of the element," leads to the same initial conclusion. When the legislature makes an element an "attendant circumstance" to the commission of an offense, as contrasted with an aspect of the prohibited conduct, the element generally does not require proof of a mental state, unless, of course, the legislature indicates otherwise. *Rainoldi,* 351 Or at 494. For any particular element, to determine which it is—an attendant circumstance or an aspect of the prohibited conduct—this court often must examine the element in the context of the statutory offense. *See, e.g., Rutley*, 343 Or at 376-77 (for offense of knowing delivery of controlled substance within 1,000 feet of school, proximity to school is attendant circumstance, not something that defendant logically must know); *State v. Miller*, 309 Or 362, 366, 788 P2d 974 (1990) (for offense of driving intoxicated, intoxication is attendant circumstance that describes defendant's

intoxicated status; a defendant's mental state has nothing to do with whether that status existed). Here, however, we do not have to read between the legislative lines. The legislature expressly identified the enumerated aggravating factors in ORS 163.095 as "circumstances," ones that "accompany" the intentional murder or "under which" the murder is otherwise committed. That choice of words by the legislature cuts strongly against implying that any culpable mental state applies to that element, especially the mental state of "intentionally." *See* ORS 161.085(7) (defining intent to apply to "result" or "conduct" described in statutory offense, not circumstance).[84]

Our conclusion is bolstered by a closer examination of the particular aggravating circumstance on which counts 1 and 2 were based, especially in the context of the other aggravating circumstances enumerated in the statute. Under ORS 163.095(1)(d), intentional murder is aggravated murder when "[t]here was more than one murder victim in the same criminal episode." The passive form of that sentence itself conveys, not action or conduct, but a circumstance attendant to the criminal episode—the circumstance that more than one person was murdered. And the past tense form of the verb "to be"—in *was* murdered—likewise suggests a state of affairs that existed at the conclusion of the criminal episode, not a state of mind that attached to the defendant's conduct during the episode.

In those respects, the "more than one murder victim" aggravating circumstance stands in stark contrast to certain of the other enumerated circumstances set out

---

[84] Defendant alternatively asserts that the aggravated murder statute is within the Criminal Code; if so, the question under ORS 163.095(2) would be whether the "more than one murder victim" aggravating factor is a "material element" that "necessarily requires a culpable mental state," which is the second of two questions that we ask under *Rainoldi*, 351 Or at 491, and ORS 161.105(1)(b) for cases that are outside the Criminal Code. We would reach the same answer for purposes of an intentional mental state were we to analyze the "more than one murder victim" factor under that test. Because the legislature expressly identified that as a "circumstance" of the crime, by force of the definition of "intent," that mental state would not "necessarily" attach. Thus, as we noted earlier, 359 Or at 500 n 83, our conclusion would be the same even if we assume that aggravated murder is outside the Criminal Code, so that the two-pronged inquiry under *Rainoldi* applies.

in ORS 163.095. For a few, the legislature expressly provided or otherwise conveyed that a culpable mental state attaches to the circumstance. In particular, under ORS 163.095(1)(e), murder is aggravated murder if "[t]he homicide occurred in the course of or as a result of *intentional* maiming or torture of the victim." (Emphasis added.) In ORS 163.095(2)(e), the legislature expressly added a purposeful aspect to another aggravating circumstance: murder is elevated to aggravated murder when the murder was committed "in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime." *See also* ORS 163.095(1)(a) (defendant committed murder pursuant to agreement made in exchange for value), (1)(b) (defendant solicited another to commit murder and paid or agreed to pay value in exchange). At the least, the legislature's choice to specify a mental state or use wording that necessarily incorporates a mental state as to some of the circumstances suggests that the legislature did not view the enumerated circumstances as generally requiring a culpable mental state. That fact, too, cuts against defendant's argument that the legislature intended a culpable mental state to attach to the "more than one murder victim" circumstance, despite the fact that it did not specify any mental state.

Nothing in the legislative history and the overall purpose of the statute leads us to a different conclusion. For the "more than one murder victim" aggravating circumstance, the legislative history is not particularly illuminating. It reveals only that the legislature sought to separately elevate and identify, as an aggravating circumstance, the killing of more than one murder victim during a single "crime spree."[85] Beyond that, the legislative history is significant principally for what it does not show—it does not contain any suggestion that, contrary to the plain import of the text, the legislature intended to require proof that a defendant have the conscious objective to kill more than one

---

[85] Tape Recording, House Committee on Judiciary, HB 3262, July 9, 1981, Tape H-81-JUD-536, Side A (legislative discussion to that general effect, in course of evaluating and drafting various 1981 amendments to aggravated murder statute); Tape Recording, Senate Committee on Justice, Conference Committee, SB 526, Aug 1, 1981, 1:30 p.m., Tape 327, Side A (same).

person during a single crime spree.[86] As defendant emphasizes, the history also shows that the nature and purpose of the aggravated murder statute as a whole was to enhance the potential penalties for particularly heinous murders. *See State v. Maney*, 297 Or 620, 624, 688 P2d 63 (1984) (discussing that purpose in light of legislative history from original 1977 enactment of aggravated murder statute). But that purpose is consistent with our conclusion. Killing two or more murder victims in a single criminal episode is more heinous than killing one, and that is true whether a defendant has, as a conscious objective, the goal of killing multiple people, or whether a defendant, during a single criminal episode, intentionally kills one person and then, as he or she continues the crime spree and encounters additional victims, forms the intent to kill each as he or she encounters them.

For those reasons, we reject defendant's argument that, on counts 1 and 2, which charged aggravated murder under ORS 163.095(1)(d), the state was required to prove that defendant intended to kill more than one murder victim in the same criminal episode. Instead, the state was required to prove only that defendant intentionally caused the death of each victim and that the other victim was murdered as part of the same criminal episode. The trial court instructed the jury, based on the statutory wording, to that effect.[87]

---

[86] Worth noting, in that regard, is that it would have been a natural subject for discussion if the legislature had so intended. A "crime spree" generally connotes a series of sequential and related crimes, often under circumstances that are not entirely predictable. So, for example, a person may set out to commit several burglaries in a single neighborhood at a time of day when he expects the homes to be unoccupied. Instead, he encounters someone in one of the homes and intentionally shoots and kills that occupant. Hearing the shot, a second occupant enters that area of the house, and the burglar shoots and kills that person too, forming the intent to kill each occupant only as he discovers them. That kind of circumstance would seem to be precisely what the legislature *did* have in mind, not what it intended to exclude, at least in the absence of any legislative history to the contrary.

[87] Specifically, on count 1, the trial court instructed the jury that it must find beyond a reasonable doubt that defendant "intended to cause the death of [Captain] Tennant, and [Trooper] Hakim, another human being, was murdered in the same criminal episode." Similarly, on count 2, the trial court instructed the jury that it must find that defendant intended to cause the death of Trooper Hakim, "and [Captain] Tennant, another human being, was murdered in the same criminal episode." Defendant does not challenge the instructions that the trial court gave.

Defendant's proposed instruction, however, would have told the jury that it must find that "defendant acted with intent as to every material element of the charged offense," which, as applied to counts 1 and 2, would have required the jury to find that defendant intended to kill more than one victim as part of the same criminal episode. Consequently, the additional instruction that defendant requested was legally incorrect as to counts 1 and 2.

As explained earlier, in addition to his arguments directed to counts 1 and 2, defendant also argues on review that the trial court erred in not giving his proposed instruction as to counts 3 and 4 (police officer as murder victim, when murder related to performance of official duties), and counts 5 and 6 (murder by means of an explosive). But defendant's proposed instruction did not separately apply to each set of duplicate counts for each victim; instead, it would have applied to all charges requiring proof of intent, including all six counts of aggravated murder based on particular circumstances listed in ORS 163.095. Neither did he propose any instruction that would have specifically told the jury that it had to find that he acted intentionally with respect to each of the particular aggravating factors on which each set of counts was based. Consequently, we do not need to examine either of the other two aggravating circumstances alleged in counts 3 through 6. Because defendant's proposed instruction was not correct as to counts 1 and 2, the trial court correctly declined to give it. *See State v. Simonsen*, 329 Or 288, 297, 986 P2d 566 (1999), *cert den*, 528 US 1090 (2000) (trial court does not err by refusing to give jury instruction that is not correct statement of law).

## IV.   OTHER ASSIGNMENTS OF ERROR

We have considered all the remaining assignments of error raised in defendant's brief on direct review, as well as those raised in defendant's supplemental *pro se* brief. We conclude that those assignments are either without merit, were not preserved and did not present issues involving plain error, or otherwise are resolved by previous cases, such that full discussion of them would not benefit the bench, the bar, or the public. We therefore reject those assignments without further discussion.

## V. CONCLUSION

We reject all assignments of error that defendant raises as to both pretrial rulings and the rulings during the guilt phase of his trial for aggravated murder and other charges. Defendant raises no assignments of error relating to the trial court's imposition of two sentences of death for the murders of Captain Tennant and Trooper Hakim. Accordingly, we affirm the trial court's judgment of conviction and sentences of death.

The judgment of conviction and sentences of death are affirmed.